KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP
Tracy Klestadt (tklestadt@klestadt.com)
Brendan M. Scott (bscott@klestadt.com)
570 Seventh Avenue, 17th Floor
New York, New York 10018
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

*Proposed Attorneys for Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| GEMINI SYSTEMS, LLC, | Case No. 15-10574 |
| Debtor. | |

**AFFIDAVIT OF SIMON LEUNG PURSUANT TO LOCAL**
**BANKRUPTCY RULE 1007-2 IN SUPPORT OF FIRST DAY MOTIONS**

I, Simon Leung, declare, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I am the Chief Executive Officer and sole member of Gemini Systems, LLC (the "Debtor") in the above captioned case (the "Chapter 11 Case") and, in such capacity, I am familiar with the day-to-day operations, business, and financial affairs of the Debtor.

2.      I submit this declaration ("Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of the Chapter 11 Case on the date hereof (the "Petition Date") and in support of the Debtor's petition (the "Petition") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon

my personal knowledge, my discussions with staff members of the Debtor, the Debtor's

professional advisors, my review of relevant documents, or my opinion based upon my

experience, knowledge, and information concerning the Debtor's operations and financial affairs.

If called upon to testify, I would testify to the facts set forth in this Declaration and that I am

authorized to submit this Declaration on behalf of the Debtor.

4.      Section I of this Declaration provides a general overview of the Debtor's business,

organizational structure, capital structure, and the circumstances giving rise to the commencement

of the chapter 11 case. Section II provides a summary of the motions filed by the Debtor on the

Petition Date. Section III lists the schedules of information required by Local Bankruptcy Rule

1007-2.

## I.      OVERVIEW OF THE DEBTOR

### A.      <u>The Debtor</u>

#### i.      <u>Overview of the Debtor's Business</u>

5.      The Debtor is a technology consulting company engaged in the sale, service, and

support of computer software. It specializes in information technology solutions based on IBM

software. The Debtor's suite of services includes information technology optimization, operations

consulting services, and analytics. Founded in 1987 by Simon Leung, its chief executive officer

and sole member, the Debtor is headquartered in leased premises in downtown Manhattan in New

York, New York. The Debtor, an IBM Premier Business Partner, derives the majority (roughly

two-thirds) of its revenues from the resale of IBM software products, with the balance stemming

from information technology-related consulting services.

6.      Since its founding, the Debtor has grown to become a technology-agnostic custom

software developer. The Debtor became an IBM Premier Business Partner in 2001, and an IBM

Software Group reseller in 2003. Since that time, the Debtor's growth has been largely driven by its relationship with IBM.

7.       In addition to its relationship with IBM, the Debtor has also developed key partnerships with Essex Technology Group, Inc. ("Essextec") and Arrow Electronics, Inc., among others. The development of these relationships has allowed the Debtor to broaden its service base, increase the technical skill set of its staff, and provide clients with a wider range of functional solutions.

8.       The Debtor serves a client base that operates principally in the New York City metropolitan area. It develops new business through a sales force of approximately five (5) sales representatives. These sales representatives are paid on a salary and commission basis, with a commission structure of between 3.5 and 5.5 percent of revenue for services and between 9 and 10 percent of gross profit for product sales. Accelerators on these commission percentages are added after various quotas are met.

9.       There is a high degree of competition in the industry; the Debtor competes with numerous suppliers and manufacturers. Many of these competitors have significantly greater financial and operational resources than the Debtor. The Debtor also competes against numerous other IBM business partners. In some instances, the Debtor may find itself bidding against IBM and other IBM business partners on a referral from IBM.

10.      The Debtor considers its main competitive advantages to include its relationship with IBM and its staff's technical expertise, specifically its domain expertise in a core set of IBM technology solutions and software platforms. In addition, the Debtor has built long term relationships with its clients that have yielded repeat business and referrals for new clients. One of

its chief competitive challenges is to grow its technical staff while maintaining the high quality of expertise needed to meet the ever increasing demands of its clients.

      ii.      <u>Relationship with Essextec</u>

11.      Over the years, the Debtor has maintained a services relationship whereby Essextec has used the Debtor as a subcontractor to provide services for certain of Essextec's customers. In these cases the Debtor would bill Essextec, and Essextec would bill their clients at a premium for these services. Essextec would be responsible for payment to Gemini for services provided with approximately net-30 terms.

12.      Over the last year through September 30, 2014, the Debtor's relationship on deals with Essextec was as follows:

- Essextec would partner with the Debtor's sales and sales engineering resources to resell IBM Software products to Essextec clients.

- For most of these transactions Essextec and the Debtor would share profits.

- For rebates associated with these transactions that the Debtor would earn from IBM - Gemini would owe Essextec 50% of these rebates.

13.      This same process was also true for deals done on the Debtor terms account from October 1, 2014 - December 31, 2014 although Essextec did guarantee some of the deals for the Debtor and has been facilitating the transactions through the outsourced finance arrangement between the Debtor and Essextec.

14.      Since the start of 2015, certain transactions done through the Debtor have been placed on Essextec's terms account (and in turn Essextec invoices the client directly on behalf of the Debtor). For shared deals the Debtor sends an invoice for 50% of the profit to Essextec. For deals at the Debtor accounts, the Debtor sends to Essextec an invoice for 100% of the profit.

15. In addition, pursuant to the terms and conditions of that certain Transition Agreement by and between the Debtor and Essextec, dated April 16, 2014, as amended ("Transition Agreement"), and that certain Security Agreement, dated August 20, 2014 between the Debtor and Essextec ("Essextec 2014 Security Agreement"), Essextec agreed to fund the services of certain of the Debtor's employees and provide certain back office services.

16. At times, Essextec has off set amounts owed to the Debtor against amounts that the Debtor owed to it under that certain Transition Agreement.

17. As of the Petition Date, there is no current balance owed by Essextec to the Debtor on account of earned profits.

iii.    Management and Employees

18. The Debtor has approximately fifty-one (51) employees, all of whom are at-will employees. The workforce includes approximately forty-two (42) consultants in the professional services business, with the balance in sales and administration. The workforce includes several consultants, sub-contractors and independent contractors.

19. Key management personnel include Simon Leung, chief executive officer; Evan Herbst, senior vice president and (since 1/28/15) acting Chief Operating Officer; David Luftig, senior vice president and (since 1/28/15) acting Chief Operating Officer; and Michael Bisignani, senior vice president and Chief Technology Officer.

20. The seasoned management team is crucial to the Debtor's success. Should more than one of these key individuals leave the Debtor, management believes that there would be a material adverse impact on the Debtor. In recent years, the Debtor has experienced some employee attrition. Staff recruitment has been difficult in the computer science/computer engineering field. Although ideally the Debtor prefers to hire experienced individuals with 3-4

years of industry experience, the tight supply of qualified workers has led the Debtor to step up its efforts to recruit new college graduates.

### B.        Events Leading Up To The Chapter 11 Filing

21.        A number of factors contributed to the Debtor's decision to commence this Chapter 11 Case. Most significantly, Debtor was unable to find a source of additional capital to fund its ongoing business. The Debtor lost a number of revenue-generating consultants through attrition whom they were unable to replace, causing significant reductions in consulting services revenue. While consulting services revenue was declining, the software reselling business was growing, but not to an extent that would make up for the declines in the consulting services business. The Debtor invested in an attempt to develop and commercialize certain software products, but was not successful.

22.        The Debtor was also unable to sufficiently reduce general and administrative costs, causing debt to keep accumulating. In April 2014, the Debtor lost access to an established line of credit offered by American Express. Furthermore, in January 2015, due to unpaid credit terms account, the Debtor's sole distributor for product resale refused to process any additional transactions with the Debtor.

23.        In March 2013, the Debtor began conversations with Essextec about a potential merger or sale of the Debtor's assets. A letter of intent was signed in July 2013. However, subsequently, certain tax liens were asserted against the Debtor by the Internal Revenue Service and the New York State Department of Taxation and Finance. As a result, Essextec's interest in the purchase of the Debtor's assets under the contemplated sale structure cooled significantly. Later, when it was anticipated that the Debtor might have an opportunity to resolve the tax liens

through negotiations with the taxing authorities, the Debtor and Essextec publically announced

plans to merge consummate the sale of the Debtor's assets to Essextec in January 2014.

Unfortunately, the Debtor has been unable to resolve the tax liens and as a result, the company

has been unable to locate a source, other than Essextec, to funds its operations during the current

downturn in business. With available funds all but exhausted, the Debtor finds itself in need of the

protections afforded by the Bankruptcy Code.

### C.     Reorganization of the Debtor

24.     Following the commencement of this case, the Debtor anticipates pursuing the sale

of substantially all of its assets pursuant to Section 363 of the Bankruptcy Code. The Debtor will

also attempt to negotiate a reduction in the amount owed to its tax creditors and anticipates

preparing and filing a plan of reorganization.

### II.    SUMMARY OF FIRST DAY MOTIONS[1]

25.     Concurrent with the filing of the Petition, the Debtor filed the First Day Motions

listed below, which I believe are necessary to enable the Debtor's business to operate with a

minimum of disruption and loss of productivity. The Debtor intends to seek entry of orders

approving each of the First Day Motions as soon as possible in accordance with the Bankruptcy

Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local

Bankruptcy Rules.

#### i.     Debtor in Possession Financing and Cash Collateral Motion

26.     By this motion (the "DIP Financing Motion"), the Debtor requests entry of interim

and final orders: (a) authorizing the Debtor to borrow up to $500,000 from Essextec, (b) granting

to Essextec a super-priority administrative claim in relation to the amount of funds loaned to the

---

[1]     All capitalized terms not defined in the following summary shall have the meanings ascribed to them in the motions discussed herein.

Debtor through the debtor in possession credit facility, (c) authorizing the Debtor's use of cash collateral on an interim basis (d) granting certain adequate protection to the Secured Creditors in connection with the use of cash collateral and any diminution in the value of the Secured Creditors' interest in the Prepetition Collateral, and (e) prescribing the form and manner of notice and setting the time for the Final Hearing.

27.     The Debtor has an immediate need for additional capital and use of Cash Collateral, including cash proceeds, to pay its ordinary business expenses, including, without limitation, payments to post-petition vendors, employee salaries, payroll, taxes and similar costs, and the payment of other costs and expenses of administering this Case. All of these requirements for use of cash must be met to preserve and maintain the Debtor's going-concern value and, ultimately, the ability to reorganize successfully for the benefit of all parties in interest.

28.     Without ability to borrow funds in accordance with the terms of the DIP credit facility, and use such funds in accordance with the Budget, the Debtor would suffer immediate and irreparable harm by being forced to shut down its businesses, lay off employees and cease operations to the vast detriment of the Debtor, its estates and the stakeholders therein.

29.     I have reviewed the DIP Financing Motion and believe that the facts stated therein are accurate to the best of my knowledge, information and belief. I further believe that the relief requested in the DIP Financing Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the DIP Financing Motion should be granted.

ii.       Sale and Bidding Procedures Motion

30.      By this Motion, the Debtor requests entry of an order Pursuant to Sections 105(A),

363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006: (A)(i)

Establishing Bidding Procedures and Bid Protections in Connection with the Sale of Certain of

the Assets of the Debtor, (ii) Approving the Form and Manner of Notices, (iii) Approving the

Asset Purchase Agreement Subject to Higher and Better Offers and (iv) Setting a Sale Hearing

Date; and (B)(i) Approving the Sale of Certain Assets of the Debtor Free and Clear of Liens,

Claims and Encumbrances, (ii) Authorizing the Assumption and Assignment of Certain

Unexpired Leases and Executory Contracts.

31.      I have reviewed the Sale and Bidding Procedures Motion and believe that the facts

stated therein are accurate to the best of my knowledge, information and belief. I further believe

that the relief requested in the Sale and Bidding Procedures Motion is in the best interests of the

Debtor's estate, its creditors, and all other parties in interest. Accordingly, on behalf of the

Debtor, I respectfully submit that the Sale and Bidding Procedures Motion should be granted.

iii.       Cash Management Motion.

32.      The guidelines established by the Office of the United States Trustee for the

Southern District of New York (the "U.S. Trustee") require debtors in possession to take certain

actions regarding prepetition bank accounts, including, among others, closing all existing bank

accounts, opening of new accounts and the immediate printing of new checks with a "Debtor in

Possession" designation on them.

33.      By this motion (the "Cash Management Motion"), the Debtor seeks entry of

interim and final orders (i) approving the use of two of its existing bank accounts (the "Existing

Bank Accounts") and (ii) authorizing the continued use of existing business forms.

34.     The Debtor manages its cash receipts, transfers, and disbursements and records such collections, transfers and disbursements through the Existing Bank Accounts. The Debtor utilizes a number of methods for disbursing and receiving funds, including: (a) debit; (b) wire transfer; and (c) written check. The Debtor has collected receivables and maintained payroll accounts and operating accounts through the Existing Bank Accounts for an extended period of time. The Debtor believes that any confusion or disruption in the continuity of these pre-existing procedures would severely hamper the Debtor's ability to operate its business and marshal its assets in the most efficient manner available. This type of disruption would create adverse economic and operational consequences which would negatively affect the Debtor's ability to maximize value for its creditors.

35.     The Existing Bank Accounts are maintained at JP Morgan Chase Bank, N.A. and Citibank, N.A., which are both financial institutions insured by the Federal Deposit Insurance Corporation (the "FDIC").

36.     I have reviewed the Cash Management Motion and believe that the facts stated therein are accurate to the best of my knowledge, information and belief. I further believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estates, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be granted.

iv.     Employee Wage Motion.

37.     In the Employee Wage Motion, the Debtor seeks entry of an order (a) authorizing, but not requiring, it to pay or cause to be paid, in its sole discretion, all or a portion of the amounts owing (and associated costs) under or related to Wages, the Withholding Obligations, the

Reimbursement Obligations, the Health and Welfare Plan Obligations in accordance with the terms of the Budget, and (b) authorizing applicable banks and other financial institutions to receive, process, and pay any and all checks drawn on the Debtor's payroll and general disbursement accounts and automatic payroll and other transfers to the extent that those checks or transfers relate to any of the foregoing (all capitalized terms as defined in the Employee Wage Motion).

38.     If the requested relief is not granted, the Debtor's relationship with its employees would be adversely impacted and there could well be irreparable harm to the employees' morale, dedication, confidence, and cooperation. The Debtor's business hinges on its relationship with its customers, and the ability to provide superior services is vital. The employees' support for the Debtor's efforts is critical to the success of these Chapter 11 cases. At this early stage, the Debtor simply cannot risk the substantial damage to its business that would result from any decline in its employees' morale attributable to the Debtor's failure to pay wages, salaries, benefits, and other similar items.

39.     I believe that the relief requested in the Employee Wage Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Employee Wage Motion should be Approved.

v.      <u>Information Required by Local Bankruptcy Rule 1007-2</u>

40.     Local Bankruptcy Rule 1007-2 requires certain information related to the Debtor, which is set forth below.

41.     To the Debtor's knowledge, no prepetition committee of creditors has been organized.

42.     In accordance with Local Bankruptcy Rule 1007-2(a)(4), Schedule 1 hereto is a list of the names, addresses, and, where available, telephone numbers of the creditors holding the twenty (20) largest unsecured claims (excluding insiders) against the Debtor. Such list includes the amount of the claim, the nature of the claim and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed, or partially secured, subject, however, to the reservations of rights stated on Schedule 1 regarding, among other things, the actual validity of any such claims.

43.     In accordance with Local Bankruptcy Rule 1007-2(a)(5), Schedule 2 hereto is a list of the names, addresses, and, where available, telephone numbers of the creditors holding the five (5) largest secured claims against the Debtor. Such list includes the amount of the claim, the nature of the claim and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed, or partially secured, subject, however, to the reservations of rights stated on Schedule 2 regarding, among other things, the actual validity of any such claim.

44.     In accordance with Local Bankruptcy Rule 1007-2(a)(6), Schedule 3 hereto provides a summary of the Debtor's assets and liabilities.

45.     In accordance with Local Bankruptcy Rule 1007-2(a)(7), I am the sole member of the Debtor and there are no securities of the Debtor that are publicly held.

46.     In accordance with Local Bankruptcy Rule 1007-2(a)(8), as of the Petition Date, none of the Debtor's property will be in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

47.     In accordance with Local Bankruptcy Rule 1007-2(a)(9), Schedule 4 hereto is a list of all of the leased premises from which the Debtor operates its business. The Debtor does not own any real property or operate from any other premises under other arrangement.

48.     In accordance with Local Bankruptcy Rule 1007-2(a)(10), the Debtor's substantial assets are located in New York, New York. Its books and records are located in New York, New York and it does not hold any assets outside the territorial limits of the United States.

49.     In accordance with Local Bankruptcy Rule 1007-2(a)(11), the Debtor is not involved in any action or proceeding threatened or pending, where a judgment against the Debtor or seizure of its property is imminent. However, the New York State Department of Taxation and Finance is currently conducting a sales tax audit of the Debtor's business.

50.     In accordance with Local Bankruptcy Rule 1007-2(a)(12), Schedule 5 hereto is a list of the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

51.     The Debtor intends to continue to operate as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

52.     In accordance with Local Bankruptcy Rule 1007-2(b)(1) and (b)(2), Schedule 6 hereto is the estimated amount of the (i) semi-monthly payroll to employees of the Debtor (exclusive of officers, directors, stockholders and partners) for the 30-day period following the filing of the chapter 11 petition, and (ii) the amount paid and proposed to be paid to officers,

stockholders, financial and business consultants for the 30-day period following the commencement of these Chapter 11 Cases.

53.     In accordance with Local Bankruptcy Rule 1007-2(b)(3), Schedule 7 hereto contains the estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the commencement of these Chapter 11 Cases.

Dated: New York, New York
        March 10, 2015

By: _____

Name: Simon Lueng
Title: Chief Executive Officer

_____
Notary Public

BRENDAN M SCOTT
NOTARY PUBLIC, STATE OF NEW YORK
LIC. # 02SC6311438
MY COMMISSION EXPIRES 9/15/18

12

**SCHEDULE 1**

## <u>LARGEST UNSECURED CLAIMS HOLDERS</u>

1.      Pursuant to Local Rule 1007-2(a)(4), the following provides information with respect to the holders of unsecured claims against the Debtor.

2.      The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtor. The Debtor reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts as of March 11, 2015.

3.      Following is the list of the Debtor's creditors holding unsecured claims:

B4 (Official Form 4) (12/07)

# United States Bankruptcy Court
## Southern District of New York

IN RE:                                                    Case No. _____

**Gemini Systems, LLC**                                   Chapter **11**
_____
Debtor(s)

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [or chapter 9] case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

| (1)<br>Name of creditor and complete mailing address including zip code | (2)<br>Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | (3)<br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br>Indicate if claim is contingent, unliquidated, disputed or subject to setoff | (5)<br>Amount of claim (if secured also state value of security) |
|---|---|---|---|---|
| **Arrow Enterprise Computing Solutions Inc**<br>**13219 Collections Center Drive**<br>**Chicago, IL  60693** | | | | **1,187,595.43** |
| **American Express**<br>**200 Vesey Street**<br>**New York, NY  10285** | | | **Contingent**<br>**Unliquidated**<br>**Disputed** | **786,346.21** |
| **RXR 61 Broadway Owner, LLC**<br>**RXR Realty**<br>**104 Broad Street**<br>**New York, NY  10004** | | | | **283,292.80** |
| **Patricia Sirabella**<br>**348 Ross Avenue**<br>**Staten Island, NY  10306** | | | | **186,000.00** |
| **Schlam Stone & Dolan LLP**<br>**26 Broadway**<br>**New York, NY  10004** | | | | **139,010.17** |
| **American Express**<br>**200 Vesey Street**<br>**New York, NY  10285** | | | **Contingent**<br>**Unliquidated**<br>**Disputed** | **85,027.43** |
| **Simon P. Leung**<br>**1676 Bard Lane**<br>**East Meadow, NY  11554** | | | | **72,875.20** |
| **Shulklapper Associates LLP**<br>**545 Fifth Avenue, Suite 640**<br>**New York, NY  10017** | | | | **71,067.00** |
| **American Express**<br>**200 Vesey Street**<br>**New York, NY  10285** | | | **Contingent**<br>**Unliquidated**<br>**Disputed** | **63,158.84** |
| **Susan Chen**<br>**1676 Bard Lane**<br>**East Meadow, NY  11554** | | | | **60,000.00** |
| **DataBP**<br>**61 Broadway**<br>**New York, NY  10006** | | | | **56,449.00** |
| **Elephant Bytes**<br>**Harborside Financial Center**<br>**2500 Plaza South**<br>**Jersey City, NJ  07311** | | | | **53,120.00** |
| **Empire HealhChoice Assurance Inc**<br>**1 Liberty Plaza, 165 Broadway**<br>**New York, NY  10006** | | | | **50,019.39** |

© 1993-2013 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

| | |
|---|---:|
| **T. Leung**<br>**1676 Bard Lane**<br>**East Meadow, NY  11554** | **50,000.00** |
| **Xenetta Systems, LLC**<br>**229 Correja Avenue**<br>**Iselin, NJ  08830** | **40,057.50** |
| **Astrosoft Technologies LLC**<br>**9301 Southwest Freeway, Suite 405**<br>**Houston, TX  77074** | **36,150.00** |
| **N. Leung**<br>**1676 Bard Lane**<br>**East Meadow, NY  11554** | **35,000.00** |
| **Inov-Soft Inc.**<br>**Attn: Satish Anthony**<br>**310 Hawthorn Road**<br>**North Brunswick, NJ  08902** | **29,200.00** |
| **Gregory Reisert** | **27,132.67** |
| **Claire Yacubovich**<br>**146 Willow Grove Drive**<br>**Lincroft, NJ  07738** | **25,000.00** |
| **Internal Revenue Service**<br>**1 Clinton Avenue**<br>**Albany, NY  12207** | **Contingent**<br>**Unliquidated**<br>**Disputed**     **0.00** |

### DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF A CORPORATION OR PARTNERSHIP

I, [the president *or* other officer *or* an authorized agent of the corporation][*or* a member *or* an authorized agent of the partnership] named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date: **March 11, 2015**          Signature: ***/s/ Simon P. Leung***

**Simon P. Leung, Chief Executive Officer**

(Print Name and Title)

© 1993-2013 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

## SCHEDULE 2

## LARGEST SECURED CLAIMS HOLDERS

1.  Pursuant to Local Rule 1007-2(a)(4), the following provides information with respect to the holders of largest secured claims against the Debtor.

2.  The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtor. The Debtor reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts as of March 11, 2015.

3.  Following is the list of the Debtor's creditors holding secured claims:

| Name of Creditor | Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if secured also state value of security) |
|---|---|---|---|---|
| Internal Revenue Service | 1 Clinton Avenue, Albany, NY 12207 | Tax Lien | Unliquidated, Disputed | 1,085,876.34 |
| Citbank, N.A. | 3950 Regent Boulevard, S2B-262, Irving, TX 75063 | Bank Loan | | 750,000 |
| Essex Technology Group, Inc. | 201 W. Passaic Street, #303 Rochelle Park, NJ 07662 | Loans | Disputed | 749,654.86 |
| New York State Department of Taxation & Finance | P.O. Box 5300 Albany, NY 12205-0300 | Tax Lien | Unliquidated, Disputed | 56,663.48 |
| New York City Department of Finance | c/o Corporation Counsel 100 Church Street New York, NY 10007 | Tax Lien | Disputed | 868.21 |

**SCHEDULE 3**

**SUMMARY OF DEBTOR' ASSETS AND LIABILITIES**

Pursuant to Local Rule 1007-2(a)(6), the following financial data (unaudited and subject to change) is the latest available information and reflects Debtor's financial condition, as of March 11, 2015 The following financial data shall not constitute an admission of liability by the Debtor. The Debtor reserves all rights to assert that any debt or claim included herein is a contingent, unliquidated or disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

Total Assets (Book Value):   $1,575,389.27

Total Liabilities:                $6,496,645.49

18

**SCHEDULE 4**

Pursuant to Local Rule 1007-4(a)(x), the following chart lists the premises owned, leased, or held under other arrangement from which the Debtor operates its businesses:

| Property Address | Type of Interest |
|---|---|
| 61 Broadway, Suite 915, New York, New York 10006 | Lease |

# SCHEDULE 5

Pursuant to Local Rule 1007-4(a)(xiii), the following is a list of the names of the Debtor's existing senior management.

| Name | Position |
|------|----------|
| **Simon P. Leung** | **Chief Executive Officer** |
| **Paul Frolov** | **Vice President** |
| **Evan Herbst** | **Senior VP and Co-COO** |
| **Arthur Homewood** | **Vice President , Controller** |
| **David Luftig** | **Senior VP and Co-COO** |
| **Harry Mousmoules** | **Vice President** |
| **Maureen Noble** | **Assistant Vice President** |
| **Patricia Sirabella** | **Senior Vice President** |
| **Claire Yacubovich** | **Senior Vice President** |

**SCHEDULE 6**

**POST-COMMENCEMENT DATE PAYMENTS**

 Pursuant to Local Rules 1007-2(b)(1) and 1007-2(b)(2), the following provides the estimated amount of weekly payroll to the Debtor's employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtor, for the 30-day period following the filing of the chapter 11 petition.

Payments to Employees:     $168,831.97

Payments to Officers, Stockholders, Directors
and/or Financial and Business Consultants  $434,110.41

**SCHEDULE 7**

**POST-COMMENCEMENT DATE ESTIMATED OBLIGATIONS AND RECEIVABLES**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees of the Debtor.

SEE ATTACHED BUDGET

**Gemini Short-term Cash Flow**
**Weekly**

| Week ending | 13-Mar | 20-Mar | 27-Mar | 3-Apr | 10-Apr | 17-Apr | 24-Apr | 1-May | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts:** | | | | | | | | | |
| Services Accounts Rec | $- | $ 72,488 | $ 467,700 | $ 71,786 | $ 134,919 | $ 29,800 | $ 443,275 | $ 87,657 | $ 1,307,625 |
| Aged Past Due Services  Receivables | | | | | $ 100,000 | | | | $ 100,000 |
| IBM Rebates | $ 106,111 | | $ 177,300 | | | $ 2,600 | | | $ 286,011 |
| Subcontracted Services due from ETG | | | | $ 9,000 | | | | $ 9,000 | $ 18,000 |
| #REF! | | | | | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 80,000 |
| Other | | | | | | | | | $ - |
| **Total** | $ 106,111 | $ 72,488 | $ 645,000 | $ 80,786 | $ 254,919 | $ 52,400 | $ 463,275 | $ 116,657 | $ 1,791,636 |
| | | | | | | | | | $ - |
| **Cash Disbursements:** | | | | | | | | | $ - |
| Payroll: | | | | | | | | | $ - |
| Net | $ 154,491 | | $ 196,991 | | $ 144,491 | | $ 211,991 | | $ 707,962 |
| Tax | $ 90,371 | | $ 110,271 | | $ 84,371 | | $ 117,671 | | $ 402,686 |
| 401 K (Employee) | $ 22,000 | $ 20,000 | | $ 24,000 | | $ 20,000 | | $ 24,000 | $ 110,000 |
| NYSIF Catchup | $ 2,901 | | | | | | | | $ 2,901 |
| NYSIF | $ 2,900 | | $ 2,901 | | $ 2,900 | | | $ 2,901 | $ 11,602 |
| Transit check catchup | $ 4,939 | | | | | | | | $ 4,939 |
| Transit check | | $ 3,753 | | | $ 3,753 | | $ 3,753 | | $ 11,259 |
| Health Insurance Catchup | | $ 50,019 | | | | | | | $ 50,019 |
| Health Insurance | | | | $ 45,000 | | | | $ 45,000 | $ 90,000 |
| Dental Insurance Catchup | $ 3,809 | | | | | | | | $ 3,809 |
| Dental Insurance | | | $ 4,400 | | $ 3,800 | | $ 4,400 | | $ 12,600 |
| Sub-contractors | | | $ 68,000 | | | | $ 68,000 | | $ 136,000 |
| Foreign Subcontractors | | | $ 12,972 | $ 5,500 | | $ 7,000 | $ 13,000 | | $ 38,472 |
| DataBP | | | | $ 22,022 | | | | $ 22,022 | $ 44,044 |
| Insurance | $ 2,321 | $ 1,014 | | | | $ 10,174 | | | $ 13,509 |
| Rent-NYC | | $ 33,600 | | | | | $ 48,000 | | $ 81,600 |
| Employee Expense reimbursements | | | | $ 5,000 | | | $ 5,000 | | $ 10,000 |
| Deal Partner Payments | | | | $ 110,000 | | | | | $ 110,000 |
| Telecommunications | | $ 1,936 | $ 6,403 | | | | | $ 8,217 | $ 16,556 |
| Equipment Leases | | $ 6,046 | | | | $ 5,449 | | | $ 11,495 |
| Bank Fees | | | $ 700 | | | | $ 700 | | $ 1,400 |
| ADP Fees | $ 1,950 | | | | $ 1,950 | | | | $ 3,900 |
| 401k service | $ 455 | | | $ 455 | | | | $ 455 | $ 1,365 |
| Employee MERP | $ 2,400 | | $ 2,400 | | | | $ 2,400 | | $ 7,200 |
| Employee Car Expense | $ 2,310 | | $ 2,010 | | | | $ 1,710 | | $ 6,031 |
| ETG Backoffice Fees | | $ 11,200 | | | | | $ 16,000 | | $ 27,200 |
| ETG Subcontractors | | $ 21,000 | | | $ 21,000 | $ 21,000 | | | $ 63,000 |
| Restructuring Prof Fees | | | | $ 55,000 | | | | $ 55,000 | $ 110,000 |
| GS Tax Accountant | | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 7,000 |
| Miscellaneous | $ - | $ 4,700 | $ - | $ - | $ - | $ 4,700 | $ - | $ - | $ 9,400 |
| **Total** | $ 290,847 | $ 143,068 | $ 534,248 | $ 173,977 | $ 242,265 | $ 69,323 | $ 493,625 | $ 158,595 | $ 2,105,949 |
| **Net Cash Flow** | $ (184,736) | $ (70,580) | $ 110,752 | $ (93,191) | $ 12,654 | $ (16,923) | $ (30,350) | $ (41,938) | $ (314,313) |
| **Beginning Cash** | $ 10,000 | $ (174,736) | $ (245,316) | $ (134,564) | $ (227,755) | $ (215,101) | $ (232,024) | $ (262,375) | |
| **Ending Cash( Essex Funding)** | $ (174,736) | $ (245,316) | $ (134,564) | $ (227,755) | $ (215,101) | $ (232,024) | $ (262,375) | $ (304,313) | |
| **Beginning ETG Loan Balance (Prior + Dip)** | $ (167,000) | $ (341,736) | $ (412,316) | $ (301,564) | $ (394,755) | $ (382,101) | $ (399,024) | $ (429,375) | |
| **Ending ETF Loan Balance (Prior + DIP)** | $ (341,736) | $ (412,316) | $ (301,564) | $ (394,755) | $ (382,101) | $ (399,024) | $ (429,375) | $ (471,313) | |