KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP
Tracy L. Klestadt
Brendan M. Scott
570 Seventh Avenue, 17th Floor
New York, NY 10018
Tel. (212) 972-3000
Fax. (212) 972-2245

*Proposed Counsel for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GEMINI SYSTEMS, LLC, | : | Case No.  15-10574 |
| | : | |
| Debtor. | : | |

**EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR (I) TO OBTAIN POST-PETITION FINANCING AND TO GRANT SUPERPRIORITY LIENS AND CLAIMS PURSUANT TO 11 U.S.C. § 364(c) AND (d); (II) TO UTILIZE CASH COLLATERAL AND GRANT ADEQUATE PROTECTION TO PREPETITION SECURED CREDITORS; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c); AND (V) GRANTING RELATED RELIEF**

TO:    THE HONORABLE _____,
         UNITED STATES BANKRUPTCY JUDGE:

Gemini Systems, LLC, (the "Debtor")[1], as debtors and debtors in possession, hereby

move (the "Motion") pursuant to sections 105, 361, 362, 363 and 364 of Title 11 of the United

States Code (as amended, the "Bankruptcy Code"), Rules 4001(b) and 9014 of the Federal Rules

---

[1] The Debtor's Federal Employer Identification Number is 11-2855787.

of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 4001-3, seek: (i) the entry of an emergency order, substantially in the form attached hereto as **Exhibit A.**

<b><u>JURISDICTION</u></b>

1.       This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 9014.

<b><u>BACKGROUND</u></b>

<b><u>The Bankruptcy Cases</u></b>

2.       On March 11, 2015 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code commencing the instant bankruptcy cases (the "Bankruptcy Cases").

3.       The Debtor continues to operate its business and manage its respective properties as a debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Bankruptcy Case.  As of the date of this Motion, the United States Trustee has not yet appointed an official committee of unsecured creditors in the Bankruptcy Case.

4.       The Court and interested parties are respectfully referred to the Affidavit of Simon Lueng Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions, dated March 10, 2015 (the "Rule 1007 Affidavit") for a background on the Debtor, its operation, and the events leading to the filing of the Bankruptcy Case.

2

## The Prepetition Secured Creditors

**A.    Prepetition Secured Lenders**

i.    <u>Citibank, N.A.</u>

5.    Pursuant to the terms of certain Credit Approval Letter, dated January 13, 2012, Citibank agreed to open a secured line of credit in the amount of $750,000 for the Debtor.

6.    To secure the obligations to Citibank, the Debtor granted to Citibank liens and security interests (the "<u>Prepetition Citibank Liens</u>") in substantially all of the Debtor's assets ("<u>Citibank Prepetition Collateral</u>").

ii.    <u>Internal Revenue Service</u>

7.    The Internal Revenue Service ("<u>IRS</u>") has asserted certain liens against the Debtor in aggregate amount of $1,085,876.34 in relation to unpaid employment taxes.  As a result, the IRS holds a security interest ("<u>Prepetition IRS Liens</u>") in substantially all of the Debtor's assets ("<u>IRS Prepetition Collateral</u>").

iii.    <u>New York State Department of Taxation and Finance</u>

8.    The New York State Department of Taxation and Finance ("<u>NYS Tax and Finance</u>") has asserted certain liens against the Debtor in aggregate amount of $56,663.48 in relation to unpaid employment taxes.  As a result, NYS Tax and Finance holds a security interest ("<u>Prepetition NYS Tax and Finance Liens</u>") in substantially all of the Debtor's assets ("<u>NYS Tax and Finance Prepetition Collateral</u>").

iv.    <u>Essex Technology Group, Inc.</u>

9.    Pursuant to the terms and condition of that certain Transition Agreement by and between the Debtor and Essex Technology Group, Inc. ("<u>Essextec</u>", and together with Citibank, IRS and NYS Tax and Finance, the "<u>Prepetition Secured Creditors</u>"), dated April 16, 2014, as

3

amended ("Transition Agreement"), and that certain Security Agreement, dated August 20, 2014

between the Debtor and Essextec ("Essextec 2014 Security Agreement"), Essextec agreed to

fund the services of certain of the Debtor's employees, provide certain back office services, and

advance Gemini moneys to fund expenses related to permanent residency (green card)

applications and H-IB temporary work visas for certain employees.

10.    Pursuant to the terms and condition of that certain Amendment to Transition

Agreement by and between the Debtor and Essex Technology Group, Inc. ("Essextec"), dated

March 6, 2015 ("Amended Transition Agreement"), Essextex agreed to increase the lending cap

set forth in the Transition Agreement and made additional advances to the Debtor.

11.    Pursuant to certain Promissory Notes, dated as of March 6, 2015, and March 10,

2015 and that certain Security Agreement, dated March 6, 2015, as amended on March 10, 2015,

between the Debtor and Essextec ("Essextec 2015 Security Agreement") Essextec agreed to loan

additional funds to the Debtor to be used to fund attorney retainers for the Debtor's Prepetition

professionals and to fund certain operating costs.

12.    To secure the obligations to Essextec, the Debtor granted to Essextec liens and

security interests (the "Essextec Prepetition Liens") in substantially all of the Debtor assets,

including but not limited to accounts, chattel paper, intellectual property, fixtures, inventory, and

contract rights, including proceeds and products of all of the foregoing (the "Essextec Prepetition

Collateral", and together with the Citibank IRS and NYS Tax and Finance , the "Prepetition

Collateral"). Certain of the Prepetition Collateral constitutes cash collateral (the "Cash

Collateral") within the meaning of section 363(a) of the Bankruptcy Code.

13.    As of the Petition Date, Essextec had made advances totaling approximately

$700,000, which had not been repaid by the Debtor.

## RELIEF REQUESTED

14.     By this Motion, the Debtor respectfully requests, pursuant to sections 105, 361,
362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the entry of
interim and final orders, inter alia: authorizing Debtor (i) to obtain post-petition financing and to
grant superpriority liens and claims pursuant to 11 U.S.C. § 364(c) and (d); (ii) to utilize cash
collateral and grant adequate protection to Prepetition Secured Creditors; (iii) modifying the
automatic stay; and (iv) scheduling a final hearing pursuant to bankruptcy rules 4001(b) and (c);]

### The Post-Petition Loan

15.     By this Motion, the Debtor is seeking authorization to obtain $500,000 in post-
petition financing from Essextec, pursuant to the terms of a certain Secured Debtor in Possession
Credit Agreement, dated March 11, 1015 ("DIP Credit Agreement"), a copy of which is annexed
hereto as **Exhibit B**, the primary purpose of which is to fund payroll and other operating
expenses, as set forth in the proposed Budget, which is annexed hereto as **Exhibit C**, through the
anticipated closing of substantially all of the Debtor's assets. The Debtor believes that timely
payment of payroll and other operating expenses is crucial to maintaining the value of the
Debtor's business as a going concern.   The Debtor submits that the post-petition financing will
give the Debtor the best opportunity to continue operations, which will inure to the benefit of the
Debtor, its creditors and its estate.

16.     The principal terms for the proposed post-petition financing are as follows:[2]

| Borrowers: | The Debtor |
|---|---|

---

[2]  This summary is qualified in its entirety by the actual terms of the Post-Petition Loan Documents.

| | |
|---|---|
| **Lender:** | Essextec |
| **Loan Amount:** | $500,000, plus Essextec's interest, fees and expenses.  Upon the entry of the Interim Financing Order, but prior to the entry of the Final Financing Order, the Debtor will be authorized to obtain financing, pursuant to the terms of the Interim Financing Order and the Post-Petition Loan Documents, equal to $500,000 (the "<u>Interim Advance</u>"). |
| **Maturity Date:** | the first to occur of (i) June 1, 2015,  (ii) the effective date of a confirmed Chapter 11 plan, (iii) on the closing date of a sale of substantially all of Borrower's assets, (iv) the date of conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, (v) the dismissal of the Chapter 11 Case, (vi) approval of the Bankruptcy Court of any debtor in possession financing for the Borrower other than hereunder, and (f) the date on which the Lender accelerates the Term Loans pursuant to **Error! Reference source not found.** |
| **Funding Dates:** | The Debtor shall be funded with Interim Advance after entry of the Interim Financing Order and will receive the remaining portion of the DIP Loan after entry of the Final Financing Order, in each case, in accordance with the Budget and the terms and conditions of the DIP Credit Agreement. |
| **Use of Proceeds:** | The Debtor will use the proceeds of the Post-Petition Loan solely to fund expenses set forth in the annexed Budget. |
| **Reimbursement of Lender's Professionals:** | The Debtor will pay all reasonable and actual fees and expenses of Essextec's professionals in connection with the Post-Petition Loan. |
| **Interest Rate:** | The interest rate applicable to the Post-Petition Loan shall be 7.5% |
| **Security and Priorities:** | Subject to the Carve Out (as defined below), the Prepetition Secured Creditors will receive a valid and perfected first-priority lien on all now owned and hereafter acquired Collateral (as defined in the DIP Loan and Security Agreement), in all of the Debtor's assets, including, without limitation, accessions, accounts receivable, books and records, chattel paper, commercial tort claims, consignments, contract rights, deposit accounts, equipment, general intangibles, goods, instruments, inventory and all other assets and the proceeds and products of all of the foregoing (the "<u>Collateral</u>"), except the Collateral shall not include avoidance and similar actions and claims of the Debtor arising under sections 502(d), 544, 545, 547, 548, 549, 550, and 551 of the Bankruptcy Code and any |

6

| | |
|---|---|
| | proceeds thereof. |
| **Superpriority Claims:** | Subject to the Carveout (as defined below), pursuant to section 364(c) of the Bankruptcy Code and the Financing Orders, all obligations of the Debtor under the Post-Petition Loan Documents at all times shall constitute allowed super-priority administrative expense claims in the Bankruptcy Case having priority over all administrative expenses of the kind specified in section 503(b) or section 507(b) of the Bankruptcy Code, subject only to the Carve-Out. |
| **Carve-Out:** | (i) allowed and unpaid professional fees and disbursements (reduced by the amount of retainers held by the professionals retained by the Borrower in connection with the Chapter 11 Case) incurred by Borrower in the amount of $85,000 and any statutory committee in the amount of $15,000 ("Professional Expense Cap"); (ii) UST Fees;  and (iii) $15,000 for the benefit of a Chapter 7 Trustee should one be appointed provided, that so long as neither the Maturity Date nor an Event of Default has occurred and is continuing, Borrower shall be permitted to pay compensation and reimburse allowed professional expenses and UST Fees as the same are due and payable in an amount not to exceed those set forth in the Budget and such payments shall not reduce the amount of the Carve-Out.  During the continuance of an Event of Default or a default under this Agreement, the Interim Order, or the Final Order, as the case may be, any payments actually made to such professionals during such continuance shall reduce the Professional Expense Cap on a dollar-for-dollar basis. |
| **Affirmative and Negative Covenants:** | Compliance with Laws, Etc.  Comply, in all material respects, with all Requirements of Law.

Payment of Taxes, Etc.  Except as are being challenged in good faith and by proper proceedings by the applicable Person and for which adequate reserves in accordance with GAAP have been established on the books and records of such Person(s), pay and discharge, before the same shall become delinquent, (i) all taxes, assessments and governmental charges or levies imposed upon it or upon its property and (ii) all lawful claims (other than claims in respect of Debt) that, if unpaid, could reasonably be expected by law to become a Lien upon its property.

Maintenance of Insurance.   Maintain insurance (including, without limitation, business interruption) with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which Borrower operates.

Preservation of Corporate Existence, Etc.  Except with the prior written consent of the Lender, preserve and maintain, its existence, legal structure, legal name, rights (charter and statutory), permits, licenses, approvals, privileges and franchises. |

<u>Visitation Rights</u>.  At any time during normal business hours, (i) permit representatives of the Lender (including legal and financial advisers, auditors, appraisers, and any other consultants engaged from time to time at the direction of the Lender) to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, Borrower to discuss the affairs, finances and accounts of Borrower with any of its officers or directors and with its independent certified public accountants and (ii) permit field examinations to be conducted at any reasonable time by the Lender or a field auditor satisfactory to the Lender, in respect of the accounts receivable of the Borrower.

<u>Keeping of Books</u>.   Keep proper books of record and account in conformity with GAAP and all Requirements of Law, in which full and correct entries (in all material respects) shall be made of all financial transactions and the assets and business of Borrower in accordance with generally accepted accounting principles in effect from time to time.

<u>Maintenance of Properties, Etc</u>.  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties that are necessary in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

<u>Transactions with Affiliates</u>.  Conduct all transactions otherwise permitted under the Loan Documents on terms that are fair and reasonable and no less favorable to Borrower than it would obtain in a comparable arm's length transaction with a Person not an Affiliate and in connection therewith shall not enter into any agreement requiring payments in breach of the foregoing, *provided* that the foregoing shall not apply to customary fees to, and indemnifications of, non-officer directors of the Borrower in compliance with the Budget (subject to the proviso in **Error! Reference source not found.**).

<u>Further Assurances</u>.  (i)  Promptly upon request by the Lender, correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Loan Document.

(ii)  Promptly upon request by the Lender, do, execute, acknowledge, deliver acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as the Lender   may reasonably require Compliance with Laws, Etc.  Comply, in all material respects, with all Requirements of Law.

<u>Due Diligence</u>.  Use its best efforts to provide all due diligence materials requested by the Lender or its legal and financial advisors (including due diligence materials with respect to any proposed asset sales and any severance obligations of Borrower or any of its Subsidiaries  to any employees or former employees); *provided*, *however*, to the extent the Borrower is prevented from providing the materials required by this 0 due

8

to confidentiality restrictions to which it is bound, the Borrower shall use commercially reasonable efforts to remove any such restriction.

<u>Use of Proceeds</u>.  Use the proceeds of the Term Loans only in accordance with the Budget and in compliance with **Error! Reference source not found.**.

<u>Liens, Etc</u>.  Create, incur, assume or suffer to exist any Lien on or with respect to any of its properties of any character whether now owned or hereafter acquired, or sign or file or suffer to exist, under the UCC (or similar law) of any jurisdiction, a financing statement that names Borrower as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, except those exception set forth in the DIP Credit Agreement

<u>Debt</u>.  Create, incur, assume or suffer to exist, any Debt, except the exceptions set forth in the DIP Credit Agreement

<u>Change in Nature of Business</u>.  Make, or permit any of its Subsidiaries to make, any material change in the nature of its business as carried on at the date hereof.

<u>Mergers, Etc</u>.  Merge into or consolidate with any Person or permit any Person to merge into it.

<u>Sales, Etc. of Assets</u>.  Sell, lease, transfer or otherwise dispose of any assets, or grant any option or other right to purchase, lease or otherwise acquire any assets, except for the exceptions set forth in the DIP Credit Agreement.

<u>Investments in Other Persons</u>.  Make or hold any Investment in any Person, except the exceptions set forth in the DIP Credit Agreement:

<u>Restricted Payments</u>.  Declare or pay any dividends, purchase, redeem, retire, defease or otherwise acquire for value any of its Equity Interests now or hereafter outstanding, return any capital to its stockholders, partners or members (or the equivalent Persons thereof) in their capacities as such, make any distribution of assets, Equity Interests, obligations or securities to its stockholders, partners or members (or the equivalent Persons thereof) in their capacities as such, or permit any of its Subsidiaries to do any of the foregoing, to purchase, redeem, retire, defease or otherwise acquire for value any Equity Interests in Borrower.

<u>Amendments of Constitutive Documents</u>.  Amend its certificate of formation or operating agreement or other constitutive documents.

<u>Accounting Changes</u>.  Make or permit any change in (i) accounting policies or reporting practices, except as required or permitted by

generally accepted accounting principles, or (ii) its fiscal year.

<u>Prepayments, Etc., of Debt</u>.   Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Debt, except the prepayment of the Term Loans in accordance with the terms of this Agreement.

<u>Negative Pledge</u>.   Enter into or suffer to exist, or permit any of its Subsidiaries to enter into or suffer to exist, any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets except (i) agreements in favor of the Lender or (ii) prohibitions or conditions under (A) any purchase money Debt permitted by **Error! Reference source not found.** solely to the extent that the agreement or instrument governing such Debt prohibits a Lien on the property acquired with the proceeds of such Debt or (B) any Capitalized Lease permitted by **Error! Reference source not found.** solely to the extent that such Capitalized Lease prohibits or requires the consent of any Person other than the Borrower and its Affiliates as a condition to the creation of a Lien on the property subject thereto.

<u>Speculative Transactions</u>.   Engage in any transaction involving commodity options or futures contracts or any similar speculative transactions.

<u>ERISA</u>.   Maintain, sponsor, participate in or contribute to any Plan or Multiemployer Plan; or incur any material liability under Title I or Title IV of ERISA for which Borrower could be reasonably expected to be liable.

<u>Material Amendments</u>.   Make any material amendment to any agreements with any senior employee or any other material employee or independent contractor unless the Borrower reasonably determines that such amendment results in cash savings or improved liquidity for the Borrower and is reflected in the Budget or to which the Lender has agreed in writing.

<u>Prepetition Indebtedness</u>.   (i) Modify, supplement or amend the Prepetition Loan Documents in any material respect or (ii) pay or discharge, or cause to be paid or discharged, any Debt of Borrower incurred before the Petition Date.

<u>Chapter 11 Case</u>.   Seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to the Orders; (ii) a priority claim for any administrative expense or unsecured claim against Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in Section 503(b) or 507(b) of the Bankruptcy Code or, from and after the entry of the Final Order, Section 506(c) of the Bankruptcy Code) equal to or superior to the priority claim of the Lender in respect to the Obligations of the Borrower hereunder other than the Carve-Out and the Permitted Liens that are expressly permitted to be equal to or superior to the priority claim of the Lender in respect to the Obligations of the Borrower hereunder; and

| | |
|---|---|
| | (iii) any Lien on any Collateral having a priority equal or superior to the Liens in favor of the Lender in respect of the Obligations of the Borrower hereunder other than the Carve-Out and the Permitted Liens. |
| **Conditions Precedent:** | Customary for credit facilities of this nature, including the delivery of certain documents to Essextec. |
| **Section 506(c):** | It shall be considered an Event of Default under the DIP Documents if any claims under section 506(c) of the Bankruptcy Code are allowed against the Essextec. |
| **Modification of the Automatic Stay:** | Subject solely to any requirement of the giving of notice by the terms of the Interim Order or the Final Order, the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court, and the Essextec, upon three business days' written notice to the Debtors, shall be entitled to exercise all of their respective rights and remedies under the Post-Petition Loan Documents, including all rights and remedies with respect to the Collateral. |
| **Events of Default:** | Each of the following events shall be an "Event of Default" under the Post-Petition Loan Agreement: The failure by Borrower to pay on the Maturity Date any principal, interest or other charge or amount required to be paid under the Loan Documents; The failure to cure the violation of any covenant (other than pursuant to clause (a) above) within 10 Business Days after receiving written notice from Lender; Any provision of any Loan Document after delivery thereof pursuant to **Error! Reference source not found.** shall for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against Borrower, or Borrower shall so assert; Any Collateral Document or financing statement after delivery thereof pursuant to **Error! Reference source not found.** shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority (subject to the Carve-Out and the Permitted Liens) lien on and security interest in the Collateral purported to be covered thereby, except as otherwise provided in such Collateral Document; A Change of Control shall occur; |

Other than as set forth in clause (b) above, the failure of Borrower to properly and timely perform or observe any covenant or condition set forth herein or any Loan Document and the continuance thereof which is not cured within 10 Business Days of Lender's notice to Borrower of such Default;

The use of any funds advanced for any purpose or to any Person other than as specified in the Budget, subject to a 10% variance, or approved, in writing, by the Lender;

Any certificate, statement, representation, warranty or audit heretofore or hereafter furnished by or on behalf of Borrower pursuant to or in connection with the Term Loans, the Loan Documents or otherwise (including representations and warranties contained herein) or as an inducement to Lender to extend any credit to or to enter into this or any other agreement with Borrower in connection with this Agreement or other loans now existing or hereafter created, proves to have been false in any material respect at the time when the facts therein set forth were stated or certified, or knowingly omitted any substantial contingent or unliquidated liability or claim against Borrower or on the Closing Date there shall have been any materially adverse change in any of the facts previously disclosed by any such certificate, statement, representation, warranty or audit, which change shall not have been disclosed to Lender in writing at or prior to the time of Closing Date; or

The occurrence of any Materially Adverse Effect;

A final judgment, which shall not be subject to the automatic stay in the Chapter 11 Case, for the payment of money in excess of $10,000 shall be rendered against Borrower (other than a judgment as to which a financially sound and reputable insurance company has acknowledged coverage of such claim in writing or otherwise covered by an appeal bond), and either (i) within 30 days after the entry of such judgment, shall not have been discharged or stayed pending appeal (or if stayed pending appeal, shall not have been discharged within 30 days after the entry of a final order of affirmance on appeal), or (ii) enforcement proceedings shall be commenced by any holder of such judgment;

The entry of an order dismissing the Chapter 11 Case or converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or if Borrower files a motion or other pleading seeking the dismissal or conversion of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

The entry of an order appointing a trustee in the Chapter 11 Case or an examiner having enlarged powers (beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4));

The entry of an order granting any other superpriority claim or lien equal

or superior in priority to that granted to the Lender, without the Lender's prior written consent, other than as permitted hereunder and the Order;

The termination or rejection, or the filing by Borrower of a motion terminating or rejecting material leases, material contracts or any other material agreement, document or instrument following the Petition Date to which either Borrower is a party, except those approved by the Lender;

The entry of an order staying, reversing, vacating or otherwise modifying this Agreement, liens securing the Obligations of the Borrower hereunder or the Orders, seeking any of the foregoing or a motion for reconsideration with respect to the Orders;

Borrower shall fail to comply with or perform any of the material terms, conditions, covenants or other obligations under the Orders;

The Interim Order shall not have been entered by March 13, 2015;

The Final Order shall not have been entered by April 30, 2015;

The filing of a motion, or any plan of reorganization or disclosure statement attendant thereto, by Borrower:    (x) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the Loan Documents; (y) to grant any lien other than Permitted Liens upon or affecting any Collateral;  or (z) any other action or actions materially adverse to the Lender or its rights and remedies hereunder or its interest in the Collateral;

The filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by either Borrower or any other person to which Lender does not consent or otherwise agree to the treatment of its claims or the entry of any order terminating such Borrower's exclusive rights to file a chapter 11 plan, unless such plan provides for the immediate and indefeasible payment in full in cash of all Obligations of the Borrower hereunder;

The entry of an order in the Chapter 11 Case confirming a plan that does not contain a provision for termination of this Agreement and indefeasible repayment in full in cash of all of the obligations due to the Lender on or before the effective date of such plan;

The payment of, or application for authority to pay, any prepetition claim without the Lender's prior written consent unless otherwise in accordance with the Budget and approved by an Order of the Bankruptcy Court on notice to the Lender;

Subject to entry of the Final Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Lender;

|  | The sale without the Lender's consent of all or substantially all of Borrower's assets, either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for indefeasible payment in full in cash of the Obligations of the Borrower hereunder to the Lender and termination of this Agreement; |
|  | The commencement of a suit or action against the Lender and, as to any suit or action brought by any Person other than Borrower, an officer or employee of Borrower, the continuation thereof without dismissal for 30 days after service thereof on the Lender, that asserts or seeks by or on behalf of Borrower, any official committee in the Chapter 11 Case or any other party in interest, a claim or any legal or equitable remedy that would (a) have the effect of subordinating any or all of the obligations to or liens of the Lender under the Loan Documents to any other claim, or (b) have a material adverse effect on the rights and remedies of the Lender under any Document or the collectability of all or any portion of the Obligations of the Borrower hereunder; |
|  | The entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents to the Lender; |
|  | The Borrower's failure to enter into an asset purchase agreement for the sale of substantially all of the assets as a going concern, subject to Bankruptcy Court approval, by June 1, 2015; |
|  | Any creditor (other than the Lender) attaches, seizes or repossesses property owned by, or in the possession of, Borrower having a fair market value individually in excess of $10,000; |

## AUTHORIZATION FOR POST-PETITION FINANCING

### A.  The Post-Petition Financing Should Be Approved Pursuant to 11 U.S.C. §364(c).

17.    Bankruptcy Code section 364(c) provides, among other things, that if a debtor is

unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code

section 503(b)(1), the court may authorize the debtor to obtain credit or incur debt (i) with

priority over any and all administrative expenses as specified in Bankruptcy Code section 503(b)

14

or 507(b); (ii) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(iii) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

18.    The statutory requirement for obtaining post-petition credit under section 364(c)

is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit

allowable under section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See also In*

*re Crouse Group Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).  Courts have applied the

following three-part test to determine whether a debtor is entitled to financing under section

364(c) of the Bankruptcy Code:

> (i)    the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;
>
> (ii)    the credit transaction is necessary to preserve the assets of the estate; and
>
> (iii)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*Crouse Group*, 71 B.R. at 549.  As discussed below, each of these elements is satisfied.

**(a) <u>The Debtor is Unable to Obtain Unsecured Credit</u>**

19.    The Debtor requires working capital, beyond the small amount of cash available

to it from current operations, in order to preserve and maintain the value of its businesses during

the Bankruptcy Case.

20.    The only party willing to provide financing for the continued operation of the

Debtor's business and to fund the administration of a Bankruptcy Case so as to preserve value

for creditors is Essextec.  The Debtor has been unable to secure credit on an unsecured basis that

was adequate to meet these needs.

21.     Second, in light of the Debtor's inability to obtain alternative post-petition financing proposals from other lenders through credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, unsecured credit allowable under sections 364(a) and 364(b) of the Bankruptcy Code, or credit secured by liens on the Debtor's assets junior to the Prepetition liens, as is contemplated by section 364(c)(3) of the Bankruptcy Code, the Debtor does not believe that any lender would be willing to loan new money to the Debtor other than on terms similar to (or worse than) those contained in the DIP Credit Agreement.

22.     In short, the Debtor determined that a consensual DIP Facility with Essextec will save expense and time at the outset of this Bankruptcy Case, thereby allowing the Debtor to preserve value and focus on its reorganization efforts in an effort to provide a distribution to its creditors.

23.     Accordingly, the Debtor has determined that the Post-Petition Loan offered by Essextec is the best and only option for post-petition financing.

**(b) <u>The Transactions Under the Post-Petition Documents are Necessary to Preserve the Estate</u>**

24.     Without access to post-petition financing, the Debtor will be unable to operate its business as a going concern, which would, in turn, significantly impair the value of the Debtor's assets and jeopardize the Debtor's ability to sell its assets to the detriment of all creditor constituencies.  The Debtor has very little cash and, as described above, almost no liquidity.

25.     By obtaining the Post-Petition Loan, the Debtor will be in a position to preserve the value of its assets during the chapter 11 process for the benefit of all creditors and work towards a plan.

26.     Absent approval of the relief sought herein, the Debtor faces a substantial risk of irreparable damage to the value of its assets and the probability of conversion of the bankruptcy

case to a case under chapter 7 without the ability to sell its assets in an orderly manner for the

benefit of the Debtor's creditors.  *See In re Sun Healthcare Group, Inc.*, 245 B.R. 779, 781

(Bankr. D. Del. 2000) (noting that the court had approved debtor-in-possession financing to

"permit the Debtors to continue to operate to preserve their estates").  Accordingly, the Debtor

needs sufficient liquidity to avoid a forced liquidation of their assets on a "fire-sale" basis to the

detriment of all creditors.

### (c) The Terms of the Post-Petition Loan are Fair and Reasonable

27.     Moreover, the terms of the Post-Petition Loan are fair and reasonable under the

circumstances, particularly given the current economic and lending environment.  As discussed

above, the Debtor made efforts to obtain credit on the most favorable terms available.

28.     Against this backdrop, the Debtor engaged in negotiations with the Essextec

regarding the proposed terms, worked with its advisors to obtain the best possible terms from

Essextec and, eventually, reached an agreement with the Essextec, for the provision of the Post-

Petition Loan.  Thus, the terms and conditions of the Post-Petition Loan Agreement were

negotiated by the parties in good faith and at arms' length and, as outlined above, were instituted

for the purpose of enabling the Debtor to meet ongoing operational expenses while in chapter 11

to preserve the going concern status of the Debtor.

29.     A debtor need only demonstrate that, notwithstanding its good faith efforts, credit

was unavailable without the protections afforded to potential lenders by sections 364(c) and (d)

of the Bankruptcy Code.  *See Bray v. Shenandoah Fed. Savs. & Loan Assoc. (In re Snowshoe

Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626,

630-31 (Bankr. S.D.N.Y. 1992) (noting that, although "the debtor must make an effort to obtain

credit" it does not need "to seek alternate financing from every possible lender.").  In short, the

Debtor concluded that adequate alternative financing terms more favorable than those to be provided under the Post-Petition Loan Documents by the Essextec, are currently unavailable.

30. Moreover, the Debtor believes that, in its business judgment, entry into the Post-Petition Loan Documents is in its best interests. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994), *rev'd on other grounds* by 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest*."); see also Funding Sys. Asset Mgmt. Corp. v. Key Capital Corp. (In re Funding Sys. Asset Mgmt. Corp*.), 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

31. Accordingly, the Debtor respectfully submits that it has satisfied the requirements of sections 364(c) of the Bankruptcy Code, that alternative credit on more favorable terms was and is unavailable to the Debtor, and requests that the Court enter the Interim Order approving the DIP Loan and Security Agreement and related DIP Documents to immediately preserve the Debtor's estate, and enter the Final Order to ensure that the Debtor's estate is maintained through the consummation of the Sale.

**B. The Post-Petition Financing Should Be Approved Pursuant to 11 U.S.C. §364(d).**

18

32.     Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d)(1).

33.     A debtor satisfies the first prong of section 364(d)(1) by demonstrating that (1) it was unable to procure financing on an unsecured basis; (2) it was unable to procure financing on a junior basis to existing liens; and (3) there is no other unencumbered property in the estate on which a debtor can grant a lien. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Although a debtor must seek to obtain credit without priming a senior lien, debtors are not required to seek alternate financing from every source possible. *Id*. at 630-31. Rather, a debtor need only demonstrate that it undertook sufficient efforts to obtain financing without the need to grant a senior lien. Id. at 631 (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position"); *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 n. 44 (Bankr. S.D.N.Y. 2010) (noting that courts require only a showing of "reasonable effort" to obtain alternative credit with lesser security); *see also In re Snowshoe Co.*, 789 F.2d at 1085 (4th Circuit 1986)(unsuccessful contact with other financial institutions in the geographic area was sufficient to demonstrate that credit was unavailable absent senior lien).The Debtor can satisfy the second prong of section 364(d) because the Adequate Protection Liens will adequately protect the Prepetition Secured Creditors.

34.     First, the value of the Cash Collateral exceeds the aggregate amount of the liens held by the Prepetition Secured Creditors.  The Debtor has entered into an Asset Purchase

19

Agreement with Essextec, wherein Essextec has agreed to pay approximately $4.4 million for substantially all of the Debtor's.  The aggregate amount of the liens held by the Prepetition Secured Creditors is approximately $2,592,539.82.  The terms of the APA demonstrate that the fair market value of the Debtor's assets exceed the value of all liens asserted against the Debtor by the Prepetition Secured Creditors.  This leaves an equity cushion in the approximate amount of $1,8 million, which constitutes adequate protection of Prepetition Secured Creditors' Liens. *See Wilmington Trust Co. v. AMR Corp. (In re AMR Corp.)*, 490 B.R. 470, 478 (S.D.N.Y. 2013) ("It is well-settled that the existence of an equity cushion can be sufficient, in and of itself, to constitute adequate protection."); *see also In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("The exist[ence] of an equity cushion seems to be the preferred test in determining whether priming of a senior lien is appropriate under section 364.")(internal quotations omitted).

35.    Second, the DIP Facility will enable the Debtor to preserve, enhance, and realize the value of the Cash Collateral, thereby providing adequate protection in and of itself. *See 495 Central Park Ave.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (holding that value derived from new postpetition borrowings used to preserve and improve a debtor's property constituted adequate protection). The funds available under the DIP Facility will enable the Debtor to continue operations in the near terms, thereby preserving and enhancing the value of the Cash Collateral and enabling the Debtor to continue to collect the proceeds thereof. Moreover, the DIP Facility will enable the Debtor to continue to transact business and create additional receivables.

36.    As additional adequate protection above and beyond the substantial equity cushion and preservation of collateral value, the Prepetition Secured Creditors will be granted a

lien on post-petition assets, each subject only to the liens and claims securing the DIP Facility and the Carve-Out.

37.     The DIP Facility is in the best interest of the Debtor's estate, its employees, claimants, and creditors, and all other parties-in-interest in this Chapter 11 Case and is consistent with the Debtor's exercise of its business judgment and fiduciary duty.

## AUTHORITY FOR USE OF CASH COLLATERAL

38.     Pursuant to court order, a debtor in possession may be authorized to use cash collateral in the ordinary course of its business operations under Bankruptcy Code §§ 363(c) and 1107.  The Court may condition such use, pursuant to Bankruptcy Code § 363(e), as is necessary to provide adequate protection of any interest held therein by any entity other than the debtor in possession.

39.     Courts repeatedly have recognized that use of cash collateral is appropriate where necessary to preserve a debtor's ability to reorganize and thus maximize the value of an estate for all interested parties. *See In re Realty Southwest Assoc.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); H.R. Rep. No. 595, 95th Cong., 1st Sess. 344 (1977); 3 Collier on Bankruptcy 363.03 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006); *see also In re Dynaco*, 162 B.R. 389, 396; *In re Stein*, 19 B.R. 458 (Bania. E.D. Pa. 1982).  Bankruptcy Rule 4001 (b) governs authorization for utilizing cash collateral and provides that the court may permit the debtor-in-possession to use cash collateral prior to a final hearing to the extent necessary to avoid immediate and irreparable harm.  After a final hearing held on at least fifteen days' notice, the court may grant the authority to use cash collateral on a permanent basis and other permanent relief requested herein.

40.    A chapter 11 debtor may not use cash collateral unless "(A) each entity that has

an interest in such collateral consents; or (B) the court, after notice and a hearing, authorizes such

use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

41.    The Debtor requires the use of the Cash Collateral to fund its operations. In the

absence of the continued authorization to use Cash Collateral, the Debtor's ability to continue

operating in the ordinary course of business will be jeopardized, causing immediate and

irreparable harm to the Debtor's estate, claimants, employees, and all other stakeholders by

virtue of the loss of significant going-concern value. Thus, the Debtor's continued use of Cash

Collateral is essential in order to enable the Debtor to meet the obligations of their ordinary

operating costs and expenses during the pendency of the Chapter 11 Case.  Among other things,

the continued use of Cash Collateral will enable the Debtor to maintain business relationships

with its vendors and claimants, pay its employees, and satisfy other ordinary operational costs

that are essential to preserve estate value by continuing to operate its business in the ordinary

course.

42.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that

has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the

trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as

is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Permissible

forms of adequate protection include periodic cash payments, additional liens, replacement liens,

and other forms of relief. 11 U.S.C. § 361. The purpose of adequate protection is to protect a

secured creditor from diminution in the value of its property interest in its collateral during the

period of use, sale, or lease. *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *see also*

*Delbridge v. Production Credit Assoc. and Fed. Land Bank*, 104 B.R. 824, 827-28 (E.D. Mich.

1989); *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990). The appropriate

form of adequate protection must be determined on a case-by-case basis. *See In re O'Connor*,

808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472, 474 (8th Cir. 1985).

43.    In connection with its entry into the DIP Facility, the Debtor anticipates that not

all of the Prepetition Secured Creditors will not consent to the Debtor's continued use of Cash

Collateral. To the extent this Court authorizes the Debtor to obtain alternative post-petition

financing on a first priority priming basis, the Debtor proposes to provide the Prepetiition

Secured Creditors with additional adequate protection with respect to the use of the Cash

Collateral. Accordingly, the Court should authorize the Debtor to use Cash Collateral on the

terms set forth in the DIP Credit Agreement and in accordance with the Budget.

44.    As discussed above, the Prepetition Secured Creditors will receive adequate

protection of their interests in the Cash Collateral in the form of (a) a substantial equity cushion

of approximately $1.8 million, (b) preservation and enhancement of collateral value through the

ability to continue operating the Debtor's business, and (c) liens and claims junior only to the

liens and claims securing the DIP Facility and the Carve-Out, (collectively, the "Adequate

Protection").  See ¶¶ 34-37 above.

45.    The Debtor respectfully submits that the Adequate Protection will sufficiently

protect the Prepetition Secured Creditors interests in the Cash Collateral from any diminution in

value and should be approved.

### The Automatic Stay Should Be Modified on a Limited Basis

46.    The relief requested herein contemplates a modification of the automatic stay (to

the extent applicable) to permit the Debtors to grant the security interests, liens, and super-

priority claims described above and to perform such acts as may be requested to assure the

perfection and priority of such security interests and liens.

47.     Stay modifications of this kind are ordinary and standard features of post-petition

financing facilities and, in the Debtors' business judgment, are reasonable and fair under the

present circumstances.

### Interim Approval Should Be Granted

48.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to

obtain credit may not be commenced earlier than 15 days after the service of such motion.  Upon

request, however, the Court is empowered to conduct a preliminary expedited hearing on the

motion and the obtaining of credit to the extent necessary to avoid immediate and irreparable

harm to a debtor's estate pending a final hearing.

49.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court

conduct an expedited interim hearing on this motion and (i) authorize the Debtors to borrow up

to $500,000 under and subject to the terms of the Post-Petition Loan Agreement on an interim

basis, pending entry of a final order, in order to (a) maintain and finance the ongoing operations

of the Debtors; (b) fund the administration of the Bankruptcy Cases; and (c) avoid immediate

and irreparable harm and prejudice to the Debtors' estate, business operations and all parties in

interest, and (ii) schedule the Final Hearing.

50.     The Debtors have an urgent and immediate need for cash to continue to operate.

Currently, the Debtors does not have sufficient funds with which to operate its business on an

ongoing basis and to purchase new inventory that is critical to keep the Debtors' stores open and

well-stocked.  Absent authorization from the Court to obtain credit, as requested, on an interim

basis pending the Final Hearing, the Debtor will be immediately and irreparably harmed.  The

24

availability of interim loans under the Post-Petition Loan Agreement will provide necessary

assurance of the Debtors' ability to meet their near-term obligations.  Failure to meet these

obligations and to provide these assurances likely would have a long-term negative impact on the

value of the Debtors' business, to the detriment of all parties in interest.  Accordingly, the

interim relief requested is critical to preserving and maintaining the going concern value of the

Debtors and facilitating its reorganization efforts.

### Compliance with Rule 4001-2 of the Local Rules

51.    Rule 4001-2 of the Local Rules requires that certain provisions contained in the

financing documents and/or Interim Order be highlighted, and that the Debtors must provide

justification for the inclusion of such highlighted provision(s).  The Debtors believes that certain

provisions of the DIP Loan implicate Local Rule 4001-2, and that such provisions are justified

and necessary in the context and circumstances of this bankruptcy case.  Accordingly, the Debtor

has set forth each of the sub-sections of Rule 4001-2 of the Local Rules and have detailed

whether or not the DIP Documents, this Motion and/or the DIP Orders contain or contemplate

provisions which would fall within the ambit thereof:

- Local Rule 4001-2(a)(1):  This Motion and the proposed DIP Orders sets forth the amount of credit the Debtor seeks to obtain, including any committed amount under the Post-Petition Loan Agreement.

- Local Rule 4001-2(a)(2):  This Motion describes all material conditions to closing and borrowing, including budget provisions.

- Local Rule 4001-2(a)(3):  This Motion describes all material pricing and economic terms, including letter of credit fees, commitment fees, any other fees, and the treatment of costs and expenses of the lender, any agent for the lender, and their respective professionals, in each case to the extent applicable.

- Local Rule 4001-2(a)(4):  The Motion describes the effects on existing liens of the granting of collateral or adequate protection provided to the lender and any priority or superpriority provisions.

- <u>Local Rule 4001-2(a)(5)</u>: This Motion describes any applicable carve-outs from liens or superpriorities;

- <u>Local Rule 4001-2(a)(6)</u>:  The Post-Petition Loan Documents do not contemplate any cross-collateralization provision that elevates prepetition debt to administrative expense (or higher) status or that secures prepetition debt with liens on postpetition assets (which liens the creditor would not otherwise have by virtue of the prepetition security agreement or applicable law).

- <u>Local Rule 4001-2(a)(7)</u>: The Post-Petition Loan Documents do not contemplate any roll-up provision which applies the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise has the effect of converting prepetition debt to postpetition debt.

- <u>Local Rule 4001-2(a)(8)</u>: The Post-Petition Loan Documents to not contemplate any provision that would limit the Court's power or discretion in a material way, or would interfere with the exercise of the fiduciary duties, or restrict the rights and powers, of the trustee, debtor in possession, or a committee appointed under § 1102 or § 1114 of the Bankruptcy Code, or any other fiduciary of the estate, in connection with the operation, financing, use or sale of the business or property of the estate, but excluding any agreement to repay postpetition financing in connection with a plan or to waive any right to incur liens that prime or are pari passu with liens granted under § 364 of the Bankruptcy Code.

- <u>Local Rule 4001-2(a)(9)</u>:  The Motion describes the implementation and restrictions on the Debtors with respect to the use of proceeds under DIP Credit Agreement as reflected in the DIP Budget.

- <u>Local Rule 4001-2(a)(10)</u>:   This Motion describes applicable events of default, any effect of termination or default on the automatic stay or the lender's ability to enforce remedies, any cross-default provision, and any events on which the availability of credit will cease.

- <u>Local Rule 4001-2(a)(11)</u>:   The Post-Petition Loan Documents do not contemplate any change-of-control provisions.

- <u>Local Rule 4001-2(a)(12)</u>:  The Motion describes any applicable provision establishing a deadline for, or otherwise requiring, the sale of property of the estate.

- <u>Local Rule 4001-2(a)(13)</u>:  The Post-Petition Loan Documents do not contemplate any provision that affects the debtors' right or ability to repay the financing in full during the course of the chapter 11 reorganization case.

- Local Rule 4001-2(a)(14):  As set forth in the Motion, the Debtor is a borrower under the Post-Petition Loan Documents and is liable for the obligations under the Post-Petition Loan Documents.

- Local Rule 4001-2(a)(15):  This rule is not applicable.

- Local Rule 4001-2(b): The Motion describes the Debtor's efforts to obtain financing, the basis for the Debtor's belief that the Post-Petition Loan is on the best terms available, and the basis for why the Debtor believes the extension of credit is being made in good faith.

## NOTICE OF FINAL HEARING

52.     Notice of this Motion and proposed Interim Financing Order was given by email, facsimile or overnight delivery of a copy to (a) the Office of the United States Trustee; (b) counsel for the Essextec; and (c) each of the Debtors' twenty (20) largest unsecured creditors. Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they be authorized to serve notice of the Final Hearing and a proposed Final Cash Collateral Order upon: (a) the Office of the United States Trustee; (b) counsel for the Essextec; (e) each of the Debtors' twenty (20) largest unsecured creditors, on or before a date to be set by the Court, and upon counsel to any official committee appointed herein, within one day after the Debtors receive notice of the appointment of such counsel.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice need be given.

## NO PRIOR REQUEST

53.     No previous request for the relief sought in this Motion has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully requests entry of the Interim Order and,

following the Final Hearing, entry of a Final Order.

Dated: New York, New York
　　　 March 11, 2015

                     KLESTADT WINTERS JURELLER
                     SOUTHARD & STEVENS, LLP

                     By: /s/ Tracy L. Klestadt
                           Tracy L. Klestadt
                           Brendan M. Scott
                     570 Seventh Avenue, 17th Floor
                     New York, New York 10018
                     T: (212) 972-3000
                     F: (212) 972-2245

                     *Proposed Counsel for Debtors and Debtors in Possession*