**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
570 Seventh Avenue, 17th Floor
New York, NY 10018
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Tracy L. Klestadt
Brendan M. Scott

*Proposed Attorneys for the Debtor and Debtor in*
*Possession*

**Hearing Date:**
**Hearing Time:**

**Objection Deadline:**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :   Chapter 11 |
| GEMINI SYSTEMS, LLC, | : |
| | :   Case No. 15-10574 |
| Debtor. | : |

-----------------------------------------------------------------x

**NOTICE OF HEARING ON MOTION FOR ORDERS PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004 AND 6006: (A)(i) ESTABLISHING BIDDING PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF CERTAIN OF THE ASSETS OF THE DEBTOR, (ii) APPROVING THE FORM AND MANNER OF NOTICES, (iii) APPROVING THE ASSET PURCHASE AGREEMENT SUBJECT TO HIGHER AND BETTER OFFERS AND (iv) SETTING A SALE HEARING DATE; AND (B)(i) APPROVING THE SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, (ii) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (iii) GRANTING <u>RELATED RELIEF</u>**

**PLEASE TAKE NOTICE** that, on March 11, 2015, the above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>") filed its Motion For Orders Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 6006: (A)(i) Establishing Bidding Procedures and Bid Protections in Connection with the Sale of Certain of the Assets of the Debtor, (ii) Approving the Form and Manner of Notices, (iii) Approving the Asset Purchase Agreement Subject to Higher and Better Offers and (iv) Settling a Sale Hearing Date; and (B)(i) Approving the Sale of Certain Assets of the Debtor Free and Clear of Liens, Claims and Encumbrances, (ii) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts; and (iii) Granting Related Relief (the "<u>Motion</u>").

**PLEASE TAKE FURTHER NOTICE** that a hearing seeking approval for the proposed bidding procedures, bidder protections, form and manner of notices, and requesting

that the Court schedule a sale hearing date will be held on _____, 2015 at _____ (EST) (the "Procedures Hearing") before the Honorable _____, United States Bankruptcy Judge at the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), One Bowling Green, New York, New York 10004.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the proposed bidding procedures, bidder protections, form and manner of notices, and the scheduling of a sale hearing date must be (a) in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, (c) filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) -- registered users of the Bankruptcy Court's case filing system must file electronically and all other parties in interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows' based word-processing format), (d) submitted in hard-copy form directly to the chambers of the Honorable _____, United States Bankruptcy Judge, and (e) served upon (i) Klestadt Winters Jureller Southard & Stevens, LLP, 570 Seventh Avenue, 17th Floor, New York, New York 10018, Attn: Tracy L. Klestadt; (ii) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10014, and (iii) and those parties that have requested notice in accordance with Rule 2002 of the Federal Rules of Bankruptcy Procedure by 5:00 p.m. on _____, 2015.

**PLEASE TAKE FURTHER NOTICE** that only those objections made as set forth herein will be considered by the Bankruptcy Court at the Sale Procedures Hearing. If no objections to the proposed bidding procedures, bidder protections, form and manner of notices, and the scheduling of a sale hearing date are timely filed and served in accordance with the procedures set forth herein, the Bankruptcy Court may enter an order approving the proposed bidding procedures, bidder protections, form and manner of notices, and scheduling a sale hearing date without further notice.

**PLEASE TAKE FURTHER NOTICE** that the Motion has been filed electronically with the Clerk of the United States Bankruptcy Court for the Southern District of New York, and may be reviewed by all registered users of the Court's website at www.nysb.uscourts.gov.

Dated: New York, New York
      March 11, 2015

                      KLESTADT WINTERS JURELLER
                      SOUTHARD & STEVENS, LLP

                      By: /s/ Tracy L. Klestadt
                          Tracy L. Klestadt
                          Brendan M. Scott
                      570 Seventh Avenue, 17th Floor
                      New York, New York 10018

Tel. (212) 972-3000

*Attorneys for Debtor and Debtor-In-Possession*

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
570 Seventh Avenue, 17th Floor
New York, NY 10018
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Tracy L. Klestadt
Brendan M. Scott

**Hearing Date:**
**Hearing Time:**

**Objection Deadline:**

*Proposed Attorneys for the Debtor and Debtor in*
*   Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re                                                              :
                                                                   :     Chapter 11
GEMINI SYSTEMS, LLC,                                               :
                                                                   :     Case No. 15-_____
                                          Debtor.                  :
------------------------------------------------------------------x

**MOTION FOR ORDERS PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004 AND 6006: (A)(i)
ESTABLISHING BIDDING PROCEDURES AND BID PROTECTIONS IN
CONNECTION WITH THE SALE OF CERTAIN OF THE ASSETS OF THE
DEBTOR, (ii) APPROVING THE FORM AND MANNER OF NOTICES, (iii)
APPROVING THE ASSET PURCHASE AGREEMENT SUBJECT TO HIGHER
AND BETTER OFFERS AND (iv) SETTING A SALE HEARING DATE; AND (B)(i)
APPROVING THE SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND
CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, (ii) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND
EXECUTORY CONTRACTS; AND (iii) GRANTING RELATED RELIEF**

        Gemini Systems, LLC, the above-captioned debtor and debtor in possession (the

"Debtor"), by its proposed attorneys, Klestadt Winters Jureller Southard & Stevens, LLP,

hereby moves (the "Motion") for entry of orders:

        a.       Substantially in the form attached hereto as **Exhibit A** (the "Bidding
                 Procedures Order") (a) establishing bidding procedures and bid
                 protections (the "Bidding Procedures"), (b) approving the form and
                 manner of notices thereof (the "Bidding Procedures Notice"),

b.      Substantially in the form attached hereto as **Exhibit B** (the "Sale Order") (a) approving the Asset Purchase Agreement (the "Purchase Agreement"), substantially in the form attached hereto as **Exhibit C**, among the Debtor, Essex Technology Group, Inc. ("Essextec"), ETGI, Inc. (the "Purchaser") and Simon Leung (the "Owner") dated as of March [11], 2015, pursuant to which the Debtor proposes to sell certain of its assets to the Purchaser free and clear of any and all liens, claims and encumbrances, subject to higher and better offers (the "Sale Transaction"), (b) approving certain procedures with respect to the Debtor's assumption and assignment of certain executory contracts and unexpired leases, and approving the form and manner of notice of assumption and assignment of executory contracts substantially in the form attached hereto as **Exhibit D**, (c) approving the sale of the Assets (as defined in the Purchase Agreement) free and clear of liens, claims and encumbrances, (d) setting a hearing no later than _____, 2015 (the "Sale Hearing") to consider approval of the Sale Transaction, (e) approving the form and manner of notice of assumption and assignment of executory contracts and unexpired leases thereof (the "Sale Notice"), substantially in the form attached hereto as **Exhibit E**, and (f) granting related relief.

In support of the Motion, the Debtor incorporates the statements contained in the Declaration of Simon P. Leung (the "Leung Declaration") and respectfully represents and alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this case is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105, 363 and 365 of Title 11, United States Code (the "Bankruptcy Code") and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

A.      **Organizational Structure.**

2.      The Debtor is a corporation organized under the laws of the state of New York.  The Debtor was founded in 1987 by Simon Leung and is headquartered in leased

premises in downtown Manhattan in New York, New York.  Mr. Leung is the Debtor's chief

executive office and sole member.

B.      **Nature of the Debtor's Business.**

3.      The Debtor is a technology consulting company engaged in the sale, service,

and support of computer software. It specializes in information technology solutions based on

IBM software. The Debtor's suite of services includes information technology optimization,

operations consulting services, and analytics. The Debtor, an IBM Premier Business Partner,

derives the majority (roughly two-thirds) of its revenues from the resale of IBM software

products, with the balance stemming from information technology-related consulting

services.

4.      Since its founding, the Debtor has grown to become a technology-agnostic

custom software developer. The Debtor became an IBM Premier Business Partner in 2001,

and an IBM Software Group reseller in 2003. Since that time, the Debtor's growth has been

largely driven by its relationship with IBM.

5.      In addition to its relationship with IBM, the Debtor has also developed key

partnerships with the Purchaser and Arrow Electronics, Inc., among others. The development

of these relationships has allowed the Debtor to broaden its service base, increase the

technical skill set of its staff, and provide clients with a wider range of functional solutions.

6.      The Debtor serves a client base that operates principally in the New York City

metropolitan area. It develops new business through a sales force of approximately five (5)

sales representatives.

7.      There is a high degree of competition in the industry; the Debtor competes

with numerous suppliers and manufacturers. Many of these competitors have significantly

greater financial and operational resources than the Debtor. The Debtor also competes against

numerous other IBM business partners. In some instances, the Debtor may find itself bidding against IBM and other IBM business partners on a referral from IBM.

8.      The Debtor considers its main competitive advantages to include its relationship with IBM and its staff's technical expertise, specifically its domain expertise in a core set of IBM technology solutions and software platforms. In addition, the Debtor has built long term relationships with its clients that have yielded repeat business and referrals for new clients. One of its chief competitive challenges is to grow its technical staff while maintaining the high quality of expertise needed to meet the ever increasing demands of its clients.

C.      **The Bankruptcy Case.**

9.      On March 11, 2015 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

10.     The Debtor continues in possession of its property and continues to operate and manage its business as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

11.     No trustee or committee has been appointed in this case.

12.     The Debtor has determined, in its business judgment, that value for the Debtor's creditors and other stakeholders will be maximized by a sale of the Seller's assets as a going concern to a financially viable purchaser.

A.      **Marketing and Sale Process**

13.     The Debtor and Essextec have been negotiating the purchase of the Debtor's assets for approximately eighteen (18) months.  As a result of this extensive and protracted negotiating period, the Debtor has not done extensive marketing of its assets.  The Debtor

intends to publish notice of the Sale Transaction in the New York Times to provide notice to interested parties and will send notice to all creditors in order to ensure a fair marketing and sale process.

14.     However, given the uncertainties surrounding the Debtor's business, particularly the amounts owed to secured and priority tax creditors, the Debtor has concluded that it is in the best interests of the Debtor, its creditors, and its estate to sell certain of the assets and/or the operations of the Debtor to the Purchaser.

15.     In or around September 2013, Essextec and Purchaser expressed an interest in acquiring the assets and operations of the Seller. Thereafter, the parties began negotiating the terms of the purchase.

16.     On or around April 16, 2014, the Debtor, Simon Leung and Essextec entered into an agreement (the "Transition Agreement") pursuant to which Essextec advanced certain payroll expenses to Debtor on a monthly basis. The foregoing indebtedness was secured by a certain Security Agreement, dated August 20, 2014 (the "Security Agreement"), between Debtor and Essextec, pursuant to which Essextec agreed to continue to provide funding under the Transition Agreement. The indebtedness was subsequently perfected by the filing of UCC-1 financing statements.

17.     Debtor, Essextec and Simon Leung entered into an Amendment to Transition Agreement and Security Agreement dated as of March 6, 2015 and the Debtor delivered Demand Notes in the amounts of (i) $50,000, (ii) $10,000 and (iii) $35,000, and on March 10, 2015 a Demand Note in the amount of $30,0000 to Essextec, perfected by the filing of additional UCC financing statements, pursuant to which Essextec agreed to make certain advances to Debtor for payroll and working capital purposes on an emergent basis, secured

by the Security Agreements and UCC Financing Statements (the Transition Agreement, Security Agreements, Amendment to Transition Agreement and UCC Financing Statements collectively the "Prepetition Loan Documents").

18.    As of the Petition Date, pursuant to the Prepetition Loan Documents, Essextec is owed an aggregate principal amount equal to approximately $700,000.00 ("Prepetition Indebtedness").

19.    Essextec retained appraiser Appraisal Economics to determine and provide a report on the fair market value of the business enterprise of the Seller as of November 30, 2014 (the "Appraisal").  Based on the Appraisal and the deteriorating financial position of the Debtor, the Essextec derived the price to purchase the assets of the Seller (the "Purchase Price").  The Purchase Price is $4,430,000.00.  Pursuant to the Purchase Agreement, the Purchaser will receive a credit against the Purchase Price on account of its assumption of certain obligations and liabilities, including, among other things, the Prepetition Indebtedness and DIP Financing Facility.

20.    Under the Purchase Agreement, the Purchase Price will be used in part to satisfy and discharge the secured debt to Citibank, N.A. as well as be applied to certain tax liens against the Debtor filed by the Internal Revenue Service and New York State Division of Tax & Finance.

21.    The Debtor will provide notice to potentially interested parties to canvas the rest of the marketplace and ensure that all potentially interested parties are informed of the Debtor's intent to sell its assets and are able to participate in an auction. These efforts will provide certainty that the Debtor has obtained the highest and best price possible for its assets.

22.     By this Motion, the Debtor seeks approval of a process to market and sell its

business and assets through a section 363 asset sale process, which process will include a

stalking horse bid from the Purchaser.

## RELIEF REQUESTED

A.     **The Proposed Sale**

23.     The Purchase Agreement sets forth the terms of the sale of certain of the

Debtor's assets and business and related transactions, subject to higher and better offers, free

and clear of liens, claims, interests and encumbrances.  The following is a summary of certain

salient provisions of the Purchase Agreement and is qualified entirely by reference to the

Purchase Agreement itself.[1]

> (a)     Purchase Price.  In consideration for the Assets, the purchase price for the Assets is $4,430,000.00.  The Purchase Price shall be payable at the Closing by wire transfer or other immediately available funds, provided, however, that the Purchaser shall receive a credit against the Purchase Price in a credit against the Purchase Price on account of the Prepetition Indebtedness and it's assumption of certain obligations and liabilities, as set forth in the Purchase Agreement.

> (b)     Purchased Assets.     Under the Purchase Agreement, the Seller  will transfer all right, title and interest in certain of its assets (described with more particularity in the Purchase Agreement as Assets), including (i) all intangible assets, goodwill, customer lists, manuals, sales and marketing materials, phone numbers, internet websites and domain names, including the right to use the name "Gemini Systems" and all derivations thereof, (ii) the Assigned Contracts, Client Contracts and IP Agreements other than the Excluded Contracts, (iii) all furniture, fixtures, equipment, inventory and other

---

[1] The following summary of the Purchase Agreement is provided for the convenience of the Court and the parties in interest.  A copy of the Purchase Agreement is attached hereto as **Exhibit F**.  To the extent that there are any discrepancies between this summary and the Purchase Agreement, the terms and language of the Purchase Agreement shall govern.  Unless defined herein, capitalized terms defined in the Purchase Agreement shall have the meanings ascribed to them therein.

personalty, (iv) all books and records relating to the foregoing in both hard copy and electronic form, (v) all security deposits provided under real estate or equipment leases that are being assigned to and assumed by Purchaser, (vi) all Accounts Receivable, (vii) all claims, Causes of Action, Acquired Avoidance Actions, and refunds including with respect to taxes for all periods ended after the Closing Date; and (viii) whatever right, title and interest Gemini may have in connection with certain agreements, among Gemini, Gemini Worldwide, ICE, ICAP and other parties with services provided by DataBP.

(c)    <u>Assumed Liabilities</u>.    Purchaser shall assume and shall subsequently observe and honor, only the going-forward obligations (i.e., obligations arising and accruing on or after the Closing Date) of Seller under the Client Contracts, the IP Agreements, and those contracts and Accounts Payable set forth in Section 1.5 of the Disclosure Schedule which are duly assigned to Purchaser in accordance with the Purchase Agreement. For the sake of clarity, the parties acknowledge that the Purchaser will assume the Client Contracts and IP Agreements in accordance with the requirements of the applicable provisions of the Bankruptcy Code and subject to the procedures set forth in the Sale Order.

(d)    <u>Representations and Warranties</u>. The Debtor has represented and warranted that it is the title owner to the Assets, and, subject to approval by the Court, they have the requisite legal authority to sell and assign such assets and Contracts, together with certain of its assets and business to Purchaser, and that all of the other representations and warranties provided under the Purchase Agreement are true and correct as detailed more fully in Article 2.1 of the Purchase Agreement. Purchaser has represented and warranted that it is a corporation duly formed under the laws of the State of New Jersey and subject to satisfaction of the conditions and requirements under the Purchase Agreement, has the requisite power, authority, and financial capability to consummate the transactions contemplated hereunder, and that all of the other representations and warranties provided under the Purchase Agreement are true and correct as detailed more fully in Article 2.2 of the Purchase Agreement.

(e)   <u>Termination</u>.   The parties may terminate this Agreement as provided below (whether before or after the entry of the Bidding Procedures Order and/or the Sale Order): (a) the Purchaser and the Debtor may terminate the Purchase Agreement by mutual written consent at any time prior to the Closing; (b) the Purchaser may terminate the Purchase Agreement by giving written notice to the Seller at any time prior to the Closing (i) in the event the Owner or the Seller has breached any representation, warranty, or covenant contained in this Agreement and such breach has caused or is reasonably likely to cause a Material Adverse Effect, or (ii) if the Closing shall not have occurred on or before the Closing Date because any of the conditions precedent set forth in Sections 6.2 through 6.5 hereof have not been satisfied in full; (c) the Seller may terminate this Agreement by giving written notice to the Purchaser at any time prior to the Closing (i) in the event the Purchaser has breached any representation, warranty, or covenant contained in this Agreement and such breach has caused or is reasonably likely to cause a Material Adverse Effect, or (ii) if the Closing shall not have occurred on or before the Closing Date because any of the conditions precedent set forth in Sections 6.2 and 6.3 hereof have not been satisfied in full; (d) the Purchaser may terminate this Agreement by giving written notice to Seller if the Closing shall not have occurred on or before 5:00 p.m. on the fifteenth day after the Sale Order has been entered (e) the Purchaser may terminate this Agreement by giving written notice to Seller if (i) the Bankruptcy Court has not entered the Bidding Procedures Order on or before April 30, 2015 or (ii) the Bidding Procedures Order has been entered but is stayed, withdrawn, or rescinded as of such date; (f)      the Purchaser may terminate this Agreement by giving written notice to Seller if (i) the Bankruptcy Court has not entered the Sale Order on or before June 1, 2015 or (ii) on or after June 30, 2015 if a legal proceeding shall be pending pursuant to which a Person has appealed the Sale Order, or if the Sale Order shall have been withdrawn or rescinded; (g) the Purchaser may terminate this Agreement by giving written notice to the Debtor if an order has been entered dismissing the Bankruptcy Case, converting the Bankruptcy Case to a Chapter 7 case or if the Debtor files a motion or other pleading seeking the dismissal or conversion of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise; (h)   the   Purchaser   or

the Seller may terminate this Agreement in the event that any Law or order becomes effective restraining, enjoining, or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement; (i)   the Seller may terminate this Agreement at any time after the Bankruptcy Court approves an Alternate Transaction, or Purchaser may terminate this Agreement upon the closing of an Alternate Transaction ; (j) the Purchaser may terminate this Agreement at any time after the appointment of a Chapter 7 trustee or an examiner with expanded powers in the Bankruptcy Case; (k) the Purchaser may terminate this Agreement at any time in the event the Bankruptcy Court does not approve the Breakup Fee and Expense Reimbursement; (l) the Purchaser may terminate this Agreement in the event the Bankruptcy Court grants relief from the automatic stay to any party to permit foreclosure or the exercise of other remedies on any material assets of Seller, other than any such relief from automatic stay granted to Essextec under a DIP Financing Facility; (m) the Purchaser may terminate this Agreement in the event that the Seller modifies, alters or amends this Agreement without the consent of Purchaser, or in the event that the Seller consents to any such modification, alteration or amendment; or (n) In the event that a DIP Financing Facility is entered into, Purchaser may terminate this Agreement if an event of default under the DIP Financing Facility has occurred and has not been cured or waived by Essextec in accordance with the terms of such DIP Financing Facility documents.

24.    The Sale Transaction provides for the continuation of business operations, preservation of attendant jobs to the extent employees of the Debtor become employees of the Purchaser, and maximization of value for the benefit of the Debtor, its creditors and the estate.

**B.    Extraordinary Provisions**

25.    In accordance with General Order M-383, In the Matter of: Adoption of Amended Guidelines for the Conduct of Asset Sales, dated November 18, 2009 ("Underline{General

Order M-383")), the Debtor discloses the following Extraordinary Provisions provided for in

the Purchase Agreement:

(a)     Record Retention: After the Closing Date, the Purchaser shall provide the Debtor, the Owner and their representatives reasonable access to the books and records of Seller included in the Assets during normal business hours and on reasonable prior notice, to enable the Seller to prepare tax returns, deal with tax audits or collect Accounts Receivable. The Debtor believes these provisions are sufficient to allow the Debtor to administer its estate.

(b)     Use of Proceeds: Under the terms of the Purchase Agreement, the first proceeds from the Sale pursuant to an Alternate Transaction will be used to pay the Bidding Protections. The proposed form of Sale Order also provides that: (i) the Liens existing on the Assets will attach to the net proceeds of the Sale to the same extent, validity and priority that existed prior to the Sale after taking into account the costs of the Sale; and (ii) the Debtor shall be authorized to use Sale proceeds to pay secured claims in the order of their relative priority, as allowed by the Court.

(c)     Successor Liability: The proposed form of Sale Order contains findings and provisions limiting the Purchaser's successor liability. The parties intend that the transfer of the Assets will not subject Purchaser to any liability other than any Assumed Liabilities. The proposed finding in the Sale Order authorizing the Sale to be made free and clear of successor liability claims complies with applicable principles of sales conducted pursuant to Section 363(f) of the Bankruptcy Code and applicable non-bankruptcy law.

(d)     Relief from Bankruptcy Rule 6004(h): The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h). The Debtor submits such relief is appropriate under the circumstances.

(e)     Agreement with Key Employees: Purchaser's obligation to consummate the Closing hereunder is contingent upon the Seller's Key Employees that Purchaser desires to employ agreeing to work for

Purchaser and entering into Confidentiality, Assignment of Invention, and Noncompetition Agreements with Purchaser in a form and substance reasonably acceptable to Purchaser.

(f)    Avoidance Actions of Employees: Included in the Assets are avoidance actions on account of or with respect to payments or transfers of property made by Seller to any former and current managers, employees and independent contractors of Seller and any of its subsidiaries prior to the filing of the Bankruptcy Case who are subsequently employed or engaged by Purchaser or any of its Affiliates or assignees.

## PROPOSED BIDDING PROCEDURES, AUCTION AND AUCTION PROCEDURES

26.    Consistent with the Purchase Agreement, the Debtor is proposing the Bidding Procedures, which are designed to maximize the value of the Assets for the Debtor's estate, creditors and other interested parties.  Specifically, as discussed in more detail below, Purchaser will enter into the Purchase Agreement, which is subject to higher and better offers.  In that regard, Essextec and Purchaser have expended considerable time, effort and resources conducting due diligence and negotiating the Purchase Agreement.

27.    The Debtor proposes that competing offers ("Competing Offers") for the Assets be governed by the following Bidding Procedures:[2]

(a)    Any entity that wishes to make a bid for Assets must provide the Debtor with sufficient and adequate information to demonstrate, to the absolute satisfaction of the Debtor, that such Competing Offeror (i) has the financial wherewithal and ability to consummate the Sale Transaction including evidence of adequate financing, and including a financial guaranty, if appropriate, (ii) can provide all non-debtor contracting parties to the Client Contracts with adequate assurance of

---

[2] The summary description of the Bidding Procedures provided herein is provided for the convenience of the Court and parties in interest.  To the extent that there are any discrepancies between this summary and the Bidding Procedures Order, the terms and language of the Bidding Procedures Order shall govern.  Unless otherwise defined herein, capitalized terms defined in the Bidding Procedures shall have the meaning ascribed to them in the Bidding Procedures Order or the Purchase Agreement.

future performance as contemplated by section 365 of the Bankruptcy Code; (iii) will be on substantially the same terms and conditions as the Purchase Agreement except for price; (iv) will require the payment of a purchase price to the Debtor of not less than $4,862,900.00 (the "Minimum Bid"); (v) will be accompanied by an earnest money deposit of 5% of the initial purchase price set forth in any Modified Purchase Agreement, plus the amount of the Bidding Protections.  Any bid satisfying such criteria shall be designated as a "Qualified Bid."   Except as provided for in the Purchase Agreement, the bid must not contain any contingencies of any kind, including, but not limited to (a) obtaining financing or shareholder, board of directors or other approval, or (b) the outcome or completion of due diligence.  Each Potential Bidder must also affirmatively acknowledge that the Potential Bidder (x) had an opportunity to conduct due diligence regarding the Assets prior to making its offer and does not require further due diligence, (y) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and (z) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures.

(b)    Competing Offers must (a) be in writing and (b) be received by Tracy L. Klestadt and Brendan M. Scott of Klestadt Winters Jureller Southard & Stevens, LLP, 570 Seventh Avenue, 17th Floor, New York, New York 10018 so that such bid is received no later than _____, 2015 at 5:00 p.m. (the "Competing Offer Deadline"). Parties who do not submit Competing Offers by the Competing Offer Deadline shall not be permitted to participate at the Auction.

(c)    Competing Offers must be accompanied by a good faith deposit in the amount of 5% of the initial purchase price set forth in any Modified Purchase Agreement, plus the amount of the Bidding Protections, in the form of in the form of wire transfer or a certified check payable to KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP ESCROW MANAGEMENT ACCOUNT.  All such deposits shall be

retained by the Debtor pending the hearing to consider the Sale Motion and shall be returned The Deposit shall be returned to a Potential Bidder (x) as soon as practicable if the Potential Bidder is not determined to be a Qualified Bidder or (y) no later than five (5) business days after entry of the Sale Order if the Potential Bidder is deemed to be a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not the Successful Bidder or the Backup Bidder; provided, however, that in the event the Purchaser is not the Successful Bidder, its Deposit shall be returned to it promptly upon termination of the Purchase Agreement, but in no event later than five (5) business days from the date of that termination.  The Debtor will maintain any Deposit in a non-interest bearing account.

(d)     Any Competing Offer by a Qualified Party conforming to the within requirements shall be considered at the auction to be held at the auction to be held at 570 Seventh Avenue, 17th Floor, New York, New York 10018 on **April [•], 2015, starting at 10:00 a.m. (EST)**, or in such manner and at such alternative location as the Debtor may determine or the Court may direct, on _____, 2015 commencing at 10:00 a.m. (EST) (the "Auction").

(e)     The Debtor shall, after the Competing Offer Deadline and prior to the Auction, evaluate all bids received, and determine which bid reflects the highest or best offer for the Assets.  The Debtor shall announce such determination at the commencement of the Auction and then the Debtor shall conduct the Auction among the parties submitting Competing Offers to determine if any higher or better offer might be obtained.  Any further bids made at the Auction shall be in increments of at least $100,000 greater than the preceding bid.

(f)     If there is a successful Competing Offer for the Assets, such successful bidder shall have such rights and responsibilities of the Purchaser, as set forth in the Modified Purchase Agreement, or the Purchase Agreement, as applicable with appropriate modifications for (i) the identity of the successful bidder and (ii) the purchase price as the same shall have been increased at the Auction.

(g)    In the event that the Court enters a Final Order approving an Alternative Transaction, then the Purchaser shall be entitled to and Debtor shall pay to Purchaser at the consummation of an Alternate Transaction (or in the case of a plan of reorganization or liquidation that is an Alternate Transaction, upon confirmation of such plan or reorganization or liquidation), 3.0% of the Purchase Price (the "Breakup Fee") to compensate the Purchaser for its efforts in connection with it being the "stalking horse" bidder for the and Assets, including the costs of the Purchaser incurred in performing due diligence, negotiating and documenting the terms of the Purchase Agreement and representing its interests with respect to the proposed sale and the Debtor's Bankruptcy Case.  The Breakup Fee shall constitute a first priority administrative expense of the Debtor pursuant to Section 503(b) and shall be paid within seven (7) days of any closing in connection with the Assets and without further order or application to the Bankruptcy Court.

(h)    In addition to any Breakup Fee that may be payable pursuant to this Section, upon (i) any event in which the Breakup Fee is payable pursuant to this Section or (ii) termination of the Purchase Agreement by Purchaser pursuant to Section 7.1.1(b) or Section 7.1.1(i), Seller shall reimburse up to $200,000 of the actual and documented out-of-pocket fees and expenses incurred by Purchaser and its Affiliates in the course of negotiating, drafting and approving the Purchase Agreement, Disclosure Schedules and the Transaction Documents prior to the date this Agreement is terminated, whether incurred before, on or after the Petition Date (the "Expense Reimbursement").  The claims of Purchaser to the Expense Reimbursement shall constitute an administrative expense against the Debtor's bankruptcy estate under the applicable provisions of the Bankruptcy Code.

(i)    In the event that a Competing Offer is the Successful Bidder and such Successful Bidder fails to consummate the proposed transaction by the Closing Date, such bidder's deposit shall be forfeited to the Debtor (but not as liquidated damages, the Debtor reserving the right to pursue all remedies that may be available to it) and the Debtor shall be free to consummate the proposed transaction with the next highest bidder at the final price bid by such bidder at the Auction (or, if that bidder is unable to consummate the transaction at that price, the

Debtor may consummate the transaction with the next higher bidder, and so forth) without the need for an additional hearing or order of the Bankruptcy Court.

(j)      All bids for the purchase of the Debtor's assets shall be subject to approval of the Bankruptcy Court.

(k)      No bids shall be considered by the Debtor or the Bankruptcy Court unless a party submitted a Competing Offer in accordance with the Bidding Procedures and participated in the Auction.  The Debtor, in its absolute discretion, may reject any Competing Offers not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules of the Court, or contrary to the best interests of the Debtor and parties of interest.

(l)      All bids (other than those of the Successful Bidder and Backup Bidder) are irrevocable until the earlier of (A) ninety (90) days following entry of the Sale Order (defined below) and (B) closing with the Successful Bidder .

(m)      All bids are subject to such other terms and conditions as are announced by the Debtor at the outset of the Auction.

## BIDDING PROTECTIONS

28.      The proposed Purchase Agreement contemplates the payment of certain protections, including a Breakup Fee and Expense Reimbursement (collectively, the "Bidding Protections"), in certain circumstances.  The Debtor requests the Court grant the proposed Bidding Protections administrative expense priority pursuant to Bankruptcy Code 503(b) and 507(b), which shall be payable solely from the first proceeds of an Alternate Transaction. The Purchase Agreement provides that if the proposed Bidding Protections are not approved by the Court, the Purchaser shall have the right, but not the obligation, to not enter into the Purchase Agreement  and none of the parties shall have any further obligations to the other.

29.     The Debtor submits that (a) approval of the proposed Bidding Protections is
an integral part of the Purchase Agreement , (b) in the absence of the Debtor's obligation to
pay the Bidding Protections, Purchaser will not enter into the Purchase Agreement, (c) the
entry into the Purchase Agreement is necessary for the preservation of the Debtor's estate and
is beneficial to the Debtor, its estate, creditors and other parties in interest, and (d) the
Bidding Protections are reasonable in relation to Essextec and Purchaser's efforts and the
amount of consideration contemplated by the Purchase Agreement .

30.     The efforts of the Purchaser have increased the chances that the Debtor will
receive the highest or otherwise best offer for the Assets by establishing a minimum bid for
other bidders, subjecting the Assets to an open auction and serving as a catalyst for other
potential or actual bidders.  Thus, the Bidding Protections benefit the Debtor, its estate, its
creditors and all other parties in interest.

31.     As stated above, the Purchaser is unwilling to commit to hold open its offer to
purchase the Assets under the terms of the Purchase Agreement unless the Bidding
Protections are approved.  Accordingly, the Debtor requests that the Court approve the
Bidding Protections and authorize payment of the Breakup Fee pursuant to the terms and
conditions of the Purchase Agreement .

## ASSUMPTION AND ASSIGNMENT AND REJECTION OF EXECUTORY CONTRACTS AND LEASES

### A.     Assigned Contracts

32.     In connection with the Sale Transaction, the Debtor seeks authority under
section 365 of the Bankruptcy Code to (a) assume and assign the Assigned Contracts, and (b)
execute and deliver to the Purchaser (or the Successful Bidder, as the case may be) such
documents or other instruments as may be necessary to assign and transfer the Assigned

Contracts as of the date of the Closing on the Purchase Agreement (and expressly subject to Closing).

33.     By and through this Motion, the Debtor is seeking authority to assume any and all Assigned Contracts (as defined in the Purchase Agreement ) following and subject to the Closing, and to assign all such contracts to the Purchaser.  The Debtor seeks the authority to assume and assign to the Purchaser any and all of the Assigned Contracts which the Purchaser in its sole discretion elects to assume and gives notice of the same to the Debtor.

34.     Under the Purchase Agreement , the Purchaser is not liable as to any obligation under or with respect to any Assigned Contract arising on account of or with respect to any time prior to the Closing other than the Cure Amount.

35.     To effectuate the assumption/assignment process, the Debtor proposes to serve a notice on the non-debtor parties to the Assigned Contracts of the potential assumption and assignment of the Assigned Contracts (the "Assignment Notice"), substantially in the form annexed hereto as **Exhibit D**, advising each such party of the Debtor's interest to assume and assign such executory contract. The Assignment Notice shall be served no later than five (5) business days following the entry of the Bidding Procedures Order. The list of Assigned Contracts attached to the Assignment Notice, which comprises all of the Debtor's executory contracts, except for those specifically excluded from the Assets, and sets forth (a) the name and address of the counterparties to the executory contracts proposed to be assumed and assigned to the Purchaser or its designee; (b) the nature of the executory contract; and (c) the amount of any cure costs that the Debtor believes to be due and owing as reflected on its books and records. Purchaser may elect, through the date of closing, to exclude any contract from the Assigned Contracts.

36.     Under the terms of the Purchase Agreement, the Purchaser is responsible for paying cure costs, if any, under any Assigned Contracts that are ultimately assumed and assigned to Purchaser.

37.     Any non-debtor party who objects to its Cure Amount set forth in its Cure Notices must file an objection to the Cure Amount with respect to such Assigned Contract, state with specificity the nature of the objection and the amount of the alleged Cure Amount and include appropriate supporting documentation demonstrating the calculation of the cure amounts as claimed not later than the Cure Objection Deadline as provided for below.  Any such objections must be (a) filed with the Court and (b) served upon (i) the proposed attorneys for the Debtor, Klestadt & Winters Jureller Southard & Stevens, LLP, 570 Seventh Avenue, 17th Floor, New York, New York 10018 (Attn: Tracy L. Klestadt, Esq. and Brendan M. Scott), (iii) Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10014 (Attn: Michael Driscoll, Esq.) and (iv) the attorneys for the Purchaser, , so as to be actually received no later than 12:00 Noon (EST), seven (7) days prior to the Sale Hearing (the "Cure Objection Deadline").

38.     If no objection to the Cure Amounts is timely received in accordance with the preceding paragraph, or if a timely objection is received but is not in compliance with the foregoing requirements, any non-debtor party to a Assigned Contract shall be barred and permanently enjoined from asserting any amounts in excess of the Cure Amount set forth in its Cure Notices.  Any objection to any Cure Amount shall be heard at the Sale Hearing.

39.     In an effort to provide the most up-to-date information to non-debtor parties to the Assigned Contracts, in the event the Purchaser is not the Successful Bidder at the

Auction, the Debtor will use its reasonable best efforts to provide non-debtor parties to the

Assigned Contracts with the identity of the Successful Bidder prior to the Sale Hearing.

Otherwise, the non-debtor parties to the Assigned Contracts may wish to plan to attend the

Sale Hearing.

40.     Any non-debtor party to a Assigned Contract shall have the right to request

adequate assurance of performance by the Purchaser of such a Assigned Contract either by

contacting the Purchaser through its attorneys, or filing, prior to the deadline for objecting to

the proposed Sale Order, such request with the Court and serving (a) filed with the Court and

(b) served upon (i) the attorneys for the Debtor, Klestadt, Winters, Jureller Southard &

Stevens LLP, 570 Seventh Avenue, 17th Floor, New York, New York 10018 (Attn: Brendan

M. Scott, Esq.), (ii) the attorneys for the Committee, if one is appointed; (iii) the Office of the

United States Trustee, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn: Attn:

Michael Driscoll) and (iv) the attorneys for the Purchaser, Saiber LLP, 270 Madison Avenue,

Suite 1400, New York, New York 10016 (Attn: Richard E. Weltman, Esq.), so as to be

actually received no later than 12:00 Noon (EST), seven (7) days prior to the Sale Hearing,

indicating what adequate assurance it requires from the Purchaser.

41.     If no such requests for adequate assurance are timely made or filed, the

Purchaser shall be deemed to have provided adequate assurance as required by section

365(f)(2)(B) of the Bankruptcy Code.  If any such requests are filed, the Court, at the Sale

Hearing, shall determine whether the Purchaser has provided adequate assurance as required

by section 365(f)(2)(B) of the Bankruptcy Code.

42.     The Debtor believes that those procedures and deadlines are fair and

reasonable, and will provide sufficient notice to the non-debtor parties to the Assigned

Contracts.  These procedures are designed to provide certainty to the Debtor and the non-debtor parties to the Assigned Contracts regarding their obligations and rights in respect of the Cure Amounts.  Accordingly, the Debtor requests that the Court approve the foregoing procedures and deadlines.

### NOTICE OF SALE, AUCTION AND BIDDING PROCEDURES

43.    The Debtor, no later than five (5) business days after entry of the Bidding Procedures Order, will serve a copy of this Motion, the Bidding Procedures Order, the proposed Sale Order and all exhibits to such orders upon the following persons by first-class mail, postage prepaid: (i) the Office of the United States Trustee; (ii) the attorneys for the Committee; if any (iii) the attorneys for the Purchaser; (iv) all counterparties to the Assigned Contracts; (v) all parties who have made an expression of interest in acquiring the Assets or the Business within twelve (12) months prior to the date of the Motion; (v) all known persons holding a lien on any of the Assets; (vi) all taxing authorities that have jurisdiction over the Assets; and (vii) parties listed on the Debtor's list of twenty (20) largest creditors (collectively, the "Bidding Procedures Parties").

44.    In addition, no later than five (5) business days after entry of the Bidding Procedures Order, the Debtor shall cause the form of sale notice, a copy of which is annexed hereto as **Exhibit E**, to be (i) served upon the Bidding Procedures Parties, and (ii) served upon all known creditors and all known parties in interest in this chapter 11 case (collectively, the "Auction Notice Parties").

45.    The Debtor believes that the foregoing notice to the Auction Notice Parties is sufficient to provide effective notice of the Bidding Procedures, the Auction and the proposed Sale to potentially interested parties in a manner designed to maximize the chance of obtaining the broadest possible participation in the Auction while minimizing the costs to the

estate.  Accordingly, the Debtor requests that the Court find that notice in this manner is

sufficient and that no further notice of the Auction, the Bidding Procedures or the proposed

Sale is required.

## BASIS FOR RELIEF REQUESTED

**A.    The Proposed Sale is Within the Debtor's Sound Business Judgment and Should Therefore Be Approved**

46.    The Debtor submits that ample authority exists for the approval of the Sale

Transaction to the Purchaser pursuant to the Purchase Agreement , or to such other purchaser

submitting a higher and better offer for the Assets.  Section 363(b) of the Bankruptcy Code

permits a debtor to sell assets outside the ordinary course of its business.  That section

provides in pertinent part, "[t]he trustee,[3] after notice and a hearing, may use, sell or lease,

other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).

While Section 363(b) does not provide any standards to be applied to a debtor's request to sell

assets, a wide body of case law has evolved containing the judicial standards governing sales

of assets.

47.    In In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983), one of the seminal and

most widely followed cases dealing with asset sales, the Second Circuit determined that a

sale of assets could be approved if the debtor could demonstrate an "articulated business

justification" for the sale.  722 F.2d at 1070.  The Court further held that the factors to be

considered in determining whether a sound business reason exists include the following:

> the proportionate value of the asset to the estate as a whole, the amount of
> elapsed time since the filing, the likelihood that a plan of reorganization will
> be proposed and confirmed in the near future, the effect of the proposed
> disposition on future plans of reorganization, the proceeds to be obtained from
> the disposition vis-à-vis any appraisals of the property, which of the

---

[3]Pursuant to Section 1107(a) of the Bankruptcy Code, the debtor in possession has all of the powers of a trustee (except the power to investigate the debtor's own financial affairs).

alternatives of use, sale or lease the proposal envisions and, *most importantly perhaps, whether the asset is increasing or decreasing in value.*

Id. at 1071 (emphasis supplied).

48.     The Lionel decision has been widely accepted and applied by numerous other courts facing a debtor's request to sell assets, including requests to approve a sale of certain of the assets of a debtor's estate.  See, e.g., In re the Delaware & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991); In re Eng'g Prod. Co., 121 B.R. 246 (Bankr. E.D. Wis. 1990); In re Thomson McKinnon Sec., Inc., 120 B.R. 301 (Bankr. S.D.N.Y. 1990); In re Channel One Communications, Inc., 117 B.R. 493 (Bankr. E.D. Mo. 1990); In re Brethren Care, 98 B.R. 927 (Bankr. N.D. Ind. 1989).  As will be demonstrated below, application of the above-listed factors demonstrates that approval of the Purchase Agreement is warranted at this time.

49.     In addition to requiring sound business reasons to approve a sale pursuant to section 363(b) of the Bankruptcy Code, many courts have required a showing that the price to be obtained for assets be fair and reasonable; that the sale to the proposed purchaser was negotiated in good faith; and that it does not unfairly benefit insiders, the purchaser, or a certain creditor or class of creditors.  See, e.g., In re Channel One Communications, 117 B.R. at 494-97; In re Indus. Valley Refrig. & Air Cond. Supplies, Inc., 77 B.R. 15 (Bankr. E.D. Pa. 1987).

50.     The Debtor and Purchaser negotiated in good faith, at arms' length, and with a view towards maximizing the value of the Debtor's estate for all creditors, rather than to benefit insiders or a particular creditor.

51.     The Debtor is confident that the Purchase Price is the best achievable under the present circumstances.  Nonetheless, the Purchase Agreement is subject to higher and better offers, thereby ensuring that the best possible offer has been or will be received.

52.     Many courts require that "fair and accurate notice" be given of the proposed

sale under section 363(b) of the Bankruptcy Code.  See, e.g., In re Delaware & Hudson Ry.,

124 B.R. 169, 176 (D. Del. 1991); Channel One 117 B.R. at 496 (Bankr. E.D. Mo. 1990);

Naron & Wagner, Chartered, 88 B.R. 85, 88 (Bankr. D.Md. 1988).  Fair and accurate notice

should inform all interested parties of the liquidation of the debtor's business; disclose

accurately the terms of the sale; explain the effect of the sale upon the debtor's business; and

explain why the sale is in the best interests of the debtor's estate.  Delaware & Hudson, 124

B.R. at 180; see also, Naron & Wagner, 88 B.R. at 88.

53.     The Debtor submits that the notice given here alerted parties in interest to the

sale contemplated by the Purchase Agreement , described and explained all material terms

thereof, and explained the effect of the sale on the Debtor's business.

**B.      The Purchaser is a Good Faith Purchaser and is Entitled to the Protections of
Section 363(m) of the Bankruptcy Code**

54.     Section 363(m) of the Bankruptcy Code provides:  "The reversal or

modification on appeal of an authorization under subsection (b) or (c) of this section of a sale

or lease of property does not affect the validity of a sale or lease under such authorization to

an entity that purchased or leased such property in good faith, whether or not such entity

knew of the pendency of the appeal, unless such authorization and such sale or lease were

stayed pending appeal."  11 U.S.C. § 363(m).

55.     Although the Bankruptcy Code does not define "good faith," in In re Colony

Hill Assocs., 111 F.3d 269 (2d Cir. 1997) the Second Circuit held that:

> The "good faith" component of the test under § 363(m) speaks to the equity of
> [the bidder's] conduct in the course of the sale proceedings. Typically, the
> misconduct that would destroy a purchaser's good faith status at a judicial sale
> involves fraud, collusion between the purchaser and other bidders or the
> trustee, or an attempt to take grossly unfair advantage of other bidders.

111 F.3d at 276 (<u>quoting</u> <u>In re Rock Industries Machinery Corp.</u>, 572 F.2d 1195, 1198 (7th Cir. 1978)) (internal quotations omitted).

56.     As set forth above, the Purchaser was selected by the Debtor after engaging in extensive negotiations and determining that the terms of the Purchaser's bid were the most favorable option.  The Purchase Agreement is a product of extensive arms-length negotiations and was not in any way tainted by fraud, collusion or bad faith.  Accordingly, the Debtor requests that the Court make a finding that the Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code.

## C.    The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, Encumbrances and Interests

57.     The Debtor seeks authorization to sell the Assets to Purchaser free and clear of all liens, claims and encumbrances, except as expressly permitted by the Purchase Agreement.  Nonetheless, the Assets may be sold free and clear of liens in accordance with section 363(f) of the Bankruptcy Code, which provides, in pertinent part:

> (f)     The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if
>
> (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

58.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will be sufficient to permit the Sale

Transaction free and clear of liens, claims, encumbrances, pledges, mortgages, security

interests, charges, options, and other interests.  The Debtor submits that, the Purchase

Agreement provides that all liens, to the extent that any such liens exist, will attach to the

proceeds of sale in the order of their priority and to the extent of their validity and the

proposed Purchase price is greater than the aggregate value of all such liens.  As such, the

rights of secured creditors are preserved.  Thus, the Assets may be sold free and clear of such

liens pursuant to section 363(f)(3) of the Bankruptcy Code.  In re General Bearing Corp., 136

B.R. 361 (Bankr. S.D.N.Y. 1992); In re Oneida Lake Development, Inc., 114 B.R. 352

(Bankr.  N.D.N.Y. 1990).

**D.     The Court Should Waive or Reduce the Fourteen-Day Stay Periods Required by
        Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure**

59.     Pursuant to Bankruptcy Rule 6004(g), unless the court orders otherwise, all

orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are

automatically stayed for 14 days after entry of the order.  Fed. R. Bankr. P. 6004(g).  The

purpose of Bankruptcy Rule 6004(g) is to provide sufficient time for an objecting party to

appeal before the order can be implemented.  See Advisory Committee Notes to Fed. R.

Bankr. P. 6004(g).

60.     Although Bankruptcy Rule 6004(g) and the Advisory Committee Notes are

silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay

period, Collier suggested that the 14-day stay period should be eliminated to allow a sale or

other transaction to close immediately "where there has been no objection to the procedure."

10 Collier on Bankruptcy 15th Ed. Rev., 6004.09 (L. King, 15th rev. ed. 2005).  Furthermore,

Collier provides that if an objection is filed and overruled, and the objecting party informs the

court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  Id.

61.     Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for 14 days, unless the court orders otherwise.

62.     To preserve the value of the Assets and limit the costs of administering and preserving the Assets, it is critical that the Debtor close the Sale Transaction as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtor hereby requests that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(g) and 6006(d), or in the alternative, if an objection to the sale or to the assignment of a contract or lease is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal to allow the sale to close as provided under the Purchase Agreement .

**E.     The Assumption and Assignment of Assigned Contracts Should be Authorized**

63.     Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(f) of the Bankruptcy Code provides that a debtor in possession may assign an executory contract or unexpired lease of the debtor only if (a) the debtor in possession assumes such contract or lease in accordance with the provisions of section 365, and (b) adequate assurance of future performance by the assignee of such contract or lease is provided. 11 U.S.C. § 365(f)(2).

64.     Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory lease or executory contract of a debtor.  This subsection provides:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee

(A) cures or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provide adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

65.      The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir.1993).

66.      When an executory contract or lease is to be assumed and assigned, adequate assurance may be provided by, among other things, demonstrating the financial health of the assignee and its experience and ability in managing the type of enterprise or property assigned. See e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when a prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of success).

67.      To the extent that any defaults exist under any Assigned Contracts, the Debtor will cure, or provide adequate assurance of cure of, such defaults within the meaning of section 365(b)(1)(A) and in accordance with the Purchase Agreement . Moreover, the Debtor will demonstrate facts at the Sale Hearing that show the Purchaser's (or the Successful

Bidder 's, as the case may be) financial credibility, experience in the industry, and

willingness and ability to perform under the Assigned Contracts.  Therefore, the Sale Hearing

will provide the Court and other interested parties with an opportunity to evaluate and, if

necessary, challenge the ability of the Purchaser (or the Successful Bidder , as the case may

be) to provide adequate assurance of future performance under the Assigned Contracts.

Accordingly, the Debtor submits that the assumption and assignment of the Assigned

Contracts as set forth herein should be approved.

**F.      Conducting an Auction Pursuant to the Bidding Procedures is in the Best
Interests of the Debtor's Estate and Creditors**

68.      In order to maximize the value of the Assets for the benefit of the Debtor, its

creditors and its chapter 11 estate, the Debtor seeks to implement a competitive bidding

process typical for transactions of this size and nature and designed to generate a maximum

recovery.  The Debtor believes that the Auction and proposed Bidding Procedures will

encourage participation by financially capable bidders that demonstrate the ability to close a

transaction.  Furthermore, the Bidding Procedures are consistent with other procedures

previously approved by this Court, and are appropriate under the relevant standards

governing auction proceedings and bidding incentives in bankruptcy proceedings.  See e.g.,

In re Kmart, Case No. 02-B02474 (SPS) (Bankr. N.D. Ill. May 10, 2002); In re Global

Crossing, Case No. 02-40188 (S.D.N.Y. March 25, 2002) (REG); In re Randall's Island

Family Golf Ctrs., Inc., 261 B.R. 96 (S.D.N.Y. 2001); In re Integrated Resources, Inc., 147

B.R. 650 (S.D.N.Y. 1992).

**G.      Bidding Protections Are Warranted**

69.      The Debtor proposes that if overbidding occurs at the Auction, the Purchaser

shall have the right, but not the obligation, to participate in the overbidding subject only to

the limitations provided by the Bidding Procedures. However, to compensate the Purchaser

for serving as a "stalking horse," thereby subjecting its bid to better or higher offers, the

Debtor and the Purchaser seek authority for the Debtor to pay the Purchaser the Breakup Fee

and Expense Reimbursement if an Alternative Transaction is approved or consummated or

there is a material breach by the Debtor preventing a Closing as provided in the Purchase

Agreement . The Debtor and the Purchaser believe that the Bidding Protections are (a) fair

and reasonable, given the benefits to the estate of having a definitive Purchase Agreement

and the risk to the Purchaser that a third-party offer may ultimately be accepted and (b) are

necessary to preserve the value of the Debtor's estate.

70.     Bidding incentives such as the Breakup Fee encourage a potential purchaser to

invest the requisite time, money and effort to conduct due diligence and sale negotiations

with a debtor despite the inherent risks and uncertainties of the chapter 11 process. See e.g.,

In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding bidding

incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding

by providing some form of compensation for the risks it is undertaking") (citation omitted);

In re Marrose Corp., 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992)

(stating that "[a]greements to provide breakup fees or reimbursement of fees and expenses

are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse'

which attracts more favorable offers").

71.     The Debtor submits that the Bidding Protections are a normal and necessary

component of sales outside the ordinary course of business under section 363 of the

Bankruptcy Code. See e.g., In re Kmart, Case No. 02 B02474 (SPS) (Bankr. N.D. Ill. May

10, 2002) (authorizing a termination fee and bid protections for potential bidders); In re

Comdisco, Inc., Case No. 01 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a

termination fee as, *inter alia*, an actual and necessary cost and expense of preserving the

debtor's estate, of substantial benefit to the debtor's estate, and a necessary inducement for,

and a condition to, the proposed purchaser's entry into the Asset Purchase Agreement); In re

Integrated Resources, Inc., 147 B.R. at 660 (noting that break up fees may be legitimately

necessary to convince a "white knight" to offer an initial bid by providing some form of

compensation for the expenses such bidder incurs, and the risks such bidder faces by having

its offer held open, subject to higher and better offers); In re Crowthers McCall Pattern, Inc.,

114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving an overbid requirement in an amount equal

to the approved break up fee); In re Kupp Acquisition Corp., Case No. 96 1223 (PJW)

(Bankr. D. Del. March 3, 1997).

72.    Here, the proposed Breakup Fee is 3.0 percent of the Purchase Price. Thus, the

Breakup Fee and Expense Reimbursement are within the range of fees typically paid in other

significant sales transactions that have been consummated in a bankruptcy setting. See e.g.,

Consumer News & Bus. Channel P'ship v. Financial News Network, Inc. (In re Financial

News Network, Inc.), 980 F.2d 165, 167 (2d Cir. 1992) (noting that transaction at issue

provided for a $8.2 million breakup fee on a $149.3 million transaction (5.5%)); Doehring v.

Crown Corp. (In re Crown Corp.), 679 F.2d 774 (9th Cir. 1982) (bid protection of 4.9%

approved).  Further, the amount of the Breakup Fee and Expense Reimbursement is

reasonably calculated to compensate the Purchaser (a) for committing the time to perform

due diligence, (b) for lost opportunity in being bound to a transaction that could be topped in

a competitive auction process and (c) for serving as a "stalking horse" to encourage the

submission of other bids. Accordingly, the Debtor believes that the Bidding Protections should be approved.

## NOTICE

73.     Notice of this Motion will be given to (i) the Office of the United States Trustee; (ii) the Debtor's twenty (20) largest unsecured creditors, and (iii) the Official Committee of Unsecured Creditors.  Additional notice will be provided in accordance with the notice provisions contained herein. The Debtor submits that such notice is sufficient and requests that this Court find that no other or further notice is necessary.

## NO PRIOR REQUEST

74.     No previous application for the relief requested herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests that this Court enter orders, substantially in the form annexed hereto, granting the Motion and such other relief as may be just and proper.

Dated: New York, New York
       March 11, 2015

                              KLESTADT WINTERS JURELLER
                              SOUTHARD & STEVENS, LLP


                              By: /s/ Tracy L. Klestadt
                                    Tracy L. Klestadt
                                    Brendan M. Scott
                              570 Seventh Avenue, 17th Floor
                              New York, New York 10018
                              Tel. No. (212) 972-3000

                              *Proposed Attorneys for the Debtor and*
                              *Debtor-In-Possession*