UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                        :

In re:                     :     Chapter 11
                         :

     GEMINI SYSTEMS, LLC      :     Case No. 15-10574
                         :

             Debtor.     :
                         :
                         :

---------------------------------------------------------------x

**ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) SCHEDULING AN AUCTION AND A SALE HEARING RELATED THERETO, (C) APPROVING THE FORM AND MANNER OF NOTICE OF THE AUCTION AND THE SALE HEARING, AND (D) APPROVING BIDDING PROTECTIONS**

Upon that portion of the motion (the "**Motion**"),[1] dated March 11, 2015 [Docket No. [•]], of Gemini Systems, LLC, as debtor and debtor in possession of the above-captioned Chapter 11 case (the "**Debtor**"), by and through its proposed counsel, Klestadt Winters Jureller Southard & Stevens, LLP, seeking the entry of an Order, pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1, 6004-1, 6006-1 and 9006-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**"): (a) approving the proposed Bidding Procedures, substantially in the form of Schedule 1 attached hereto, to be used in connection with the proposed sale (the "**Sale**") of substantially all of the Debtor's assets (the "**Assets**") to ETGI, Inc. (the "**Purchaser**"), pursuant to an Asset Purchase Agreement between the Debtor, the Purchaser, Essex Technology Group, Inc. ("**Essextec**") and Simon Leung (the "**Owner**"), dated as of March

---

[1]    Capitalized terms used but not otherwise defined herein shall be ascribed the meanings provided to those terms in the Motion or the Purchase Agreement (defined below), as applicable.

___, 2015, or to any competing bidder (or competing bidders) (the "**Successful Bidder**") that

submits (or collectively submits) higher or otherwise better offer (or offers) for the Assets; (b)

scheduling an auction (the "**Auction**") and a hearing to approve the Sale (the "**Sale Hearing**");

(c) approving the form and manner of the notice of the Auction and the Sale Hearing (the "**Sale**

**Notice**"), substantially in the form of <u>Schedule 2</u> attached hereto; and (d) approving the payment

of the Breakup Fee and Expense Reimbursement (together, the "**Bidding Protections**") and

certain overbid procedures (collectively, the "**Bidding Procedures Relief**"); and this Court

having held a hearing on March [•], 2015 to consider the Bidding Procedures Relief (the

"**Bidding Procedures Hearing**"); and upon the Motion and the record of the Bidding

Procedures Hearing, it now appearing that the Bidding Procedures Relief is in the best interest of

the Debtor's estate, its creditors and other parties in interest; and after due deliberation thereon

and good cause appearing therefor, it is hereby:

## FOUND AND DETERMINED THAT:[2]

A.    This Court has jurisdiction over the Motion and the Bidding Procedures

Relief pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Bidding Procedures

Relief is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court

in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Good and sufficient notice of the Bidding Procedures Relief sought in the

Motion has been given and no additional or further notice is required.  A reasonable opportunity

to object or be heard regarding the Bidding Procedures Relief requested in the Motion has been

afforded to interested persons and entities, including:  (i) counsel for the official committee of

unsecured creditors (the "**Creditors' Committee**"), if one is appointed; (ii) each of the Debtor's

---

[2]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings
of fact, when appropriate.  <u>See</u> Fed. R. Bankr. P. 7052.

secured creditors, or their counsel if known; (iii) the Office of the United States Trustee for the

Southern District of New York (the "**U.S. Trustee**"); (iv) all parties in interest who requested

notice pursuant to Bankruptcy Rule 2002; (v) all counterparties to the Assigned Contracts; (vi)

the following state and local taxing and regulatory authorities:  (a) the United States Attorney for

the Southern District of New York, (b) the Attorney General of the State of New York, (c) the

Internal Revenue Service, (d) New York State Department of Taxation and Finance, (e) New

York City Department of Finance and (f) the Environmental Protection Agency; (vii) counsel to

the Purchaser; (viii) all parties who are known to assert a Lien on the Assets; (ix) all parties

identified by the Debtor as potentially having an interest in acquiring some or all of the Assets

(collectively, the "**Notice Parties**"); and (x) all creditors of the Debtor who are listed on the

Debtor's Schedules of Assets and Liabilities [Docket No. __], or who filed proofs of claim

against the Debtor's estate (the "**Scheduled and Filed Creditors**").

  C. The proposed Sale Notice constitutes good, appropriate, adequate and

sufficient notice, and is reasonably calculated to provide all interested parties, including the

Notice Parties and the Scheduled and Filed Creditors, with timely and proper notice of the

Bidding Procedures, the Bidding Protections, the Auction, the assumption and assignment of the

Assigned Contracts and Cure Amounts, and the Sale, as set forth herein and in the Motion, and

no other or further notice is required.

  D. The Debtor has articulated good and sufficient reasons for this Court to

grant the relief requested in the Motion, including this Court's (i) approval of the Bidding

Procedures, (ii) approval of payment of the Bidding Protections from the proceeds of any

Alternate Transaction or as otherwise provided for under the terms of the Purchase Agreement,

(iii) determination of final Cure Amounts, and (iv) approval of the form and manner of service of the Sale Notice.

E.    The Debtor has articulated good and sufficient reasons for, and the best interests of the Debtor's estate will be served by, this Court scheduling the Sale Hearing to consider whether to grant the remainder of the relief requested in the Motion, including approval of the proposed Sale in accordance with either (i) the Purchase Agreement between the Debtor and the Purchaser, attached as <u>Exhibit C</u> to the Motion, or (ii) such other agreement or agreements by and between the Debtor and the Successful Bidder or Successful Bidders, free and clear of, among other things, any and all liens, claims, encumbrances and interests (collectively, "**Liens**") (other than the Permitted Liens (as defined in the Purchase Agreement)), with the same to attach to the proceeds of the Sale pursuant to section 363 of the Bankruptcy Code.

F.    The Purchaser has provided the Debtor with $500,000 in debtor in possession financing to assist in the administration of this Chapter 11 case, which financing was "So Ordered" by the Court during a hearing conducted on _____, 2015, which financing is secured by the liens and claims afforded under section 364(c) of the Bankruptcy Code (the "**Postpetition Financing**").

G.    The Bidding Protections to be paid in accordance with the terms set forth in the Purchase Agreement are (i) an actual and necessary cost and expense of preserving the Debtor's estate within the meaning of section 503(b) of the Bankruptcy Code, (ii) commensurate to the real and substantial benefit conferred upon the Debtor's estate by the Purchaser, (iii) reasonable and appropriate in light of the size and nature of the proposed Sale and comparable transactions, the commitments that have been made, and the efforts that have been

and will be expended by the Purchaser, and (iv) necessary to induce Purchaser to continue to pursue the Sale and to continue to be bound by the terms of the proposed Purchase Agreement.

H.      The Debtor's authorization to pay the Bidding Protections is an essential inducement and condition relating to the Purchaser's entry into, and continuing obligations under, the Purchase Agreement.  The Debtor's commitment to pay the Bidding Protections, which has induced Purchaser to submit its bid that will serve as a minimum or floor bid for the Sale of the Assets on which the Debtor can rely, provides a material benefit to the Debtor's estate, its creditors and other parties in interest by increasing the likelihood that the best possible purchase price for the Assets will be received.

I. The Bidding Protections and the Bidding Procedures are reasonable and appropriate.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      All objections to entry of this Order or to the Bidding Procedures Relief requested in the Motion that have not been withdrawn, waived, resolved or settled are hereby denied and overruled in their entirety.

**The Bidding Procedures**

2.      The Bidding Procedures, as set forth on Schedule 1 attached hereto and incorporated herein by reference, are hereby approved in all respects and shall govern all bids and bid proceedings relating to the Sale of the Assets.  Notwithstanding the above, any party in interest may object at the Sale Hearing to the criteria used by the Debtor in ultimately selecting the highest or otherwise best offer for the Assets.

3.      The deadline for submitting bids for the Assets (the "**Bid Deadline**") shall be **April [•], 2015, at 4:00 p.m. (EST)**.

4.      Except as may be limited by the Purchase Agreement, the Debtor is authorized to extend the deadlines set forth in this Order and/or adjourn, continue or suspend the Auction and/or the Sale Hearing for any reason.

5.      The Debtor is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

## The Auction

6.      The **Auction shall commence at 10:00 a.m. (EST) on April [•], 2015** at 570 Seventh Avenue, 17th floor, New York, New York 10018, or during such later time or at such other place as decided by the Debtor.  The Debtor shall notify all Qualified Bidders of any such later time or different place; provided, however, that in the event that no Qualified Bids (other than that submitted by Purchaser, which is hereby deemed to be a Qualified Bid) are received by the Bid Deadline, or if the aggregate value of the highest Qualified Bids that have been submitted for all or a portion of the Assets does not exceed the Minimum Bid (as defined in the Bidding Procedures), the Debtor shall not be required to conduct an Auction, and in such event the Debtor shall proceed with the approval of the Purchase Agreement.

## The Bidding Protections

7.      Sections 4.15 (Bankruptcy Covenants), 4.16 (Acquisition Proposal or Alternate Transaction) and 4.10 (Breakup Fee and Expense Reimbursement) of the Purchase Agreement are approved and binding on the Debtor and its estate.  The Debtor is authorized and directed to pay the Bidding Protections to the extent incurred and solely in the event of the consummation of an Alternate Transaction from the first proceeds of such transaction, or as otherwise set forth in the Purchase Agreement, without further order of the Court.

8.      The Postpetition Financing, along with any supplemental postpetition financing loaned by Essextec to the Debtor after the filing date of the Motion that is approved

pursuant to an order of the Court (or as "So Ordered" on the record during a hearing before the Court), will mature upon the approval of an Alternate Transaction and paid contemporaneously with the closing or confirmation of that Alternate Transaction.   Accordingly, the Bidding Procedures require that, upon the closing of the Sale of the Assets to an entity other than Essextec (or its designee(s)), the Successful Bidder shall be required to:  (a) repay to Essextec, contemporaneously with the closing of that Alternate Transaction, any outstanding amounts of the Postpetition Financing and any supplemental postpetition financing provided by Essextec to the Debtor approved pursuant to an order of the Court (or as "So Ordered" on the record during a hearing before the Court); and (b) in the event that the Court authorizes Essextec to extend supplemental postpetition financing to the Debtor pursuant to an agreement approved by the Court, assume and continue to perform all of Essextec's rights and obligations in connection with that financing pursuant to the terms of that agreement.

### **Sale Hearing**

9.     The Sale Hearing shall be held before the Honorable _____, United States Bankruptcy Judge, on **April [•], 2015 at __:__ a/p.m. (EST)**, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, Courtroom No. ___, at which time this Court shall consider:  (i) approval of the Sale to Purchaser or any other Successful Bidder(s); (ii) the proposed assumption and assignment of the Assigned Contracts and related Cure Amounts in connection with the Sale; (iii) the entry of the proposed sale order, substantially in the form attached to the Motion as Exhibit B (the "**Sale Order**"); (iv) any issues or objections that are timely interposed by any parties; and (v) such other or further relief as this Court may deem just or proper.

10.    Except as may be limited by the Purchase Agreement, the Sale Hearing may be adjourned by the Debtor, after consultation with the Creditors' Committee, without further order of this Court, by filing a notice with this Court and serving such notice on all Qualified Bidders.

## Notice

11.    The Sale Notice, substantially in the form attached hereto as Schedule 2, is hereby approved.

12.    By no later than three business days after the entry of this Order, the Debtor shall cause a copy of the Bidding Procedures, the Sale Notice and this Order to be served upon the Notice Parties and the Scheduled and Filed Creditors via first class mail.

13.    The notice set forth in the preceding paragraphs shall constitute good and sufficient notice of the Motion, the Auction, the Sale Hearing and the proposed Sale Order, and no other or further notice of the Motion, the Auction, the Sale Hearing and/or the proposed Sale Order shall be necessary or required.

## Objections to Motion

14.    Objections, if any, to the remaining relief sought in the Motion must (a) be made in writing, (b) state with particularity the reasons for the objection or response, (c) conform to the Bankruptcy Rules and the Local Bankruptcy Rules, (d) set forth the name of the objecting party, the nature and basis of the objection, and the specific grounds therefore, and (e) be filed with the Clerk of the Court (with a copy to be delivered to the Chambers of the Honorable _____, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, Courtroom No. ___, and shall be served so as to be **actually received** no later than **4:00 p.m. (EST) on April [•], 2015** (the "**Objection Deadline**"), upon: (i) proposed counsel to the Debtor, Klestadt Winters Jureller Southard &

Stevens, LLP, 570 Seventh Avenue, 17th Floor, New York, New York 10018-6314, Attn.:

Brendan Scott, Esq.; (ii) proposed counsel for the Creditors' Committee, if one is appointed; (iii)

counsel to the Purchaser, Saiber LLP, 270 Madison Avenue, 14th Floor, New York, New York

10016, Attn.:  Richard E. Weltman, Esq.; and (iv) the Office of the U.S. Trustee, U.S. Federal

Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn.: Michael

Driscoll.

<u>**Assigned Contracts**</u>

15.    The Debtor shall file a copy of the Schedule of Assigned Contracts (the

"**Assumption Schedule**") with the Court no later than fifteen (15) days prior to the Objection

Deadline and shall concurrently serve notice of such schedule upon all counterparties to the

Assigned Contracts and the Notice Parties.

16.    The Assumption Schedule shall identify the proposed Assigned Contracts

and the corresponding Cure Amounts required under section 365 of the Bankruptcy Code, if any.

The Debtor, with the consent of Purchaser or the Successful Bidder(s), as applicable, shall have

the right until the tenth (10th) day prior to the closing of the Sale to amend and remove executory

contracts or unexpired leases from the Assumption Schedule.  The Debtor shall file and serve

notice of any such amendment (an "**Amendment Notice**") on all non-Debtor parties to the

Assigned Contracts that are impacted by any amendment to the Assumption Schedule.

17.    All non-Debtor parties to the Assigned Contracts shall have until the

Objection Deadline to file an objection (an "**Assumption Objection**") to the assumption and

assignment of the Assigned Contracts to which they are parties, or to the Cure Amounts listed for

those Assigned Contracts.  Any party filing an Assumption Objection shall state with specificity

the basis of the objection and asserted Cure Amount, and shall include appropriate documentation in support thereof.

18.      If an Assumption Objection is timely filed and not consensually resolved, this Court may hold a hearing with respect to the Assumption Objection either at the Sale Hearing or at such other date as this Court shall designate.  If the Assumption Objection relates only to the Cure Amount of an Assigned Contract, that Assigned Contract may be assumed by the Debtor and assigned to Purchaser or the Successful Bidder(s), as applicable; provided, however, that the amount asserted by the objecting party as the proper Cure Amount, or a different amount set by this Court, shall be held in escrow pending further order of this Court or mutual agreement of the parties as to the proper Cure Amount for that Assigned Contract.  The Debtor and Purchaser or the Successful Bidder(s), as the case may be, are hereby authorized to settle, compromise or otherwise resolve any disputed Cure Amounts with the relevant non-Debtor party to any Assigned Contract without Court approval or notice to any party.

19.      If no Assumption Objection is timely filed and served, then subject to entry of an Order by this Court upon the Sale Hearing approving the Sale and proposed assumption and assignment of the Assigned Contracts in connection therewith, the Cure Amounts set forth in the Assumption Schedule shall control notwithstanding any terms or conditions to the contrary in any Assigned Contract.  The non-Debtor parties to the Assigned Contracts shall be barred from asserting against the Debtor or the Purchaser (or the Successful Bidder(s), as the case may be) any other claim arising from the Assigned Contracts.

20.      The effective date of any assumption and assignment of any Assigned Contract shall be the date on which the Sale closes.  Any Cure Amounts to be paid under any Assigned Contract shall be paid by the Purchaser (or Successful Bidder(s), as the case may be)

either prior to, upon or promptly following the closing of the Sale, or as otherwise agreed to by the parties to the Assigned Contract.

## **<u>Additional Provisions</u>**

21.    The Debtor is authorized and empowered to take all steps, and incur and pay all costs and expenses, as may be reasonably necessary to fulfill the requirements established by this Order.

22.    Nothing contained in this Order precludes any party in interest from objecting to the Sale in accordance with the objection procedures set forth herein, and no party shall be deemed to have consented to the Sale by virtue of not having objected to the Bidding Procedures Relief requested in the Motion.

23.    The Debtor is hereby authorized to implement the Bidding Procedures and conduct the Auction without the necessity of complying with any state or local bulk transfers law, or requirement or any similar law of any state or other jurisdiction which may apply in any way to any of the transactions under the Purchase Agreement.

24.    This Court shall retain jurisdiction over any and all matters or disputes arising from or relating to the implementation of this Order, including jurisdiction to allocate the consideration paid for some or all of the Acquired Assets in satisfaction of Liens that attach to the proceeds thereof.

25.    Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for fourteen (14) days after the entry hereof, and shall be effective and enforceable immediately upon entry hereof.

Dated: March __, 2015
    New York, New York

_____

UNITED STATES BANKRUPTCY JUDGE

**<u>Schedule 1 to Exhibit A</u>**

**Bidding Procedures**

## BIDDING PROCEDURES
## AND TERMS AND CONDITIONS OF SALE

Gemini Systems, LLC (the "**Debtor**" or "**Seller**"), as debtor and debtor in possession in Bankruptcy Case No. 15-_____ (____) (the "**Chapter 11 Case**"), currently pending before the United States Bankruptcy Court for the Southern District of New York (the "**Court**"), has entered into an asset purchase agreement (the "**Purchase Agreement**") with ETGI, Inc. (the "**Purchaser**"), Essex Technology Group, Inc. ("**Essextec**") and Simon Leung (the "Owner"), dated as of March [•], 2015, for the sale of substantially all of the Debtor's assets (collectively, the "**Assets**"), free and clear of any and all liens, claims, encumbrances and other interests (except as explicitly stated in the Purchase Agreement).  The Debtor is currently soliciting higher or otherwise better bids for the sale of the Assets (the "**Sale**").[1]

### A.    **Bidding Procedures**

Set forth below are the bidding procedures (the "**Bidding Procedures**") with respect to the Sale of the Assets.  On March [•], 2015, the Court entered the *Order Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (B) Scheduling an Auction and a Sale Hearing Related Thereto, (C) Approving the Form and Manner of Notice of the Auction and the Sale Hearing, and (D) Approving Bidding Protections* [Docket No. [•]] (the "**Bidding Procedures Order**"), which, among other things, granted those portions of the Debtor's sale motion [Docket No. [•]] (the "**Sale Motion**") concerning approval of the Bidding Procedures and Bidding Protections to be employed in connection with the solicitation of higher or otherwise better bids and an auction (the "**Auction**") for the Sale of the Assets.

### B.    **Relevant Dates**

| | |
|---|---|
| Bid Deadline: | April [•], 2015 (4:00 p.m. EST) |
| Auction: | April [•], 2015 (10:00 a.m. EST) |
| Objection Deadline: | April [•], 2015 (4:00 p.m. EST) |
| Sale Hearing: | April [•], 2015 ([•] a/p.m. EST) |

### C.    **Assets to be Sold Free and Clear**

The Debtor is offering to sell the Assets.  Except as otherwise provided for in the Purchase Agreement, with respect to the Sale, all of the Seller's right, title and interest in and to the Assets shall be sold free and clear of any and all liens, claims, encumbrances, security interests and other restrictions on transfer (collectively, the "**Liens**") to the extent permitted by section 363 of title 11 of the United States Code (the "**Bankruptcy Code**") and other applicable law (except as otherwise expressly provided for in the Purchase Agreement) with such Liens to attach to the proceeds of the Sale.

---

[1]    Capitalized terms used but not otherwise defined herein shall be ascribed the meanings provided to those terms in the Motion or the Purchase Agreement, as applicable.

Except as expressly provided in the Purchase Agreement, the Sale of the Assets shall be on an **"as is, where is"** basis and without representations or warranties of any kind, nature or description by the Debtor or its agents.

### D.    Stalking Horse Bidder

The Purchaser shall act as the "stalking horse bidder" at the Auction for the Assets with the right to receive a break-up fee of $132,900.00 (or 3% of the Purchase Price) (the "**Breakup Fee**") and reimbursement of Essextec's out-of-pocket costs, fees and other expenses (including legal expenses) incurred in connection with the transactions described in the Purchase Agreement, not to exceed the aggregate amount of $200,000 (the "**Expense Reimbursement**" and, together with the Breakup Fee, the "**Bidding Protections**") under the terms set forth in the Purchase Agreement.   The Bidding Protections shall be paid from the first proceeds of an Alternate Transaction, including the Sale, or as otherwise set forth in the Purchase Agreement.

Essextec has provided the Debtor with $500,000 in debtor in possession financing, pursuant to the liens and claims afforded under section 364(c) of the Bankruptcy Code, to assist the Debtor in its administration of the Chapter 11 Case (the "**Postpetition Financing**").   The Postpetition Financing, along with any supplemental postpetition financing loaned by Essextec to the Debtor after the filing date of the Sale Motion that is approved pursuant to an order of the Court (or as "So Ordered" on the record during a hearing before the Court), will mature upon the approval of an Alternate Transaction and be paid at the closing of that Alternate Transaction.   Accordingly, upon the closing of the Sale of the Assets to an entity other than Purchaser, the Successful Bidder shall be required to:  (a) repay to Essextec, at the closing of that Alternate Transaction, any outstanding amounts of the Postpetition Financing and any supplemental postpetition financing provided by Essextec to the Debtor approved pursuant to an order of the Court (or as "So Ordered" on the record during a hearing before the Court); and (b) in the event that the Court authorizes Essextec to extend supplemental postpetition financing to the Debtor pursuant to an agreement approved by the Court, assume and continue to perform all of Essextec's rights and obligations in connection with that financing pursuant to the terms of that agreement.

THE DEBTOR RESERVES THE RIGHT, IN ITS DISCRETION, AND AFTER CONSULTATION WITH THE CREDITORS' COMMITTEE, IF ONE IS APPOINTED, TO DETERMINE WHETHER ANY BID IS BETTER, IF NOT HIGHER, THAN ANOTHER BID SUBMITTED DURING THE AUCTION.  THE DEBTOR MAY CONSIDER A VARIETY OF FACTORS IN MAKING THIS DECISION, INCLUDING, WITHOUT LIMITATION, ANY PROPOSED CONDITIONS TO CLOSING, TIMING OF CLOSING OF THE PROPOSED TRANSACTION AND THE LIKELIHOOD OF THE BIDDER TO OBTAIN REQUISITE APPROVALS.

### E.    Mailing the Sale Notice

The Debtor shall provide notice of the Auction and the Sale of the Assets (the "**Sale Notice**"), together with a copy of these Bidding Procedures, by first class mail, postage prepaid, to:  (i) counsel for the Creditors' Committee, if one is appointed; (ii) the Debtor's secured creditors or their counsel, if known; (iii) the Office of the United States Trustee for the

Southern District of New York (the "**U.S. Trustee**"); (iv) all parties in interest who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); (v) all counterparties to the Assigned Contracts; (vi) the following federal, state and local taxing and regulatory authorities: (a) the United States Attorney for the Southern District of New York, (b) the Attorney General of the State of New York, (c) the Internal Revenue Service, (d) New York State Department of Taxation and Finance, (e) New York City Department of Finance and (f) the Environmental Protection Agency; (vii) counsel to the Purchaser; (viii) all parties who are known to assert a lien on any portion of the Assets; (ix) all parties identified by the Debtor as potentially having an interest in acquiring some or all of the Assets (collectively, the "**Notice Parties**"); and (x) all creditors of the Debtor who are listed on the Debtor's Schedules of Assets and Liabilities [Docket No. __] or who have filed proofs of claim against the Debtor's estate (collectively, the "**Scheduled and Filed Creditors**").

Any other party in interest that wishes to receive a copy of the Bidding Procedures Order and/or the Sale Motion may make such request in writing to Brendan M. Scott, Esq., Klestadt, Winters, Jureller, Southard & Stevens, LLP, 570 Seventh Avenue, 17th Floor, New York, New York 10018, by telephone: (212) 972-3000 or via email at bscott@klestadt.com.

### F.    Confidentiality Agreement / Due Diligence

Any entity that wishes to conduct due diligence with respect to the Assets, other than Purchaser, must (i) deliver to the Debtor an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtor and on terms no less favorable than the confidentiality agreement executed by the Purchaser, and (ii) deliver to the Debtor a written non-binding expression of interest to purchase the Assets, reasonably acceptable to the Debtor.

Interested parties that comply with the foregoing (each such entity referred to as a "**Potential Bidder**"), shall be permitted to conduct diligence with respect to the Assets; provided, however, that the Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline (defined below).

### G.    Qualification of Bids and Bidders

To participate in the bidding process and have a bid considered by the Debtor (or Chapter 11 trustee in the event that one is appointed), each Potential Bidder must deliver a written, irrevocable offer to purchase some or all of the Assets that satisfies the following criteria.

**A BID MAY BE MADE FOR ALL OR ONLY A PORTION OF THE ASSETS.**

To become a "**Qualified Bidder**", a Potential Bidder must deliver a binding bid that, in the Debtor's discretion, after consultation with the Creditors' Committee, satisfies the following (a "**Qualified Bid**"):

i.    Bid Deadline. Each Bid Package (as defined below) must be delivered, in written form, to: (i) proposed counsel to the Debtor, Klestadt, Winters,

Jureller, Southard & Stevens, LLP, 570 Seventh Avenue, 17th Floor, New York, New York 10018, Attn: Brendan M. Scott, Esq.; (ii) counsel for the Creditors' Committee, if a Creditors' Committee is appointed; and (iii) the Office of the U.S. Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn.: Michael Driscoll, in each case so as to be **actually received no later than 4:00 p.m. (prevailing Eastern Time) on April [•], 2015 (the "Bid Deadline")**.

ii.      Bid Package.  Each bid must include:

(a)      a written and signed irrevocable offer (i) stating that the bidder seeks to consummate a sale transaction on terms and conditions no less favorable than in the Purchase Agreement and in an amount at least equal to the Minimum Bid (defined below), (ii) confirming that the bid will remain irrevocable until the earlier of (A) ninety (90) days following entry of the Sale Order (defined below) and (B) closing with the Successful Bidder, and (iii) that the Potential Bidder had the opportunity to conduct due diligence prior to submitting its bid, does not require further due diligence, has relied solely upon its own independent review and investigation when submitting its bid, and did not rely on any written or oral representation of the Debtor in preparation for submission of its bid;

(b)      an executed copy of the Purchase Agreement, as modified by the Potential Bidder in accordance with its bid (the "**Modified Purchase Agreement**"), as well as an electronic markup of the Purchase Agreement clearly identifying the revisions in the Modified Purchase Agreement (formatted as a Microsoft Word document or such other word processing format acceptable to the Debtor)

(collectively, the "**Bid Package**").

The Debtor, in consultation with the Creditors' Committee shall determine whether any Modified Purchase Agreement that modifies the Purchase Agreement in any respect beyond the identity of the purchaser and the purchase price constitutes a Qualified Bid.

iii.      Minimum Bid.  For a Bid Package submitted by a Potential Bidder to qualify as a Qualified Bid, the purchase price in that bid must provide for net cash in an amount not less than $4,862,900.00, which represents the Purchase Price, the maximum amount of the Bidding Protections and a $100,000 minimum overbid (the "**Minimum Bid**").

iv.      Financial Information.  To constitute a Qualified Bid, the Bid Package must contain financial and other information of the Potential Bidder that will allow the Debtor to make a determination as to the Potential Bidder's financial wherewithal to consummate the transactions contemplated by any Modified Purchase Agreement, including (a) any proposed conditions

to Closing and (b) adequate assurance of such Potential Bidder's ability to perform under any Assigned Contracts and to pay all cure amounts required to assume and assign any such Assigned Contracts. A Potential Bidder shall cooperate reasonably with any request by any creditor, the Debtor, the U.S. Trustee, the Creditors' Committee or any other interested party (except the Purchaser or another Potential Bidder) for further due diligence that is reasonably necessary and customary to evaluate the viability and terms of the Potential Bidder's Qualified Bid. Any due diligence conducted of a Potential Bidder shall be completed no later than five (5) business days following the submission of the Potential Bidder's Bid Package.

v.     <u>Additional Bidding Protections</u>. The bid shall not request or entitle the Potential Bidder to any termination fee, transaction or break-up fee, expense reimbursement or similar type of payment.

vi.    <u>Identity of Bidders</u>. Each Potential Bidder must fully disclose the identity of each entity that will be bidding for the Assets, as well as disclose the organizational form and business conducted by each entity, and what connections, if any, the Potential Bidder has with the Debtor. Potential Bidders shall be required to provide such additional information as the Debtor may require regarding a bidder's ability to satisfy the requirements of the transaction contemplated by any Modified Purchase Agreement.

vii.   <u>Due Diligence</u>. Except as provided for in the Purchase Agreement, the bid must not contain any contingencies of any kind, including, but not limited to (a) obtaining financing or shareholder, board of directors or other approval, or (b) the outcome or completion of due diligence. Each Potential Bidder must also affirmatively acknowledge that the Potential Bidder (x) had an opportunity to conduct due diligence regarding the Assets prior to making its offer and does not require further diligence, (y) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and (z) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures.

viii.  <u>Consents</u>. Each Potential Bidder must represent that it obtained all necessary organizational (not regulatory) approvals to make its competing bid and to enter into and perform any Modified Purchase Agreement.

ix.    <u>Deposit</u>. A Potential Bidder must deposit 5% of the initial purchase price set forth in any Modified Purchase Agreement, plus the amount of the Bidding Protections, with the Debtor in the form of a certified check or wire transfer on or before the Bid Deadline (the "**Deposit**"). The Potential

Bidder or the Backup Bidder (defined below) shall forfeit the Deposit if (a) the Potential Bidder or the Backup Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein before the Court approves the Debtor's selection of the Successful Bidder (defined below), or (b) the bidder is a Successful Bidder and modifies or withdraws its bid without the Debtor's consent before the consummation of the sale contemplated by the bid, or breaches any of the terms of the relevant Modified Purchase Agreement.

The Deposit shall be returned to a Potential Bidder (x) as soon as practicable if the Potential Bidder is not determined to be a Qualified Bidder or (y) no later than five (5) business days after entry of the Sale Order if the Potential Bidder is deemed to be a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not the Successful Bidder or the Backup Bidder; provided, however, that in the event the Purchaser is not the Successful Bidder, its Deposit shall be returned to it promptly upon termination of the Purchase Agreement, but in no event later than five (5) business days from the date of that termination.  The Debtor will maintain any Deposit in a non-interest bearing account.

x.　　"As Is, Where Is".  Any Modified Purchase Agreement must provide that the Sale will be on an "as is, where is" basis and without representations or warranties of any kind, except and solely to the extent expressly set forth in the Modified Purchase Agreement of the Successful Bidder.  Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its bid and that it has relied solely upon its own independent review and investigation in making its bid.

xi.　　Debtor's Considerations.　　The Debtor, after consultation with the Creditor's Committee, if one is appointed, shall have the right to determine that a bid is not a Qualified Bid if the terms of the bid are materially more burdensome or conditional than the terms of the Purchase Agreement and are not offset by a material increase in purchase price, which determination may take into consideration:  (1) whether the bid requires any indemnification of the Qualified Bidder; (2) whether the bid does not provide sufficient cash consideration to pay transfer taxes, cure costs or other cash costs of the transaction (including professionals' fees and the Bidding Protections); (3) whether the bid includes a non-cash instrument or similar consideration that is not freely marketable; or (4) any other factors that the Debtor, after consultation with the Creditor's Committee, may deem relevant.

The Debtor is offering to sell the Assets.  The Debtor, in consultation with the Creditors' Committee, if one is appointed, shall have the exclusive right to determine whether a bid is a Qualified Bid and shall notify Potential Bidders whether their respective bid(s) have been determined to be Qualified Bid(s) prior to the Auction.  The Debtor may reject any bid that is on

terms more burdensome or conditional than the Purchase Agreement or is otherwise contrary to the best interests of the Debtor's estate.  In addition to the requirements above, the Debtor may request any additional information from any Potential Bidder to assist the Debtor in making a determination as to whether a bid is a Qualified Bid.

**H.    Sale to Purchaser**

The Purchase Agreement shall be deemed a Qualified Bid and the Purchaser shall be deemed a Qualified Bidder.  If no Qualified Bid other than Purchaser's is submitted by the Bid Deadline, the Debtor shall not hold the Auction, but may proceed with the Sale Hearing and seek approval of the Purchase Agreement and the transactions contemplated thereby.

**I.    Auction**

In the event that the Debtor timely receives at least one Qualified Bid (excluding the Purchaser's Qualified Bid) by the Bid Deadline for all or any portion of the Assets, the Debtor shall conduct the Auction with respect to the Assets.  The Auction will take place at 570 Seventh Avenue, 17th Floor, New York, New York 10018 on **April [•], 2015, starting at 10:00 a.m. (EST)**, or at such other date, time or place as may be determined by the Debtor at or prior to the Auction.  The Auction shall be governed by the following procedures:

i.      Participation.  Only Qualified Bidders that have submitted a Qualified Bid and provided Deposits will be eligible to participate in the Auction, and each Qualified Bidder shall appear in person at the Auction (and any attorney for a Qualified Bidder may appear at the Auction at the discretion of the Qualified Bidder).  In the event that a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith.

The Debtor, in consultation with the Creditors' Committee, if one is appointed, shall evaluate all Qualified Bids received and will select the Qualified Bid that reflects the highest or otherwise best offer for all or any portion of the Assets, and otherwise complies with the bid requirements set forth herein (the "**Starting Auction Bid**").  The Debtor may consider a variety of factors to determine the Starting Auction Bid, including, but not limited to, modifications to the Purchase Agreement and the Qualified Bidder's ability to consummate the Sale.  At the Auction, the Debtor shall announce the material terms of the Starting Auction Bid and the basis for calculating the total consideration offered in the Starting Auction Bid.

ii.     Bidding.  Bidding at the Auction shall commence at the amount of the Starting Auction Bid.  Qualified Bidders may then submit successive bids in increments of no less than $100,000 (the "**Minimum Bid Increment**"); provided, however, that the Debtor, in consultation with the Creditors' Committee, if one is appointed, shall retain the right to modify the Minimum Bid Increment during the Auction.  Any bid submitted after the conclusion of the Auction shall not be considered for any purpose.

iii.   <u>Higher or Otherwise Better</u>.  The Debtor reserves the right, in consultation with the Creditors' Committee, if one is appointed, to determine whether any bid is better, if not higher, than another bid submitted during the Auction.  The Debtor may consider any other factor that it, in consultation with the Creditors' Committee, deems relevant.

iv.   <u>Successful Bid</u>.    The Auction shall continue until there is only one collective offer or separate offers for the Assets that the Debtor, in consultation with the Creditors' Committee, if one is appointed, determines, subject to Court approval, is (or are) the highest or otherwise best offer(s) from among the Qualified Bids submitted at the Auction (the "**Successful Bid(s)**") and the Debtor announces that the Auction is closed. The Qualified Bidder(s) submitting such Successful Bid(s) shall become the "**Successful Bidder(s)**," and shall have such rights and responsibilities of the Purchaser, as set forth in the Modified Purchase Agreement, or the Purchase Agreement, as applicable.

Within one business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Successful Bidder(s) shall (a) complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid(s) was/were made, and (b) supplement the relevant Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such Deposit equals 5% of the Successful Bid(s) plus the amount required for payment of the Bidding Protections.

v.   <u>Anti-Collusion</u>.   At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with any other Qualified Bidder or Potential Bidder with respect to the bidding or the Sale.

vi.   <u>Conduct of Auction</u>.  The Auction may be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid.   The Debtor or its counsel may meet privately with any Qualified Bidder to negotiate the terms of its bid.   The Debtor, in consultation with the Creditors' Committee, if one is appointed, may adopt other rules for the conduct of the Auction at the Auction, which, in its judgment, will better promote the goals of the Auction.

vii.   <u>Backup Bid</u>.  At the conclusion of the Auction, the Debtor will announce the second highest or otherwise best bid(s) from among the Qualified Bids submitted at the Auction (the "**Backup Bid(s)**").  The Qualified Bidder(s) submitting such Backup Bid(s) shall become the "**Backup Bidder(s)**," and subject to the rights of the Successful Bidder(s), shall have such rights and responsibilities of the Purchaser, as set forth in the Modified Purchase Agreement or the Purchase Agreement, as applicable.

The Backup Bid shall remain open and irrevocable until the earlier of (a) ninety (90) days following entry of the Sale Order and (b) Closing of the Sale; provided, however, that if the Purchaser's bid is deemed the Backup Bid, the Purchaser's rights and obligations with respect to such bid shall be subject to the terms of the Purchase Agreement. The Backup Bidder's Deposit will be returned by the Debtor upon consummation of the Sale of the Assets to the Successful Bidder(s), or will be otherwise applied or forfeited as provided in Section G(ix) above if the Backup Bidder is determined to be the Successful Bidder, except with respect to the Purchaser, which shall be subject to the terms of the Purchase Agreement.

viii.    Extensions/Adjournment. The Debtor reserves its rights, in the exercise of its reasonable business judgment, and in consultation with the Creditors' Committee, if one is appointed, to modify any non-material provisions of these Bidding Procedures at or prior to the Auction, including, without limitation, extending the deadlines set forth in the Auction procedures, modifying bidding increments, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice consistent with the Purchase Agreement and Bidding Procedures Order.

## J.    **Sale Hearing and Return of Deposits**

The Successful Bid(s) and the Backup Bid(s) will be subject to approval by the Court after a hearing (the "**Sale Hearing**") and entry of an order (the "**Sale Order**"). The Sale Hearing will take place on **April [•], 2015 at     :00 a/p.m. (EST)**. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court. Upon approval of the Backup Bid(s) by the Court, the Backup Bid(s), other than the Purchaser's bid which shall be subject to the terms of the Purchase Agreement, shall remain open and irrevocable until the earlier of ninety (90) days following entry of the Sale Order or the Closing of the Sale.

No offer shall be deemed accepted unless and until it is approved by the Court and the Sale Order is entered.

Objections, if any, to the Sale Motion and any filed supplements thereto, shall: (i) be in writing; (ii) specify, with particularity, the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) proposed counsel to the Debtor, Klestadt, Winters, Jureller, Southard & Stevens, LLP, 570 Seventh Avenue, 17th Floor, New York, New York 10018, Attn.: Brendan M. Scott, Esq.; (b) counsel for the Creditors' Committee, if a Creditors' Committee is appointed; (c) the Office of the U.S. Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn.: Michael Driscoll; and (d) counsel to the Purchaser, Saiber LLP, 270 Madison Avenue, Suite 1400, New York, New York 10016, Attn.: Richard E. Weltman, Esq., so as to **be actually received by 4:00 p.m. (EST) on April [•], 2015 (the "Objection Deadline")**.

### K.    Consummation of the Sale

Except as provided herein and in the Purchase Agreement, following the Sale Hearing, if for any reason the Successful Bidder fails to consummate the Sale of the Assets, then the Backup Bidder shall automatically be deemed to have submitted the highest or otherwise best bid.  The Debtor and the Backup Bidder are authorized to effectuate the Sale of the Assets to the Backup Bidder as soon as is commercially reasonable without further order of the Court.  If the failure to consummate the Sale is the result of a breach by the Successful Bidder, its Deposit shall be forfeited to the Debtor.  The Debtor specifically reserves the right to seek all available damages from the defaulting Successful Bidder.

### L.    Jurisdiction

The Court shall retain exclusive jurisdiction over any matter or dispute relating to the Sale of the Assets, the Bidding Procedures, the Sale Hearing, the Auction, the Successful Bid(s), the Backup Bid(s) and/or any other matter that in any way relates to the foregoing.

**Hearing Date and Time:  April __, 2015 at __:__a/p.m. (ET)**
**Objection Deadline:  April __, 2015 at 4:00 p.m. (ET)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                                         :

In re:                                        :     Chapter 11
                                               :

GEMINI SYSTEMS, LLC            :     Case No. 15-10574
                                             :

                           Debtor.      :

----------------------------------------------------------------x

### NOTICE OF AUCTION AND HEARING TO CONSIDER APPROVAL
### OF THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS

NOTICE IS HEREBY GIVEN, as follows:

On March 11, 2015, Gemini Systems, LLC, the debtor and debtor in possession (the "**Debtor**") in the above-captioned chapter 11 case (this "**Chapter 11 Case**") filed a motion (the "**Motion**") [Docket No. [•]][1] which sought, among other things, entry of an order pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"):  (a) approving the proposed Bidding Procedures to be used in connection with the proposed sale of the Debtor's Assets, free and clear of any and all liens, claims, encumbrances, security interests and other interests, to ETGI, Inc. (the "**Purchaser**"), or to any competing bidder or bidders (the "**Successful Bidder(s)**") that submits or collectively submit a higher or better offer or offers for the Assets; (b) scheduling the Auction and Sale Hearing to approve the Sale of the Assets;  (c) approving the form and manner of notice of the Auction and

---

[1]    Capitalized terms used but not otherwise defined herein shall be ascribed the meanings provided in the Motion.

Sale Hearing; and (d) approving the Bidding Protections and certain overbid procedures in connection therewith (the "**Bidding Procedures Order**").  The Bankruptcy Court conducted a hearing on March [•], 2015 to consider entry of the Bidding Procedures Order.  On March [•], 2015, the Court entered the Bidding Procedures Order [Docket No. [•]].

The Motion, the Bidding Procedures, and the Bidding Procedures order have been filed electronically with the Clerk of the United States Bankruptcy Court for the Southern District of New York and may be reviewed by all registered users of the Court's website at http:ecf.nyeb.uscourts.gov.  Copies of the Objection can also be obtained by telephonic, written, or e-mail request to the undersigned counsel to the Debtor, Attn: Brendan M. Scott (Telephone: (212) 972-3000 or e-mail: bscott@klestadt.com.

As set forth in the Bidding Procedures, the sale of the Assets remains subject to higher or better offers for all or a portion of the Assets and Bankruptcy Court approval.  All interested parties are invited to make competing offers for all or a portion of the Assets in accordance with the terms of the Bidding Procedures and the Bidding Procedures Order.  The deadline to submit a competing offer in accordance with the terms of the Bidding Procedures is **April [•], 2015 at 4:00 p.m. (ET)** (the "**Bid Deadline**").  Pursuant to the Bidding Procedures Order, if a Qualified Bid other than the Purchaser's bid is received by the Bid Deadline, the Debtor may conduct an auction (the "**Auction**") for the sale of the Assets at 570 Seventh Avenue, 17th Floor, New York, New York 10018, **beginning at 10:00 a.m. (ET) on April [•], 2015**.

The Bidding Procedures Order further provides that a Sale Hearing will be held on **April [•], 2015 at    :    a/p.m. (ET)** before the Honorable _____, United States

Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York,

One Bowling Green, New York, New York 10004, Courtroom No. ___.

At the Sale Hearing, the Debtor will request that the Bankruptcy Court enter an

order, among other things, approving the highest or otherwise best bid for the Assets (which will

be determined in accordance with the terms of the Bidding Procedures).  In addition, the Debtor

shall request that the Bankruptcy Court provide that the transfer of the Assets be free and clear of

any and all liens, claims, interests, encumbrances and security interests, including successor

liability claims, except as expressly assumed by Purchaser or Successful Bidder(s).

At the Sale Hearing, the Bankruptcy Court may enter such orders as it deems

appropriate under applicable law and as required by the circumstances and equities of this

Chapter 11 case.  Objections, if any, to the Motion must (a) be made in writing, (b) state with

particularity the reasons for the objection or response, (c) conform to the Bankruptcy Rules and

the Local Bankruptcy Rules for the Southern District of New York, (d) set forth the name of the

objecting party, the nature and basis of the objection, and the specific grounds therefore, and

(e) be filed with the Clerk of the Court (with a copy to be delivered to the Chambers of the

Honorable _____, United States Bankruptcy Court for the Southern District

of New York, One Bowling Green, New York, New York 10004, Courtroom No. __, and shall

be served upon:  (i) proposed counsel to the Debtor, Klestadt Winters Jureller Southard &

Stevens, LLP, 570 Seventh Avenue, 17th Floor, New York, New York 10018-6314, Attn.:

Brendan Scott, Esq.; (ii) proposed counsel for the Creditors' Committee, if one is appointed; (iii)

counsel to the Purchaser, Saiber LLP, 270 Madison Avenue, 14th Floor, New York, New York

10016, Attn.:  Richard E. Weltman, Esq.; and (iv) the Office of the U.S. Trustee, U.S. Federal

Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn.: Michael

Driscoll, so as to be **actually received** no later than **4:00 p.m. (EST) on April [•], 2015**.

        Requests for information concerning the sale of the Acquired Assets should be

directed by written or telephonic request to:  Brendan M. Scott, Esq., Klestadt Winters Jureller

Southard & Stevens, LLP, 570 Seventh Avenue, 17th Floor, New York, New York 10018-6314,

(212) 972-3000 or via email at bscott@klestadt.com.

**EXECUTION VERSION**

## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of March __, 2015 (the "Effective Date"), among ETGI, Inc., a New Jersey corporation (the "Purchaser"), ESSEX TECHNOLOGY GROUP, INC., a New Jersey corporation ("Essextec"), GEMINI SYSTEMS LLC, a New York limited liability company ("Gemini" or "Seller"), and SIMON LEUNG, an individual (the "Owner").

## W I T N E S S E T H:

**WHEREAS**, Gemini filed a voluntary petition for reorganization under Chapter 11, Title 11, United States Code, as amended (the "Bankruptcy Code") on March [11], 2015 in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Case Number 15-10574 (___) (the "Bankruptcy Case");

**WHEREAS**, at the time of the filing of the Bankruptcy Case, Seller was engaged in the business of software consulting services and software sales operations in the United States (the "Business");

**WHEREAS,** the Seller wishes to sell and transfer to the Purchaser and the Purchaser wishes to purchase from the Seller all of the Assets (as hereinafter defined) relating to the Seller' Business in accordance with Sections 105(a), 363 and other applicable provisions of the Bankruptcy Code, upon the terms and conditions and for the consideration described below in this Agreement; and

**WHEREAS**, the transactions hereunder are subject to Bankruptcy Court approval and the Assets will be sold pursuant to a Sale Order (as hereinafter defined) in form and substance satisfactory to Seller, Owner and Purchaser.

**NOW, THEREFORE,** in consideration of the mutual promises, covenants, representations and warranties made herein and of the mutual benefits to be derived therefrom, the parties hereto agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ASSETS

1.1     Sale of Assets.  Subject to the terms and conditions hereof, at the Closing (as hereinafter defined) the Seller shall sell, transfer, convey and deliver all of the Assets (as hereinafter defined) of the Seller to the Purchaser and the Purchaser shall purchase all of the Assets from the Seller free and clear of all Liens existing as of the Closing, regardless of whether any of such Assets existed before, on, or after the commencement of the Bankruptcy Case.

1.2     Purchase Price.  The purchase price of the Assets (the "Purchase Price") is $4,430,000.00.  The Purchase Price shall be payable at the Closing by wire transfer or other

immediately available funds, provided, however, that the Purchaser shall receive a credit against the Purchase Price on account of its assumption of the following obligations and liabilities: (a) any and all cure amounts to be paid to counterparties to Assigned Contracts, as agreed, other than amounts paid to cure pre-petition defaults under Gemini's lease for Suite 925 at 61 Broadway, New York, New York, if any, (b) certain pre-petition debt owed by Gemini to Arrow Electronics, Inc. and its Affiliates, in the amount of $1,190,000.00; (c) any and all obligations of Gemini in respect of the $500,000 DIP Financing Facility loaned by Essextec to Gemini pursuant to Section 364(c) of the Bankruptcy Code and as "So Ordered" by the Bankruptcy Court, (d) any and all obligations of Gemini in respect of future amounts loaned, if any, by Essextec to Gemini pursuant to Section 364(c) of the Bankruptcy Code on an as "So Ordered" basis by the Bankruptcy Court after the date hereof; (e) money owed on account of advances made or obligations incurred under that certain Transition Agreement dated as of April 16, 2014 as amended by that certain Amendment to Transition Agreement dated March 5, 2015 (collectively, the "Transition Agreement"), and (f) any and all obligations of Gemini in respect of (i) a Demand Note dated March 6, 2015 in the original principal amount of Fifty Thousand and 00/100 Dollars ($50,000.00), (ii) a Demand Note dated March 6, 2015 in the original principal amount of Ten Thousand and 00/100 Dollars ($10,000.00), (iii) a Demand Note dated March 6, 2015 in the original principal amount of Thirty-Five Thousand and 00/100 Dollars ($35,000.00), and (iv) a Demand Note dated March 10, 2015 in the original principal amount of Thirty Thousand and 00/100 Dollars ($30,000.00) (collectively, the "Demand Notes"). The amount set forth in clause (a) and (b) shall be paid directly to Gemini or any other applicable counterparties. The obligations in clauses (c) – (f) shall be applied to reduce the amount of the Purchase Price and shall be deemed satisfied in full upon consummation of the Closing.

1.3    Closing.  The closing of the sale and purchase of the Assets (the "Closing") shall take place at the offices of the Gemini's counsel in New York, New York on or before _____, 2015 (as such date may be extended by the mutual written agreement of the parties, the "Closing Date").    The Parties shall use their commercially reasonable efforts to consummate the transactions contemplated herein within two (2) calendar days after the Sale Order becomes a Final Order.  At the Closing:

1.3.1    The Seller shall deliver to the Purchaser, free and clear of any Lien other than Permitted Liens, all of the Assets by delivery of instruments of conveyance and such other documents and certificates as are specified herein.

1.3.2    The Purchaser and Seller's Key Employees who are hired by Purchaser shall enter into Confidentiality, Assignment of Invention, and Noncompetition Agreements in a form and substance reasonably acceptable to Purchaser.

1.3.3    A portion of the Purchase Price shall be applied to satisfy and discharge in full: (a), (c) that certain tax lien filed against Gemini by the Internal Revenue Service, as more particularly described in Section 1.3.3 of the Disclosure Schedule (the "Federal Tax Lien"), (d) that certain tax lien filed against Gemini by the New York Division of Taxation and Finance, as more particularly described in Section 1.3.3 of the Disclosure Schedule (the "State Tax Lien"), and (e) the secured debt owed by Seller to Citibank, N.A. (the "Citibank Loan").

2

1.3.4   Each of the parties shall deliver a certificate certifying that all representations and warranties made by such party hereunder remain true, correct and complete in all respects as of the Closing Date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date).

1.3.5   The Purchaser shall pay the balance of the Purchase Price, if any, to the Seller.

1.4   Allocation of Purchase Price.  The parties agree to allocate: (a) $20,000.00 of the Purchase Price to furniture, fixtures and equipment; (b) a portion of the Purchase Price equal to at least $800,000.00 and no more than $1,000,000.00 to Accounts Receivable; and (c) the balance of the Purchase Price to goodwill.  The parties shall each report the federal, state, local and other tax consequences of the purchase and sale of the Assets contemplated hereby in a manner consistent with such allocation.  In that regard, Purchaser and Seller each hereby covenant and agree to deliver at Closing copies of Form 8594, Asset Acquisition Statement Under Section 1060 (which shall be filed by both Purchaser and Seller, in accordance with the Instructions therefor), and that neither Purchaser nor Seller will take a position on any income tax return or in any judicial proceeding that is in any way inconsistent with the Purchase Price allocation as determined in this Agreement.

1.5   Assumption of Liabilities; Purchaser Not Successor to Seller.  Purchaser shall assume as of the Closing Date and shall subsequently observe and honor, only the going-forward obligations (i.e., obligations arising and accruing on or after the Closing Date) of Seller under the Client Contracts (as hereinafter defined), the IP Agreements (as hereinafter defined) and those contracts and Accounts Payable set forth in Section 1.5 of the Disclosure Schedule which are duly assigned to Purchaser in accordance with this Agreement (collectively, the "Assumed Liabilities").  For the sake of clarity, the parties acknowledge that the Purchaser will assume the Client Contracts and IP Agreements in accordance with the requirements of the applicable provisions of the Bankruptcy Code and subject to the procedures set forth in the Sale Order. Purchaser shall not be the successor to either of the Seller and Seller hereby acknowledges and agrees that, except for the Assumed Liabilities, Purchaser is not assuming any liabilities or obligations of Seller, whether known, unknown, contingent or otherwise.

1.6   Open Client Contracts.  Subject to Bankruptcy Court approval, the Seller shall assign to the Purchaser, and the Purchaser shall assume, all Client Contracts other than the Excluded Contracts (as hereinafter defined) relating to the Business entered into by the Seller prior to the Closing in the Ordinary Course of Business and consistent with the representations and warranties contained in this Agreement and past practice (the "Client Contracts"). As of the Effective Date, all Client Contracts are listed on Section 1.6 of the Disclosure Schedule.

1.7   Intellectual Property Rights.  All of the Seller's agreements and contracts with respect to Intellectual Property (as hereinafter defined) are set forth in Section 1.7 of the Disclosure Schedule (the "IP Agreements").

3

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

2.1     <u>Representations and Warranties of the Seller and the Owner</u>.    The Seller and
Owner severally, and not jointly, represent and warrant to Purchaser as follows:

2.1.1    <u>Ownership and Condition of Assets</u>.    The Seller has good and marketable
title to all the Assets, free and clear of any Liens, whether arising by operation of any law,
judgment, decree or agreement, except for (a) the Federal Tax Lien, (b) the State Tax Lien, (c)
liens securing the Citibank Loan, and (c) Permitted Liens.    Subject to the entry of and in
accordance with the Sale Order, all Liens other than Permitted Liens will be discharged in full on
or prior to the Closing Date.    The Assets being transferred to the Purchaser are sufficient for the
operation of the Seller's Businesses as currently conducted.    Gemini Systems, Inc. ("Gemini
Systems"), Gemini Systems Worldwide, Inc. ("Gemini Worldwide") and Gemini Systems
Services, Inc. ("Gemini Services") do not own any Assets, except as set forth in Disclosure
Schedule 2.1.1, and their consent is not required to consummate the sale or transfer of the Assets
pursuant to the terms of this Agreement, except as set forth on Disclosure Schedule 2.1.1.

2.1.2    <u>Authority for Agreements</u>.    Subject to Bankruptcy Court approval and entry
of the Sale Order, the Seller and the Owner have the legal capacity to execute and deliver this
Agreement as well as other agreements and instruments referenced in this Agreement
(collectively, the "Transaction Agreements"), and to perform their obligations under the
Transaction Agreements and to consummate the transactions contemplated by each such
Agreement.    Subject to Bankruptcy Court approval, the Transaction Agreements constitute the
valid and legally binding obligations of the Seller and the Owner.    The execution and delivery of
the Transaction Agreements and the consummation of the transactions contemplated by the
Transaction Agreements will not conflict with or result in any violation of or default under any
provision of (a) the operating agreement or certificate of formation of Gemini, or (b) any
mortgage, indenture, lease, agreement or other instrument, permit, concession, grant, franchise,
license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to the Seller
or the Owner, or any of the properties of the Seller or the Owner.    Upon entry of the Sale Order,
except as set specified in Section 2.1.2 of the Disclosure Schedule, no consent, license, approval,
order or authorization of, or registration, declaration or filing with, any Governmental Authority
is required on the part of the Seller or the Owner in connection with the execution and delivery of
this Agreement or the consummation of the transactions contemplated hereby.    Upon entry of the
Sale Order, except as set specified in Section 2.1.2 of the Disclosure Schedule, no consent of any
third party is required to be obtained by the Seller in connection with the execution, delivery and
performance of this Agreement or the consummation of the transactions contemplated hereby
(including, without limitation, in connection with the assignment to Purchaser of the Client
Contracts).

2.1.3    <u>Company Status</u>.    Gemini is a limited liability company duly formed,
validly existing and in good standing under the laws of the State of New York, and subject to
Bankruptcy Court approval, has full power and authority to carry on its business as now
conducted and to own or lease and to operate its properties as and in the places where such

business is now conducted and such properties are now owned, leased or operated.  The Seller is duly qualified or licensed to do business and is in good standing in each of the jurisdictions specified in Section 2.1.3 of the Disclosure Schedule, which includes each jurisdiction in which the nature of such Seller's business or the properties owned or leased by it makes such qualification necessary and where the failure to so qualify may give rise (individually or in the aggregate) to a Material Adverse Effect.  Gemini has delivered to the Purchaser complete and correct copies of its operating agreement and certificate of formation, as in effect on the Effective Date, together with a Certificate of Good Standing (or the applicable equivalent) in the State of New York and each of the jurisdictions set forth in Section 2.1.3 of the Disclosure Schedule.

> 2.1.4   <u>Capitalization</u>.  All of the membership interests in Gemini are owned by the Owner, either directly or indirectly through those intermediate entities set forth in Section 2.1.4 of the Disclosure Schedule.

> 2.1.5   <u>Undisclosed Liabilities</u>.  Except as disclosed in the Bankruptcy Case, Seller does not have any liabilities or obligations of any nature, whether absolute, accrued, contingent or otherwise.

> 2.1.6   <u>Taxes</u>.  Except as provided in Section 2.1.6 of the Disclosure Schedule, the Seller and Owner have duly filed all federal, state and local Returns which are required to be filed by them prior to the Effective Date and have paid all Taxes which are shown thereon to be due and all other Taxes imposed by law upon them or any of their properties, assets, income, receipts, payrolls, transactions, capital, net worth or franchises which have become due and payable.  Except as provided in Section 2.1.6 of the Disclosure Schedule, no transfer, property or other Taxes are or will be payable (including, without limitation, as a result of an audit or other official inquiry before or after the Closing) by the Purchaser or the Seller in respect of the sale by the Seller.  Except for the Federal Tax Lien and State Tax Lien described in Section 2.1.6 of the Disclosure Schedule, no tax liens have been filed and neither the Internal Revenue Service, the New York State Department of Taxation and Finance, nor any other taxing authority is now asserting or, to the Knowledge of the Seller and Owner, threatening to assert against the Seller or Owner any deficiency or claim for additional Taxes.  Except as provided in Section 2.1.6 of the Disclosure Schedule, no Return of the Seller or Owner is currently under audit by the Internal Revenue Service, the New York State Department of Taxation and Finance, or by the taxing authorities of any other jurisdiction.

> 2.1.7   <u>Material Contracts</u>.  Section 2.1.7 of the Disclosure Schedule contains a complete and correct list as of the Effective Date of all agreements, contracts and commitments of the following types, written or oral, to which the Seller is currently a party or by which the Seller or its properties are bound as of the Effective Date:   (a) mortgages, indentures, security agreements, letters of credit, loan agreements and other agreements, guarantees and instruments relating to the borrowing of money or extension of credit; (b) employment, consulting, sales representative, severance and agency agreements; (c) collective bargaining agreements; (d) bonus, profit-sharing, compensation, stock option, pension, retirement, deferred compensation or other plans, trusts or funds for the benefit of employees, officers, agents and directors (whether or not legally binding); (e) licenses of patent, copyright, trade names, trademark, transfer of technology or know how and other intellectual property rights; (f) agreements or commitments for capital

expenditures in excess of $20,000 for any single project (it being warranted that all undisclosed agreements or commitments for capital projects do not exceed $50,000 in the aggregate for all projects); (g) brokerage or finder's agreements; (h) joint venture and partnership agreements; and (i) other agreements, contracts and commitments which in any case involve payments or receipts of more than $20,000.  The Seller has delivered to the Purchaser complete and correct copies of all such written agreements, contracts and commitments, together with all amendments thereto, and accurate descriptions of all oral agreements.  Such agreements, contracts and commitments are in full force and effect and there does not exist thereunder any default or event or condition or course of dealing which, after notice or lapse of time or both, would constitute a default thereunder on the part of the Seller or, to the Knowledge of the Seller and Owner, any other party thereto.  The Seller has all required certifications, authorizations and approvals from its vendors and others (including, without limitation, International Business Machines Corp.) to operate the Business, and upon consummation of the transactions contemplated by the Transaction Agreements the Purchaser shall possess all such certifications, authorizations and approvals.

2.1.8    Property.

(a)    The Seller owns no real property.  The only real property leased by the Seller in the United States is the real property (such property, collectively the "Real Property") leased pursuant to the leases set forth on Section 2.1.8 of the Disclosure Schedule (the "Leases").  The Seller has a valid leasehold interest in each Real Property, free and clear of all Liens.  The Leases are in full force and effect, and true, correct and complete copies thereof have been delivered to the Purchaser.  Except as set forth in Section 2.1.8 of the Disclosure Schedule, no default exists under the Leases, and no event has occurred under Leases which, but for the giving of notice or the passage of time, or both, would constitute a breach or default thereunder.

(b)    All improvements located on the Real Property and all tangible personal property currently in use by the Seller are in operating condition and repair, subject to ordinary wear and tear, and are performing the functions for which they were intended.  The Real Property possesses all Certificates of Occupancy and permits required to allow the Business to be conducted.

2.1.9    Employees, Labor Matters, etc.

(a)    Section 2.1.9 of the Disclosure Schedule contains a complete and correct list of the names of all directors, officers and salaried employees of the Seller engaged in the Business (the "Applicable Employees").  Immediately prior to the Closing, all of the Applicable Employees of the Seller shall be terminated and Seller shall, in accordance with the priorities set forth in section 507 of the Bankruptcy Code and any other applicable sections thereof, to the extent funds are available, (i) pay all wages and other remuneration due to such Applicable Employees with respect to their services as employees of Seller through the date of such termination, including pro rata bonus payments and all vacation pay earned prior to the Closing Date (if any); (ii) pay termination or severance payments and provided health plan continuation coverage in accordance with the requirements of Section 4980B of the Code (as well as its predecessor provision, Section 162(k) of the Code) and Sections 601 through 608, inclusive, of ERISA and Sections 601 through 608 of ERISA ("COBRA"); and (iii) make any and all

payments to Applicable Employees required under Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar foreign, state, or local law, regulation, or ordinance.  Notwithstanding the foregoing, Seller and Owner agree to assist and cooperate with the Purchaser in hiring and employing all or any of such Applicable Employees that Purchaser desires to employ after the Closing Date.

(b)     Section 2.1.9 of the Disclosure Schedule sets forth the location of each Applicable Employee of the Seller, and, with respect to each such Applicable Employee, his or her salary or hourly rate currently in effect, annual bonuses (last paid or payable), if any, any other fringe benefits or incentive paid or payable to him or her and the total value of such other fringe benefits and incentives.  Except as set forth on Section 2.1.9 of the Disclosure Schedule, all such Applicable Employees are actively at work, and no such Applicable Employee is currently on leave of absence, layoff, military leave, suspension, sick leave, workers' compensation, salary continuance or short or long term disability or otherwise not actively performing his or her work during all normally scheduled business hours.

(c)     No Applicable Employee of the Seller is a party to any confidentiality, non-competition, proprietary rights or other such agreement between such Applicable Employee and any Person besides such entity that would be material to the performance of such Applicable Employee's employment duties, or the ability of such entity or Purchaser to conduct the business of such entity;

(d)     No labor organization or group of employees has filed any representation petition or made any written or oral demand for recognition;

(e)     To the Knowledge of the Seller and Owner, no union organizing or decertification efforts are underway or threatened and no other question concerning representation exists;

(f)     No labor strike, work stoppage, slowdown, or other material labor dispute has occurred, and none is underway or, to the Knowledge of Seller and Owner, threatened;

(g)     There is no workman's compensation liability, experience, or matter that could have a Material Adverse Effect;

(h)     There is no employment-related charge, complaint, grievance, investigation, inquiry, or obligation of any kind, pending or threatened in any forum, relating to an alleged violation or breach by Seller (or their officers or directors) of any law, regulation, or contract;

(i)     No employee or agent of Seller has committed any act or omission giving rise to liability for any violation or breach identified in subsection (h) above;

(j)     Each Applicable Employee of the Seller is employed on an "at-will" basis;

7

(k)      There are no employment contracts or severance agreements with any Applicable Employees of Seller, and there are no written personnel policies, rules, or procedures applicable to Applicable Employees of Seller; and

(l)      There are no collective bargaining agreements.

2.1.10  <u>Litigation</u>.  Except for the Bankruptcy Case and as set forth in Section 2.1.10 of the Disclosure Schedule there is no judicial or administrative action, suit, proceeding or investigation pending or, to the Knowledge of the Seller or the Owner, threatened which has or could have a Material Adverse Effect or result in any liability on the part of the Seller, or which involves or could involve the validity of this Agreement or of any action taken or to be taken in connection herewith; nor has any such action, suit, proceeding or  investigation been pending within the three (3) years preceding the Effective Date.

2.1.11  <u>Brokers, Finders, etc</u>.  All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the participation of any Person acting on behalf of the Seller in such manner as to give rise to any valid claim against the Seller or the Purchaser for any brokerage or finder's commission, fee or similar compensation.

2.1.12  <u>Compliance with Applicable Laws</u>.  The Seller is in compliance in all material respects with all Applicable Laws relating to the operation or conduct of the Business.

2.1.13  <u>Transactions with Affiliates</u>.  Except as set forth on Section 2.1.13 of the Disclosure Schedule, during the past three years neither the Seller nor the Owner has directly or indirectly, purchased, leased from others or otherwise acquired any property relating to the Business or obtained any services from, or sold, leased to others or otherwise disposed of any property relating to the Business or furnished any services relating to the Business to, or otherwise dealt with respect to the Business with any Affiliate (except with respect to remuneration for services as officers, directors or employees of the Seller).  No Affiliate is involved in a business that is in competition with the business of the Seller or Purchaser.

2.1.14  <u>Intellectual Property</u>.

(a)      Section 2.1.14 of the Disclosure Schedule contains a complete and correct list and accurate summary description of all intellectual property relating to the Business now held by or owned by the Seller (the "Intellectual Property").  The Intellectual Property includes all intellectual property that is used in the Business.  Except as set forth in Section 2.1.14 of the Disclosure Schedule, all Intellectual Property is registered to or owned by or licensed to the Seller, and is valid and enforceable.

(b)      Except as set forth in Section 2.1.14 of the Disclosure Schedule, the Seller has not infringed nor is infringing, nor has the Seller contributed to or is contributing to the infringement of, any copyrights, trademarks, trade-names, logos, inventions, discoveries, trade secrets, processes, know-how, or any applications or registrations relating thereto, owned by another Person and not licensed to the Seller.  Except as set forth in Section 2.1.14 of the

Disclosure Schedule, there are no pending or, to the Knowledge of the Owner or Seller, threatened actions against the Seller for infringement of any such Intellectual Property.

(c)    all licenses for the use of any Intellectual Property and computer software owned by or licensed by third parties to the Seller are described in Section 2.1.14 of the Disclosure Schedule, are in full force and effect and, following the consummation of the transactions contemplated by this Agreement, shall remain in full force and effect.

(d)    The IP Agreements constitute all of the contracts and agreements relating to the Intellectual Property included in the Assets.  The IP Agreements are in full force and effect, and true, correct and complete copies thereof have been delivered to the Purchaser.  No default exists under the IP Agreements, and no event has occurred under IP Agreements which, but for the giving of notice or the passage of time, or both, would constitute a breach or default thereunder.

(e)    Set forth in Section 2.1.14 of the Disclosure Schedule is a list of all contracts and agreements (whether oral or written) between the Seller and a third party which imparts or which imparted an obligation of noncompetition, secrecy, confidentiality or non-disclosure upon the Seller or any employee, which obligation is currently in effect.

(f)    The Seller and the Owner have received no notices from any party indicating to them that Sections 2.1.14(a), (b) and (c) are untrue.

2.1.15  Insurance.  Section 2.1.15 of the Disclosure Schedule contains a complete and correct list and accurate summary description of all insurance policies maintained by the Seller.  The Seller has delivered to the Purchaser complete and correct copies of all such policies together with all riders and amendments thereto.  Such policies are in full force and effect, and all premiums due thereon have been paid.  The Seller has complied in all respects with the terms and provisions of such policies.

2.1.16  ERISA.

(a)    Each Seller Plan is identified in Section 2.1.16 of the Disclosure Schedule.  Each Seller Plan that is intended to qualify under Section 401(a) of the Code or similar provision of foreign law is identified as such in Section 2.1.16 of the Disclosure Schedule, and is so qualified.  The Seller has performed all obligations required to be performed by it by the terms of the Seller Plans and applicable laws, rules and regulations.  The Seller has complied in all material respects with all applicable laws, rules and regulations relating to each Seller Plan.

(b)    The Seller has not, and the Seller and Owner have no Knowledge that any other party in interest (as defined in Section 3(14) of ERISA) to any Seller Plan has, engaged in any transaction with respect to any Seller Plan in connection with which the Seller or any other party in interest could be subjected to either a civil penalty assessed pursuant to Section 502(i) of ERISA or a tax imposed by Section 4975 of the Code.

9

(c)     No Seller Plan which is a "defined benefit plan" (as defined in Section 3(35) of ERISA) or any trust created under any such Seller Plan has been terminated since September 2, 1974.  No material liability to the Pension Benefit Guaranty Corporation (the "PBGC"), other than annual premium payments, has been or is expected by the Seller to be incurred by the Seller with respect to any Seller Plan.  There has been no reportable event (within the meaning of Section 4043(b) of ERISA), which at the time of such event required notification within 30 days to the PBGC.  There has been no other reportable event with respect to any Seller Plan which could result in a liability to the business of the Seller as a result thereof.  There has been no event or condition which presents a risk of termination of any such Seller Plan by the PBGC.

(d)     Full payment has been made of all amounts which the Seller is required under the terms of each Seller Plan to have paid as contributions to such Seller Plan as of the last day of the most recent fiscal year of such Seller Plan ended prior to the Effective Date or, if later, the most recent date as of which such amount is required to be paid under such Seller Plan (and, with respect to any Seller Plan that is subject to Section 412(m) of the Code, all payments required to be made have been paid on or before each required installment due date (as defined in Section 412(m) of the Code) preceding the Effective Date), and, with respect to any Seller Plan, no accumulated funding deficiency (as defined in Section 302 of ERISA and Section 412 of the Code), whether or not waived, exists.  There has been no failure to make any payment due prior to the Effective Date that is or could become a liability of the Seller under Section 412(c) of the Code.

(e)     The present value as of the date of the most recent Financial Statements of all accrued benefits under all Seller Plans subject to Section 412 of the Code did not, as of such date, exceed the current value of the assets of such Seller Plans allocable to such accrued benefits.  The terms "present value," "current value" and "accrued benefit" have the meanings specified in section 3 of ERISA.

(f)     No Seller Plan is a Multiemployer Plan and the Seller has not withdrawn or partially withdrawn from any Multiemployer Plan under circumstances giving rise to a withdrawal liability under ERISA.

(g)     Neither the Seller nor any corporation, trade or business under common control with the Seller (within the meaning of Sections 414(b), (c), (m) or (o) of the Code) has engaged in any transaction since January 1, 1986 described in Section 4069(a) of ERISA.

(h)     No Seller Plan provides for the payment of any welfare benefit (as defined in Section 3(1) of ERISA) to any former or retired employee of the Seller or any of the Affiliates, except as may be required by Section 4980B of the Code or Section 601 of ERISA.

(i)     No Seller Plan provides for the payment of severance benefits upon termination of employment.

2.1.18 <u>Client Contracts</u>.    Subject to Bankruptcy Court approval, the Client Contracts are in full force and effect, and true, correct and complete copies thereof have been delivered to the Purchaser.   No default exists under the Client Contracts, and no event has occurred under the Client Contracts which, but for the giving of notice or the passage of time, or both, would constitute a material breach or default thereunder.

2.1.19 <u>Customers</u>.    Listed in Section 2.1.19 of the Disclosure Schedule are the names of all of the top twenty-five (25) customers of the Seller that ordered goods or services from the Seller for the past twelve (12) months, and the amount during such period for which each such customer was invoiced.   Except as disclosed in Section 2.1.19 of the Disclosure Schedule, the Seller and the Owner have no Knowledge as of the Effective Date that any customer of the Seller listed in Section 2.1.19 of the Disclosure Schedule has ceased, or will cease whether by reason of the consummation of the transactions contemplated by this Agreement or otherwise, to use the goods or services of the Seller which are being transferred to and assumed by the Purchaser, or has substantially reduced, or will substantially reduce, the use of such goods or services at any time.

2.1.20 <u>Disclosure</u>.   The representations and warranties contained in this Section 2.1 do not contain any untrue statement of a fact or omit to state any fact which is either (a) necessary in order to make the statements and information contained in this Section 2.1 not misleading, or (b) which a prudent purchaser of the Assets would want to know.

2.1.21 <u>Bankruptcy</u>.   Gemini is in full compliance with the Bankruptcy Code, the rules promulgated thereunder and all orders of the Bankruptcy Court in connection with the Sale Order.   Neither Gemini nor Gemini Systems or any affiliate or representative of Seller has taken any action, or failed to take any action, which might, to any extent, prevent, impede or result in the revocation of the vesting in Purchaser upon entry of the Sale Order of good, valid and marketable title to the Assets (or any portion thereof) free and clear of all Liens and interests of creditors and equity security holders.

2.1.22 <u>No Other Representations and Warranties</u>.   Except for the representations and warranties contained in this Section 2.1 (including the related portions of the Disclosure Schedule), neither Seller nor Owner has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller or Owner, including any representation or warranty as to the future revenue, profitability or success of the Business.

2.2    <u>Representations and Warranties of the Purchaser and Essextec</u>.   The Purchaser and Essextec, jointly and severally, represent and warrant to the Seller and Owner as follows:

2.2.1    <u>Corporate Status</u>.   The Purchaser and Essextec are each a corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey.

2.2.2    <u>Authority for Agreements</u>.   Purchaser and Essextec have the full corporate power and authority to execute and deliver the Transaction Agreements to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated by such Transaction Agreements.   The execution and delivery of the Transaction

Agreements, and the consummation of the transactions contemplated hereunder have been duly authorized by the Purchaser and Essextec, as applicable.  This Agreement constitutes the valid and legally binding obligation of the Purchaser and Essextec.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereunder will not conflict with or result in any violation of or default under any provision of the Purchaser's or Essextec's respective certificate of formation or any mortgage, indenture, lease, agreement or other instrument, permit, concession, grant, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to the Purchaser or Essextec or any of their respective properties.  No consent, approval, order or authorization of, or registration, declaration or filing with any Governmental Authority is required on the part of the Purchaser or Essextec in connection with the execution and delivery of this Agreement, or the consummation of the transactions contemplated hereby or by any Transaction Agreement.

      2.2.3    <u>Brokers, Finders, etc</u>.  All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the participation of any Person acting on behalf of the Purchaser in such manner as to give rise to any valid claim against the Seller for any brokerage or finder's commission, fee or similar compensation.

      2.2.4    <u>Sufficiency of Funds</u>.  Purchaser has sufficient cash on hand, when combined with the proceeds of the funds committed by Essextec and/or others, to make payment of the Purchase Price and consummate the transactions contemplated hereby.

## ARTICLE III

## CLOSING OBLIGATIONS

3.1    <u>Closing Deliveries</u>.  At the Closing the following agreements, instruments and documents shall be executed and delivered:

      3.1.1.    <u>Sale of Assets and Assumption of Client Contracts</u>.  The Seller and the Purchaser shall execute and deliver a Bill of Sale, Assignment and Assumption Agreement in the form attached hereto as Exhibit A.

      3.1.2    <u>Employment of Owner by Purchaser</u>.  Essextec and the Owner shall execute and deliver an Employment Agreement in substantially the form attached hereto as Exhibit B (the "Employment Agreement").

      3.1.3    <u>Lease Assignment</u>.  If Purchaser assumes the Lease, Seller shall execute and deliver a Lease Assignment in a form mutually agreeable to Purchaser and Seller, whereby it assigns to Purchaser all of its right, title and interest in and to that certain Agreement of Lease, dated November 30, 1995, for space located at 61 Broadway, New York, NY.

      3.1.4    <u>Resolutions</u>.    The Purchaser and Seller shall each deliver written resolutions of their respective members, managers, shareholders and/or board of directors (as applicable) authorizing the transactions contemplated herein.

3.1.5   <u>Incumbency Certificate</u>.  The Seller shall deliver a Incumbency Certificate naming all of its directors, officers, shareholders and/or members (as applicable), and containing certified copies of such Seller's (a) certificate of incorporation or certificate of formation (as applicable), (b) bylaws or operating agreement (as applicable), and (c) resolutions authorizing the transactions contemplated herein.

3.2   <u>Satisfaction of Indebtedness and other Liabilities</u>.  The Seller shall permit the Purchaser to use a portion of the Purchase Price to make the payments described in Section 1.3 hereof.

3.3   <u>Accounts Receivable; Accounts Payable; Representation of</u> .  On the Closing Date, Seller shall provide Purchaser with a list of all its Accounts Receivable and the invoice dates thereof and the name of the payee.  On the Closing Date, Seller shall provide Purchaser with a list of all of its Accounts Payable and other obligations, whether or not disclosed or reserved against in the Financial Statements, excluding only those that are being paid at the Closing.  On the Closing Date, the Seller shall deliver to Purchaser written acknowledgments signed by those individuals who made loans to the Seller setting forth (a) the amount of such loan, (b) the amount of interest accrued to the Closing Date, (c) a waiver of any right to receive interest on such loan from and after the Closing Date, and (d) an agreement not to look solely to the Seller's Accounts Receivable for payment of such loan.  Such undertakings shall be acceptable in form and substance to the Purchaser.

## **ARTICLE IV**

## **COVENANTS**

4.1   <u>Due Diligence</u>.  During the term of this Agreement, Seller will afford Purchaser's authorized representatives all reasonable opportunity and access during normal business hours to its personnel, contracts, books and records and all other documents and data related to the Seller, the Assets and the Business.  Where practicable, Seller will mail such information and materials related to the Seller, the Business and the Assets to Purchaser or Purchaser's accountants and counsel.

4.2   <u>Conduct of Business until the Closing Date</u>.  From the Effective Date to the Closing Date, except as contemplated by this Agreement or otherwise consented to by Purchaser in writing (which consent shall not be unreasonably withheld or delayed), subject to orders of the Bankruptcy Court and otherwise to the requirements of the Bankruptcy Code, the Seller shall use commercially reasonable efforts to:

4.2.1   carry on its business in, and only in, the Ordinary Course of Business, in substantially the same manner as has been conducted since the Petition Date, subject to orders of the Bankruptcy Court and otherwise to the requirements of the Bankruptcy Code, and use all reasonable efforts to preserve intact its present business organization, keep available the services of its present officers and Key Employees, and preserve its relationship with customers and others

having business dealings with it to the end that its goodwill and going business shall be in all material respects unimpaired following the Closing Date;

      4.2.2   maintain all its material structures, equipment and other tangible  personal property currently in use in good operating condition and repair, except for ordinary wear and tear;

      4.2.3   keep in full force and effect insurance comparable in amount and scope of coverage to insurance now carried by it;

      4.2.4   pay accounts payable and other obligations when they become due and payable in the Ordinary Course of Business;

      4.2.5   perform in all material respects all of its obligations under agreements, contracts and instruments relating to or affecting its properties, assets and business;

      4.2.6   maintain its books of account and records in the usual, regular and ordinary manner;

      4.2.7   not amend its certificate of incorporation or bylaws;

      4.2.8   not enter into or assume any agreement, contract or commitment of the character required to be disclosed in Section 2.1.9;

      4.2.9   not merge or consolidate  with, or agree to merge or consolidate with, or purchase substantially all of the assets of, or otherwise acquire any business or any corporation, partnership, association or other business organization or division thereof;

      4.2.10  not take any action the taking of which would result in a violation of any of the representations and warranties set forth in Section 2.1.7; and

      4.2.11  promptly advise Purchaser in writing of any change which, individually or in the aggregate, has or could have a Material Adverse Effect on the Business or breach this Section 4.2.

    4.3   <u>Financials, etc</u>.  Seller shall provide Purchaser, as soon as the same become available, copies of all financial statements in the form of management reports of Seller for periods subsequent to the most recent Financial Statement which become available prior to the Closing Date.

    4.4   <u>Public Announcements</u>.  Except as required by law, none of the parties hereto shall make any public announcement in respect of the transactions contemplated hereby without the prior written consent of the other parties hereto (which consent will not be unreasonably withheld or delayed).

14

4.5     <u>Filings and Authorizations</u>.  The Seller shall, as promptly as practicable, file or supply, or cause to be filed or supplied, all applications, notifications and information required to be filed or supplied by them pursuant to Applicable Law in connection with the sale and transfer of the Assets pursuant to this Agreement and the consummation of the transactions contemplated hereby.  Seller, as promptly as practicable, (i) shall make, or cause to be made, all such other filings and submissions under laws, rules and regulations applicable to them and give such reasonable undertakings, as may be required for them to consummate the transfer of the Assets and the other transactions contemplated hereby, (ii) shall use its commercially reasonable efforts to obtain, or cause to be obtained, all authorizations, approvals, consents and waivers from all Persons and Governmental Authorities necessary to be obtained by it in order for it to consummate such transfer and such transactions, including without limitation all third party consents required for the assignment of contracts, and (iii) shall use its reasonable efforts to take, or cause to be taken, all other actions necessary, proper or advisable in order for it to fulfill its obligations hereunder; and Seller shall coordinate and cooperate with the Purchaser in exchanging such information and supplying such reasonable assistance as may be reasonably requested by the Purchaser in connection herewith.

4.6     <u>Access to Records</u>.  After the Closing Date, the Purchaser shall provide the Seller, the Owner and their representatives reasonable access to the books and records of Seller included in the Assets during normal business hours and on reasonable prior notice, to enable the Seller to prepare tax returns, deal with tax audits or collect Accounts Receivable.

4.7     <u>Further Assurances</u>.  By way of example and not limitation, following the Closing the Seller and the Owner shall use their commercially reasonable best efforts to cause International Business Machines Corporation to enter into Agreements or Relationships with the Purchaser similar to those that now exist with Seller.  By way of further example and not limitation, following the Closing the Seller shall change its company name to one that does not include 'Gemini' or any variation thereof.
.

4.8     <u>Restrictive Covenants</u>.

4.8.1     <u>Covenant Not to Compete</u>.  The Seller and the Owner recognize and agree that in order to adequately protect the Business to be conducted by the Purchaser, a covenant not to compete of limited duration and scope is necessary and desirable.  The Seller and the Owner therefore each agree that for a period of sixty (60) months after the Closing Date or twenty-four (24) months after the termination of the Employment Agreement referenced in Section 3.1.2, whichever is later (the "Restricted Period"), for any reason whatsoever, none of them (nor any of their Affiliates) will directly or indirectly, either as an individual for his own account or enterprise, or as a partner, owner, joint-venturer, officer, director, employee, agent, salesman, independent contractor, supplier, principal consultant, or 5% or more equity holder of any entity or third party:

(a)     engage directly or indirectly in the United States in any business that sells or licenses software or provides consulting services relating to software;

(b)     hire or solicit for employment, directly or indirectly, any of the Purchaser's personnel or any of the Applicable Employees (which shall be deemed to include, without limitation, any existing employee, consultant or independent contractor of the Purchaser or any person who is such an employee, consultant or independent contractor of the Purchaser as of the Closing Date) in any capacity whatsoever; provided that this Section 4. 8.1(b) shall not restrict the right of Seller or Owner to (i) solicit or recruit generally in the media, or (ii) solicit or hire employees that have been separated from the service of the Purchaser or any of its Affiliates for a period of at least one hundred eighty (180) days, provided that neither Seller nor Owner solicited such separation;

(c)     attempt directly or indirectly to induce (a) any Applicable Employees not to become employed by the Purchaser, or (b) any of the Purchaser's personnel to leave the employ of, or discontinue such person's consultant, contractor, or other business association with the Purchaser; or

(d)     interfere with, disrupt or attempt to disrupt the business relationships, contractual or otherwise between the Purchaser and any of its (or those that Purchaser will have as a result of the transactions contemplated hereby) agents, customers, suppliers or employees.

4.8.2   <u>Confidentiality</u>.  The Seller and the Owner will treat and hold as such all of the Confidential Information, refrain from using any of the Confidential Information except in connection with this Agreement, and deliver promptly to the Purchaser or destroy, at the request and option of the Purchaser, all tangible embodiments (and all copies) of the Confidential Information that are in its possession. In the event that Seller or the Owner are requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, the Seller or the Owner (as applicable) will notify the Purchaser promptly of the request or requirement so that the Purchaser may seek an appropriate protective order or waive compliance with the provisions of this Section 4.8. If, in the absence of a protective order or the receipt of a waiver hereunder, any of the Seller or the Owner is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, such Seller or the Owner (as applicable) may disclose the Confidential Information to the tribunal; *provided, however*, that such Seller or the Owner (as applicable) shall use its best efforts to obtain, at the request of the Purchaser, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as the Purchaser shall designate.

4.8.3   <u>Non-Disparagement</u>.  The Seller and the Owner shall not make any statements, whether oral or in writing, that would tend to disparage or defame the Purchaser, Essextec or their respective products, services, employees, officers, directors or shareholders.

4.8.4   <u>Remedies</u>.  The Seller and the Owner acknowledge and agree that if they were to breach the covenants contained in Sections 4. 8.1, 4. 8.2 or 4. 8.3 hereof, monetary damages alone would not adequately compensate the Purchaser.  In addition to all remedies available at law or in equity, in the event that any of the Seller and/or the Owner breaches the

covenants contained in Sections 4. 8.1, 4. 8.2 or 4. 8.3 hereof, the Purchaser shall be entitled to interim restraints and permanent injunctive relief for the enforcement thereof.  The duration of the Seller's and the Owner's covenants set forth in Sections 4. 8.1, 4. 8.2 or 4. 8.3 also shall be extended by a period of time equal to the number of days, if any, during which any of the Seller and/or the Owner is in violation of the provisions contained in Sections 4. 8.1, 4. 8.2 or 4. 8.3  (as applicable).  All of the rights and remedies of the parties hereto shall be cumulative with, and in addition to, any other rights, remedies or causes of action allowed by law or equity and shall not exclude any other rights or remedies available to either of the parties hereto.

      4.8.5    <u>Acknowledgements</u>.  The Seller and the Owner acknowledge that (i) the type of restrictions, periods of restriction, and geographical scope of the restrictions imposed in the provisions of Sections 4. 8.1, 4. 8.2 or 4. 8.3 are fair and reasonable and are reasonably required in order to protect and maintain the proprietary interests of the Purchaser, other legitimate business interests and the goodwill associated with the business of the Purchaser; and (ii) the time, scope, geographic area and other provisions of this Section 4. 8 have been specifically negotiated by sophisticated commercial parties, represented by legal counsel, and are given as an integral part of this Agreement. If any of the covenants contained in Sections 4. 8.1, 4. 8.2 or 4. 8.3, or any part thereof, is held to be unenforceable by reason of it extending for too great a period of time or over too great a geographic area or by reason of it being too extensive in any other respect, the parties agree (a) such covenant shall be interpreted to extend only over the maximum period of time for which it may be enforceable and/or over the maximum geographic areas as to which it may be enforceable and/or over the maximum extent in all other respects as to which it may be enforceable, all as determined by the court or arbitration panel making such determination and (b) in its reduced form, such covenant shall then be enforceable, but such reduced form of covenant shall only apply with respect to the operation of such covenant in the particular jurisdiction in or for which such adjudication is made. Each of the covenants and agreements contained in this Section 4. 8 (collectively, the "Protective Covenants") is separate, distinct and severable. All rights, remedies and benefits expressly provided for in this Agreement are cumulative and are not exclusive of any rights, remedies or benefits provided for by law or in this Agreement, and the exercise of any remedy by a party hereto shall not be deemed an election to the exclusion of any other remedy (any such claim by the other party being hereby waived). The existence of any claim, demand, action or cause of action of the Seller or the Owner against the Purchaser, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Purchaser of each Protective Covenant. The unenforceability of any Protective Covenant shall not affect the validity or enforceability of any other Protective Covenant or any other provision or provisions of this Agreement.

      4. 8.6    <u>Notification of Restrictive Covenants</u>.  Prior to accepting employment with any person, firm or entity during the Restricted Period, the Owner shall notify the prospective employer in writing of his obligations pursuant to this Section 4. 8 and shall simultaneously provide a copy to the Purchaser.  In addition, the Owner hereby grants consent to notification by the Purchaser to his new employer about Owner's obligations under this Agreement, including providing a copy of this Agreement (or the relevant provisions hereof).

      4. 8.7    <u>Fees and Costs</u>.  If the Seller and/or the Owner should breach any of the terms, provisions, and conditions of this Section 4. 8, the Purchaser shall be entitled to recover all

costs of suit plus reasonable attorney's fees incurred in enforcing such terms, provisions, and restrictions.

4. 8.8    Survival of Restraints.  The provisions of this Section 4. 8 shall survive the closing of the transactions contemplated hereby.

4.10    Breakup Fee and Expense Reimbursement.

4.10.1    Breakup Fee.  In the event that the Bankruptcy Court enters a Final Order approving an Alternate Transaction, then Purchaser shall be entitled to and Gemini shall pay to Purchaser at the consummation of an Alternate Transaction (or in the case of a plan of reorganization or liquidation that is an Alternate Transaction upon confirmation of such plan of reorganization or liquidation), 3.0% of the Purchase Price (the "Breakup Fee").  The Breakup Fee provided for by this Section is intended to cover opportunity costs incurred by Purchaser in pursuing and negotiating this Agreement and the transactions contemplated hereby, and is considered by the Parties to be reasonable for such purposes.  The Breakup Fee shall be paid from the first sale proceeds of an Alternate Transaction.  The claims of Purchaser to the Breakup Fee shall constitute an administrative expense against Gemini's bankruptcy estate under the applicable provisions of the Bankruptcy Code.

4.10.2    Expense Reimbursement.  In addition to any Breakup Fee that may be payable pursuant to this Section, upon (i) any event in which the Breakup Fee is payable pursuant to this Section or (ii) termination of this Agreement by Purchaser pursuant to Section 7.1.1(b) or Section 7.1.1(i), Seller shall reimburse up to $200,000 of the actual and documented out-of-pocket fees and expenses incurred by Purchaser and its Affiliates in the course of negotiating, drafting and approving this Agreement, Disclosure Schedules and the Transaction Documents prior to the date this Agreement is terminated, whether incurred before, on or after the Petition Date (the "Expense Reimbursement").  The claims of Purchaser to the Expense Reimbursement shall constitute an administrative expense against Gemini's bankruptcy estate under the applicable provisions of the Bankruptcy Code.  "Alternative Transaction" means (a) a merger, consolidation, restructuring, reorganization, plan of reorganization in the Bankruptcy Case, joint venture, refinancing, funding of a plan of reorganization in the Bankruptcy Case, business combination, transaction or series of transactions involving the sale or other disposition (including, without limitation, by lease, foreclosure, transfer in lieu of foreclosure, or management agreement) of all or any part of a Seller, the Business, the Assets or any other assets of a Seller pursuant to one or more transactions to a Person other than Purchaser; (b) the sale of outstanding or newly issued (or some combination of sold and newly issued) capital stock of a Seller (including by way of a debt for equity swap, tender offer, foreclosure or plan of reorganization or liquidation) resulting in a transfer of voting control of a Seller to a Person or group of Persons who, before the transaction or series of transactions, did not hold voting control of such Seller; or (c) any other business combination with a Person other than Buyer affecting the Assets or voting control of a Seller.

4.10.3    Survival.  The provisions of this Section 4.10 shall survive the closing or earlier termination of the transactions contemplated hereby.

4.11    Employees and Employee Benefits.

4.11.1 Purchaser shall, or shall cause an Affiliate of Purchaser to, offer employment effective on the Closing Date, to all Applicable Employees that it affirmatively elects, in its sole discretion, to offer employment (the Applicable Employees who are offered and accept such employment and commence employment on the Closing Date, the "Transferred Employees").

4.11.2 With respect to any employee benefit plan maintained by Purchaser or an Affiliate of Purchaser for the benefit of any Transferred Employee, effective as of the Closing, Purchaser shall use good faith efforts to recognize all service of the Transferred Employees with Seller, as if such service were with Purchaser, for vesting, eligibility and accrual purposes; provided, however, such service shall not be recognized to the extent that (x) such recognition would result in a duplication of benefits or (y) such service was not recognized under the corresponding benefit plan provided for the Transferred Employee by the Seller.

4.11.3 Effective as of the Closing, the Transferred Employees shall cease active participation in the Seller Plans. Seller shall remain liable for all eligible claims for benefits under the Seller Plans that are incurred by the Applicable Employees prior to the Closing Date.

4.11.4 This Section 4.11 shall be binding upon and inure solely to the benefit of each of the parties to this Agreement, and nothing in this Section 4.11, express or implied, shall confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Section 4.11. Nothing contained herein, express or implied, shall be construed to establish, amend or modify any benefit plan, program, agreement or arrangement. The parties hereto acknowledge and agree that the terms set forth in this Section 4.11 shall not create any right in any Transferred Employee or any other Person to any continued employment with Purchaser or any of its Affiliates or compensation or benefits of any nature or kind whatsoever.

4.11.5 Purchaser has no obligation to hire any employees of the Seller pursuant to this Agreement.  Seller acknowledges, however, that the Purchaser is entitled to hire any of the Applicable Employees; provided that Purchaser shall give Seller a written list of those Applicable Employees that it desires to hire at least five (5) days prior to the Closing Date.

4.12   <u>Supplement to Disclosure Schedules</u>.   From time to time prior to the Closing, Seller shall supplement or amend the Disclosure Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof that causes a representation or warranty set forth in Section 2.1 to be untrue (each a "Schedule Supplement").   Each such Schedule Supplement shall be deemed to be incorporated into and to supplement and amend the Disclosure Schedules as of the Closing Date; <u>provided</u>, however, that if such event, development or occurrence which is the subject of the Schedule Supplement constitutes or relates to something that has had or is reasonably likely to cause a Material Adverse Effect, then Purchaser shall have the right to terminate this Agreement pursuant to Section 7.1.1(c); provided, further, that Seller's provision of a Schedule Supplement and Purchaser's non-termination of this Agreement shall not constitute a waiver of any of Purchaser's rights hereunder.   After receiving a Schedule Supplement Purchaser may elect to close the transaction of purchase and sale contemplated by this Agreement and seek indemnification from Seller and Owner pursuant to Section 5.1.

4.13   <u>Confidentiality</u>.   Seller, Owner, Purchaser and Essextec acknowledge and agree that the Confidentiality Agreement dated April 15, 2013 remains in full force and effect and, in addition, covenant and agree to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to the parties hereto and their advisors pursuant to this Agreement. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this Section 4.13 shall nonetheless continue in full force and effect.

4.14   <u>Sales Tax on Transfer</u>.   Unless waived by order of the Bankruptcy Court, all sales or use taxes payable with respect to and/or on account of the transfer of the Seller's furniture and fixtures to Purchaser shall be paid by Purchaser to Seller at the Closing in the form of a certified check in the amount of the sales tax indicated on the notice provided by the Tax Department (or, if no such notice is received as of the Closing, the amount agreed upon by Seller and Purchaser based on the allocation of the Purchase Price and the applicable sales tax rate) made payable to the Tax Department.   Seller shall promptly remit the same to the Tax Department following Closing. Seller and Owner shall jointly and severally defend, indemnify and hold the Purchaser harmless against all claims for any additional New York State sales tax owed in connection with this Agreement and the transactions contemplated hereby.

4.15   <u>Bankruptcy Covenants</u>.

4.15.1 The Sale Motion seeking the entry of the Bidding Procedures Order shall be filed within three (3) business days after execution of this Agreement.   The purchase and sale of the Assets shall be subject to the terms and conditions of the Bidding Procedures Order.

4.15.2 If this Agreement and the sale of the Assets to Purchaser on the terms and conditions hereof are determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order, Purchaser and Seller agree to use commercially reasonable best efforts to cause the Bankruptcy Court to enter the Sale Order, which shall include provisions authorizing and approving the transactions contemplated hereby, including, without limitation (i) the sale of the Assets to Purchaser free and clear of all encumbrances pursuant to the terms of this Agreement and Section 363(b) and (f) of the Bankruptcy Code; (ii) finding Purchaser to be in good faith and providing for the protection afforded under Section 363(m) of the Bankruptcy

20

Code; (iii) waiving the stays set forth in Bankruptcy Rules 6004(h) and 6006(d); (iv) providing that Purchaser shall not be subject to any successor liability and shall have no liability or suffer any damages for any encumbrances existing prior to the Closing Date which may be asserted against Seller, the Assets, the Business or Gemini's bankruptcy estate, or any claims against Purchaser as successor to the Assets; (v) approving the assumption and assignment to the Purchaser pursuant to Section 365 of the Bankruptcy Code of all assigned contracts; (vi) providing for the retention of jurisdiction by the Bankruptcy Court to resolve any and all disputes that may arise under or relate to this Agreement or the Sale Order, whether between Seller and Purchaser or involving a Person in interest in the Bankruptcy Case; (vii) containing findings of fact and conclusions of law that include the following: (A) the transactions under this Agreement were negotiated and entered into in good faith and at arm's-length; (B) the marketing and sale process conducted by Seller pursuant to the Bidding Procedures are bona fide and adequate; (C) Seller gave due and proper notice and an opportunity to be heard to all interested parties of this Agreement and the transactions contemplated herein; (D) Purchaser is not holding itself out to the public as a continuation of Seller; (D) the consideration to be paid by Purchaser under this Agreement constitutes reasonably equivalent value (as that term is used in each of the Uniform Fraudulent Transfer Act and Section 548 of the Bankruptcy Code) and fair consideration for the Assets; and (F) neither Purchaser nor Seller are entering into the transactions contemplated by this Agreement fraudulently.  Gemini shall promptly provide Purchaser with copies of any objections to the Sale Order.

4.15.3  In the event an appeal is taken or a stay pending appeal is requested (or a petition for certiorari or motion for rehearing or reargument is filed), with respect to the Bidding Procedures Order, the Sale Order, or any other order of the Bankruptcy Court related to this Agreement, Seller shall take all steps as may be reasonable and appropriate to defend against such appeal, petition, or motion and Purchaser agrees to cooperate in such efforts.  Each Party shall use its commercially reasonable best efforts to obtain an expedited resolution for such appeal.

4.15.4  From and after the date of this Agreement, except as may be provided in the Bidding Procedures Order, Seller shall not take any action or fail to take any action, which action or failure to act would reasonably be expected to prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement. Seller covenants and agrees that the terms of any plan of reorganization or liquidation or proposed order of the Bankruptcy Court that may be filed, proposed or submitted or supported by Gemini after entry of the Sale Order or consummation of the transactions contemplated hereby shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement, the Bidding Procedures Order or the Sale Order, or the rights of Purchaser hereunder or thereunder.

4.15.5  The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, as applicable, the Bidding Procedures Order and the Sale Order.  Each Party shall promptly provide the other Party and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Party has in its possession (or receives) pertaining to the Sale Motion, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on

21

the docket of the Bankruptcy Court or otherwise made available to the other Parties and their counsel.

4.16    Acquisition Proposal or Alternate Transaction.  Seller represents that, other than this Agreement, Seller is not party to or bound by any contract with respect to an Acquisition Proposal or an Alternate Transaction.  Other than as provided in, and contemplated by, the Bidding Procedures Order, Seller shall not (and Seller shall cause each Representative or Affiliate of Seller to not), directly or indirectly, solicit or participate in negotiations or discussions regarding any Acquisition Proposal from any Person other than Purchaser or execute or enter into a contract with respect to an Acquisition Proposal or Alternate Transaction.  If, after the date hereof, Seller receives any written proposal or offer with respect to a potential or actual Acquisition Proposal or Alternate Transaction, Seller shall promptly (but no later than two (2) days after receipt thereof) communicate to Purchaser the material terms of any such proposal or offer and, if not prohibited by confidentiality obligations, the identity of the party making such proposal or offer.  Subject to Bankruptcy Court approval, Seller agrees that in order for any Acquisition Proposal to be accepted by Seller and submitted for approval by the Bankruptcy Court, such proposal must be a "Qualified Bid" as defined in the Bidding Procedures Order.

## ARTICLE V

## INDEMNIFICATION

5.1    By Seller and Owner.  The Seller and the Owner covenant and agree to defend, indemnify and hold harmless the Purchaser and its Affiliates, and each of its respective officers, directors, employees and agents from and against any and all liability, obligation, loss, cost, diminution of value, deficiency or damage (whether absolute, accrued, conditional or otherwise) and including reasonable attorneys' fees incurred in the defense of any of the same ("Losses"), resulting from or arising out of (a) in the case of the Seller, (i) the incorrectness of any representation or warranty made by the Seller and/or the Owner herein, (ii) any breach of any covenant, agreement or obligation to be performed by Seller and/or Owner herein; (iii) any liabilities or obligations of Seller other than the Assumed Liabilities, (iii) any claims relating to the Seller's operations other than the Business; or (iv) any claim or loss engendered by Purchaser's exercise of the powers granted it pursuant to Section 4.6 of this Agreement and (b) in the case of the Owner, (i) the incorrectness of any representation or warranty made by Owner under Section 2.1.1, 2.1.2, 2.1.3, 2.1.4, 2.1.6 or 2.1.13 of this Agreement, (ii) the incorrectness of any representation or warranty made by Owner under this Agreement, either by misstatement or a failure to disclose, to the extent that (x) such representation or warranty is incorrect in a material manner, or (y) the Owner had Knowledge of such incorrectness at the time such representation or warranty was made, or (iii) a breach of this Agreement or any other Transaction Agreements by the Owner.  In all cases the Seller's or Owner's obligation to provide indemnification for Losses shall end from and after the date, if any, that a court of competent jurisdiction shall have determined in a final and non-appealable judgment that such claim or loss resulted primarily from the gross negligence or willful misconduct of the Purchaser.

5.2    By Purchaser and Essextec.  The Purchaser and Essextec, jointly and severally, covenant and agree to defend, indemnify and hold harmless the Seller and the Owner from and

against any and all Losses, resulting from or arising out of (i) the incorrectness of any representation or warranty made by the Purchaser or Essextec herein, (ii) any breach of any covenant, agreement or obligation to be performed by Purchaser or Essextec herein; or (iii) the Assumed Liabilities.

5.3     Procedure.

5.3.1    The party making a claim under this Article V is referred to as the "Indemnified Party", and the party against whom such claims are asserted under this Article V is referred to as the "Indemnifying Party".  In the case of any claim asserted by a third party against an Indemnified Party, notice shall be given by the Indemnified Party to the "Indemnifying Party" promptly after such Indemnified Party has actual Knowledge of any claim as to which indemnity may be sought, and the Indemnified Party shall permit the Indemnifying Party (at the expense of such Indemnifying Party) to assume the defense of any claim or any litigation resulting therefrom, provided that (i) counsel for the Indemnifying Party, who shall conduct the defense of such claim or litigation, shall be reasonably satisfactory to the Indemnified Party,  and the Indemnified Party may participate in such defense, but only at such Indemnified Party's expense pursuant to this Section 5.3, and (ii) the omission by any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its indemnification obligation under this Agreement except to the extent that such omission results in the a failure of actual notice to the Indemnifying Party and such Indemnifying Party is damaged as a result of such failure to give notice.   No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of the Indemnified Party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability with respect to such claim or litigation.   The Indemnifying Party shall have the full right to defend against any such claim or demand, and shall be entitled to settle or agree to pay in full such claim or demand; provided, however, that the Indemnifying Party shall not accept settlement of any such claim or demand without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld.  In any event, the Seller and the Purchaser shall cooperate in the defense of any action or claim subject to this Section 5.3 and the records of each shall be available to the other with respect to such defense.

5.3.2    Except in the case of fraud or breaches of this Agreement that merit the issuance of interim restraints and/or permanent injunctive relief, the indemnification provided for in this Section shall provide the sole recourse for the parties to this Agreement in the event of a breach of or inaccuracy in a representation or warranty, or any other breach of this Agreement. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under Applicable Law, except in the case of fraud, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates arising under or based upon any Applicable Law, except pursuant to the indemnification provisions set forth in this Article V.

5.3.3    No indemnification may be sought for breach of or inaccuracy in a representation or warranty unless written notice with respect thereto is given to the Indemnifying Party prior to the expiration of the subject representation or warranty under Section 5.4 hereof.

5.3.4   In the event that the Purchaser has any claims against the Seller or the Owner pursuant to Section 5.3.1 hereof, the Purchaser shall be entitled to set off against any payments due to the Seller pursuant hereto or the Owner pursuant to the Bonus Compensation Plan (as defined in the Employment Agreement) that is part of the Employment Agreement, by placing the amount in dispute in a separately segregated bank account located in the State of New Jersey.  The segregated funds shall be released upon final adjudication or settlement of the disputed issue in accordance with the terms of the judgment or settlement. The parties shall attempt in good faith to resolve any such dispute.

5.3.5   The Purchaser's right to indemnification hereunder shall not in any way be affected or limited by (a) the fact that the Purchaser performed due diligence on the Seller, the Assets and the Business, and (b) any Knowledge of the Purchaser, whether actual, constructive or otherwise, as to the inaccuracy of any of the representations or warranties made by the Seller or the Owner hereunder.

5.4   <u>Survival of Representations and Warranties, etc.</u>   The representations and warranties contained in this Agreement shall survive the execution and delivery of this Agreement, any examination by or on behalf of the parties hereto and the completion of the transactions contemplated herein, but only to the extent specified below:

5.4.1   except as set forth in Sections (b) and (c) below, the representations and warranties contained in Sections 2.1 and 2.2 shall survive for a period of two (2) years following the Closing;

5.4.2   the representations and warranties contained in Sections 2.1.1, 2.1.2, 2.1.3, 2.1.4, 2.1.13, 2.2.1, 2.2.2 and 2.2.3 shall survive without limitation; and

5.4.3   the representations and warranties contained in Sections 2.1.8 and 2.1.19 shall survive until the expiration of the applicable statute of limitations.

5.5   <u>Certain Limitations</u>.  The indemnification provided for in Section 5.1 and Section 5.2 shall be subject to the following limitations:

5.5.1   The Indemnifying Party shall not be liable to the Indemnified Party for indemnification under Section 5.1(i) or Section 5.2(i), as the case may be, until the aggregate amount of all Losses in respect of indemnification under Section 5.1(i) or Section 5.2(i) exceeds $100,000 (the "Deductible"), in which event the Indemnifying Party shall be required to pay or be liable for all Losses, including those within the Deductible.  Notwithstanding the foregoing, this Section 5.5.1 shall not apply to (a) any breach of any representation or warranty of which the Person making the same had Knowledge at the time it was made, (b) an intentional breach of any covenant or obligation contained herein, or (c) a breach of the representations and warranties contained in Sections 2.1.1, 2.1.2, 2.1.3, 2.1.4, 2.1.13, 2.2.1, 2.2.2 and 2.2.3.

5.5.2   The aggregate amount of all Losses for which a party shall be liable as an Indemnifying Party pursuant to Section 5.1(i) or Section 5.2(i) shall not exceed [$3,000,000.]

5.5.3    Each Indemnified Party shall take, and cause its Affiliates to take, all commercially reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise thereto, including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to a claim for indemnification.

# ARTICLE VI

## CONDITIONS PRECEDENT

6.1    <u>Conditions to Closing of the Parties</u>.  The respective obligations of the Parties to consummate the transactions contemplated by this Agreement to consummated at the Closing are subject to the satisfaction of the condition that the sale of the Assets by Seller to Purchaser and the assumption and assignment of the Assigned Contracts as contemplated by this Agreement shall have been approved by the Bankruptcy Court pursuant to the Sale Order in form and substance satisfactory to all Parties, which as of the Closing Date shall be in full force and effect and shall not have been violated, vacated, withdrawn, overruled, resolved or stayed, modified, reversed, amended or revoked.

6.2    <u>Bidding Procedures Order and Sale Order</u>.    Purchaser's obligations to consummate the Closing hereunder are contingent upon the Bankruptcy Court having entered the Bidding Procedures Order and the Sale Order, which Sale Order shall have become a Final Order.

6.3    <u>Filed Motions</u>.  Purchaser's obligations to consummate the Closing hereunder are contingent upon all motions and other documents having been filed with and submitted to the Bankruptcy Court in connection with the Acquisition (including, without limitation, the Sale Order), in the form and substance satisfactory to Purchaser in its sole discretion.

6.4    <u>No Default</u>.  In the event that a DIP Financing Facility is entered into after the date of this Agreement, there shall exist no default or event of default under the DIP Financing Facility Documents.

6.5    <u>Sale Order</u>.  Purchaser's obligations to consummate the Closing hereunder are contingent upon the Bankruptcy Court having entered the Bidding Procedures Order which*, inter alia*, approves the amount and conditions for payment of the Breakup Fee and Expense Reimbursement and which is in form and substance satisfactory to Purchaser, and the Bankruptcy Court having entered a Sale Order, in form and substance satisfactory to Purchaser in its sole discretion, which order shall be in full force and effect; shall not have been reversed, vacated or stayed; shall not have been amended, supplemented, or otherwise modified without the prior written consent of Purchaser (which consent shall not be unreasonably withheld), and the Sale Order shall have become a Final Order.

6.6    <u>Receipt of Governmental Approvals</u>.  Purchaser's and Seller's obligations to consummate the Closing hereunder are contingent upon Seller and Purchaser receiving all Governmental Approvals required for lawful consummation of the transactions contemplated

herein, if any.  The parties shall use their commercially reasonable best efforts to obtain all such Governmental Approvals.

6.7     Agreements with Key Employees.  Purchaser's obligation to consummate the Closing hereunder is contingent upon the Seller's Key Employees that Purchaser desires to employ agreeing to work for Purchaser and entering into Confidentiality, Assignment of Invention, and Noncompetition Agreements with Purchaser in a form and substance reasonably acceptable to Purchaser.

6.8     Bankruptcy Case.  Since the date of this Agreement, there shall not have been any dismissal of the Bankruptcy Case or conversion of the Bankruptcy Case to a case under Chapter 7 of Title 11 of the United States Code.

## ARTICLE VII

### TERMINATION

7.1     Termination.

7.1.1     Termination of Agreement.  The parties may terminate this Agreement as provided below (whether before or after the entry of the Bidding Procedures Order and/or the Sale Order):

(a)     the Purchaser and the Seller may terminate this Agreement by mutual written consent at any time prior to the Closing;

(b)     the Purchaser may terminate this Agreement by giving written notice to the Seller at any time prior to the Closing (i) in the event the Owner or the Seller has breached any representation, warranty, or covenant contained in this Agreement and such breach has caused or is reasonably likely to cause a Material Adverse Effect, or (ii) if the Closing shall not have occurred on or before the Closing Date because any of the conditions precedent set forth in Sections 6.2 through 6.5 hereof have not been satisfied in full;

(c)     the Seller may terminate this Agreement by giving written notice to the Purchaser at any time prior to the Closing (i) in the event the Purchaser has breached any representation, warranty, or covenant contained in this Agreement and such breach has caused or is reasonably likely to cause a Material Adverse Effect, or (ii) if the Closing shall not have occurred on or before the Closing Date because any of the conditions precedent set forth in Sections 6.2 and 6.3 hereof have not been satisfied in full;

(d)     the Purchaser may terminate this Agreement by giving written notice to Seller if the Closing shall not have occurred on or before 5:00 p.m. on the fifteenth day after the Sale Order has been entered;

(e)      the Purchaser may terminate this Agreement by giving written notice to Seller if (i) the Bankruptcy Court has not entered the Bidding Procedures Order on or before April 30, 2015 or (ii) the Bidding Procedures Order has been entered but is stayed, withdrawn, or rescinded as of such date;

(f)      the Purchaser may terminate this Agreement by giving written notice to Seller if (i) the Bankruptcy Court has not entered the Sale Order on or before June 1, 2015 or (ii) on or after June 30, 2015 if a legal proceeding shall be pending pursuant to which a Person has appealed the Sale Order, or if the Sale Order shall have been withdrawn or rescinded;

(g)      the Purchaser may terminate this Agreement by giving written notice to Seller if an order has been entered dismissing the Bankruptcy Case, converting the Bankruptcy Case to a Chapter 7 case or if Gemini files a motion or other pleading seeking the dismissal or conversion of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise;

(h)      the Purchaser or the Seller may terminate this Agreement in the event that any Law or order becomes effective restraining, enjoining, or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement;

(i)      the Seller may terminate this Agreement at any time after the Bankruptcy Court approves an Alternate Transaction, or Purchaser may terminate this Agreement upon the closing of an Alternate Transaction;

(j)      the Purchaser may terminate this Agreement at any time after the appointment of a Chapter 7 trustee or an examiner with expanded powers in the Bankruptcy Case;

(k)      the Purchaser may terminate this Agreement at any time in the event the Bankruptcy Court does not approve the Breakup Fee and Expense Reimbursement;

(l)      the Purchaser may terminate this Agreement in the event the Bankruptcy Court grants relief from the automatic stay to any party to permit foreclosure or the exercise of other remedies on any material assets of Seller, other than any such relief from automatic stay granted to Essextec under a DIP Financing Facility;

(m)      the Purchaser may terminate this Agreement in the event that the Seller modifies, alters or amends this Agreement without the consent of Purchaser, or in the event that the Seller consents to any such modification, alteration or amendment; or

(n)      In the event that a DIP Financing Facility is entered into, Purchaser may terminate this Agreement if an event of default under the DIP Financing Facility has occurred and has not been cured or waived by Essextec in accordance with the terms of such DIP Financing Facility documents.

7.2      Effect of Termination.  In the event of the termination of this Agreement pursuant to the provisions of Section 7.1, this Agreement shall become void and have no effect, without

any liability on the part of any party hereto, or any of its directors, officers, employees, agents, consultants, representatives or stockholders, to any other party to this Agreement in respect of this Agreement, except for (i) any liability resulting from such party's breach of this Agreement, and (ii) Seller's obligation, if any, to Purchaser to pay the Breakup Fee and Expense Reimbursement.

## ARTICLE VIII

## DEFINITIONS; MISCELLANEOUS

8.1     <u>Definition of Certain Terms</u>.    The following terms shall have the following meanings:

<u>Accounts Payable</u>:  obligations to trade creditors on account of services rendered or goods provided in connection with the operation of the Business prior to the Closing Date.

<u>Accounts Receivable</u>:  (i) all trade accounts receivable and other rights to payment from customers of the Seller with respect to the Business, and the full benefit of all security for such accounts or rights to payment, (b) all other accounts or notes receivable of Seller and the full benefit of all security for such accounts or notes, and (iii) any claim, remedy or other right related to any of the foregoing.

<u>Affiliate</u>:  as to any Person, means any other Person who or which, directly or indirectly, alone or together with others, controls, is controlled by, or is under common control with such Person, or any officer or director of such Person or any member of the immediate family of any such natural Person.

<u>Applicable Employee</u>:  as defined in Section 2.1.9.

<u>Applicable Law</u>:  means all applicable provisions of all (i) constitutions, treaties, statutes, laws, rules, regulations, ordinances, orders or directives of any Governmental Authority, (ii) Governmental Approvals and (iii) orders, decisions, judgments, awards and decrees of any Governmental Authority.

<u>Acquisition Proposal</u>:  means a proposal (other than from Purchaser) relating to (i) any merger, consolidating, restructuring, reorganization, plan of reorganization in the Bankruptcy Case, joint venture, refinancing, funding of a plan of reorganization in the Bankruptcy Case, business combination, sale or other disposition of all or any part of a Seller, the Business, the Assets or any other assets of a Seller pursuant to one or more transactions, (ii) the sale of any of the outstanding shares of capital stock or equity interests of a Seller (including by way of a debt for equity swap, tender offer, foreclosure or plan of reorganization or liquidation) or (iii) any similar transaction or business combination involving one or more Persons (other than Purchaser) and a Seller with respect to a Seller, the Business, the Assets, or any other assets of Seller.

<u>Assets</u>:  means the following assets used in the Business:

28

(i)        All intangible assets, goodwill, customer lists, manuals, sales and marketing materials, phone numbers, internet websites and domain names, including the right to use the name "Gemini Systems" and all derivations thereof;

(ii)       The Assigned Contracts, Client Contracts and IP Agreements other than the Excluded Contracts;

(iii)      All furniture, fixtures, equipment, inventory and other personalty;

(iv)       All books and records relating to the foregoing in both hard copy and electronic form;

(v)        All security deposits provided under real estate or equipment leases that are being assigned to and assumed by Purchaser;

(vi)       All Accounts Receivable;

(vii)      all claims, Causes of Action, Acquired Avoidance Actions, and refunds including with respect to taxes for all periods ended after the Closing Date; and

(viii)     whatever right, title and interest Gemini may have in connection with its certain agreements, among Gemini, Gemini Worldwide, ICE, ICAP, and other parties with services provided by DataBP.

Notwithstanding the above, the assets to be transferred to the Purchaser under this Agreement shall not include the following (the "Excluded Assets"):  cash, bank accounts, insurance policies or proceeds, credit card balances, the right to tax refunds, corporate records, any contracts or agreements other than the Client Contracts and IP Agreements, automobiles or the Owner's personal effects, and rights under the Transaction Agreements.

Assigned Contracts: means all of Seller's contracts that are (i) listed on Schedule 1.5 of Seller's Disclosure Schedules as the date hereof and (ii) listed on Schedule 1.5 of the Seller's Disclosure Schedules after the date hereof with Purchaser's prior written consent.

Assumed Liabilities:  as defined in Section 1.5.

Acquired Avoidance Action:  means any Avoidance Actions on account of or with respect to payments or transfers of property made by Seller to any former or current managers, employees and independent contractors of Seller and any subsidiaries prior to the filing of the Bankruptcy Case who are employed or engaged by Purchaser or any of its Affiliates or assignees.

Avoidance Actions:  means all causes of action of Gemini under Sections 544 through 553 of the Bankruptcy Code with respect to payments or transfers of property made prior to the filing of the Bankruptcy Case.

Bankruptcy Case:  as defined in the first "Whereas" clause.

Bankruptcy Code:  as defined in the first "Whereas" clause.

Bankruptcy Court:  as defined in the first "Whereas" clause.

Bankruptcy Rules:   means the Federal Rules of Bankruptcy Procedure, as amended, or any successor rules.

Bidding Procedures:  means the procedures for the submission of competing bids for the acquisition of the Assets as approved by the Bidding Procedures Order.

Bidding Procedures Order:  means the order to be entered by the Bankruptcy Court approving those portions of the Sale Motion that concern the notice of auction and sale hearing, Bidding Procedures, and bidding protections, including the Breakup Fee and Expense Reimbursement.

Breakup Fee:  as defined in Section 4.10.1.

Business:  as defined in the second "Whereas" clause.

Causes of Action:  means all claims, causes of action, choses in action, rights of recovery, repayment obligations, rights of setoff and rights of recoupment that Seller has or may have against any Person.

Client Contracts:  as defined in Section 1.6.

Closing:  as defined in Section 1.3.

Code:  the Internal Revenue Code of 1986, as amended.

Confidential Information:  confidential or proprietary information about the Purchaser, the Seller and/or its respective clients or customers, including but not limited to, trade secrets, methods, models, passwords, access to computer files, financial information and records, computer software programs, agreements and/or contracts between the Seller and its respective clients and customers, Client Contracts, creative policies and ideas, educational and strategic marketing support products, methods of operation, financial or business projections of the Seller or the Purchaser and information about or received from the Seller's or the Purchaser's clients or customers and other companies with which the Seller or the Purchaser do business.

DIP Financing Facility:  means any debtor-in-possession financing facility, if any, entered into after the date hereof by and between Gemini and Essextec.

Disclosure Schedule:  the disclosure schedule, dated the date hereof, which has been delivered to the Purchaser by the Seller and initialed by the Seller for identification.

ERISA: the Employee Retirement Income Security Act of 1974, as amended.

Excluded Contracts: all contracts other than the Assigned Contracts.

Final Order:  means an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for re-argument has been taken or been made and is pending for argument.

Governmental Approval:  means an authorization, consent, approval, permit, license or exemption of, registration or filing with, or report or notice to, any Governmental Authority.

Governmental Authority:  means any nation or government, any regional, state, local or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including, without limitation, any government authority, agency, department, board, commission or instrumentality of the United States, any State of the United States or any political subdivision thereof, and any tribunal or arbitrator(s) of competent jurisdiction.

IP Agreements:  as defined in Section 1.7.

Intellectual Property:  as defined in Section 2.1.14.

Knowledge:  the actual or constructive knowledge of the Owner or any Key Employee, after diligent inquiry.

Key Employees:  those employees of the Seller set forth on Exhibit C hereto.

Lien:  any mortgage, pledge, adverse claim, security interest, encumbrance, title defect, title retention agreement, voting trust agreement, interest, equity, option, lien or charge of any kind.

Material Adverse Effect:  any material adverse change in the condition (financial or other) of the Seller's properties, assets, liabilities, business, operations or prospects, other than changes of a general economic or political nature, which do not affect the Seller or the Business uniquely.

Multiemployer Plan:  a "multiemployer plan" within the meaning of Section 3(37) of ERISA.

Ordinary Course of Business.  an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person.

Permitted Lien.  (a) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures; (b) mechanics', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business; (c) liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business; and (d) other immaterial imperfections of title or Liens, if any, that have not, and would not, interfere with Purchaser's continued use of the Assets and conduct of the Business as presently conducted.

Person:  any natural person, firm, partnership, association, corporation, limited liability company, trust or Governmental Authority.

Petition Date:  means March [11], 2015.

Purchaser:  as defined in the first paragraph of this Agreement.

Purchaser Plan:  any pension, retirement, profit sharing, stock bonus or other plan of deferred compensation, any medical, dental or other health benefit plan, any life insurance, disability insurance or accident insurance plan, any severance plan, policy or arrangement, or any other employee benefit plan within the meaning of Section 3(3) of ERISA an any bonus, incentive, stock option, restricted stock or other equity based compensation program to which the Essextec, Purchaser or any of their Affiliates are party, to which Essextec, Purchaser or any of their Affiliates contribute or in connection with which Essextec, Purchaser or any of their Affiliates are or could become liable for contributions, or under which employees of Essextec, Purchaser or any of their Affiliates participate or have a right to receive benefits.

Returns:  all reports, estimates, declarations, information statements and returns due under all foreign, federal, state or local laws or regulations, as appropriate, relating to Taxes.

Sale Motion:  means the motion filed in the Bankruptcy Court on behalf of Gemini, for among other things, approval of the notice of auction and sale hearing, Bidding Procedures and bidding protections, including the Breakup Fee and Expense Reimbursement, the sale of the Assets to Purchaser and the assignment by Gemini, and assumption by Purchaser, of the Assigned Contracts.

Sale Order:  means one or more orders of the Bankruptcy Court authorizing among other things, the sale of the Assets to Purchaser and the assignment by Seller and assumption by Purchaser of the Assigned Contract.

Seller Plan:  any pension, retirement, profit sharing, stock bonus or other plan of deferred compensation, any medical, dental or other health benefit plan, any life insurance, disability insurance or accident insurance plan, any severance plan, policy or arrangement, or any other employee benefit plan within the meaning of Section 3(3) of ERISA an any bonus, incentive, stock option, restricted stock or other equity based compensation program to which the Seller is party, to which the Seller contributes or in connection with which the Seller is or could become liable for contributions, or under which employees of the Seller participate or have a right to receive benefits.

Taxes:    means all federal, state, local and foreign taxes, assessments and governmental charges, of any nature, kind or description (including, without limitation, all income taxes, franchise taxes, withholding taxes, estimated taxes, unemployment insurance, social security taxes, payroll taxes, sales and use taxes, excise taxes, occupancy taxes, real and personal property taxes, stamp taxes, transfer taxes, workers' compensation and withholding taxes) and all interest, additions to tax and penalties with respect thereto, whether such interest, additions or penalties arise before or after the Closing Date.

Transaction Agreements:  as defined in Section 2.1.2.

8.2    Representation by Counsel.  Each party hereto has been represented by separate and independent counsel in connection with the negotiation, preparation and execution of this Agreement.

8.3    Expenses.  The Seller and the Owner, on the one hand, and the Purchaser, on the other hand, shall bear their respective expenses, costs and fees (including attorneys' and accountants' fees) in connection with the transactions contemplated hereby, including the preparation and execution of this Agreement and compliance herewith, whether or not the transactions contemplated hereby shall be consummated, provided that the Seller, on the one hand, and the Purchaser, on the other hand, shall pay to the other all such expenses, costs or fees incurred by the other if such party shall materially breach its obligations hereunder.

8.4    Payment of Taxes.  The Seller will be responsible for all income, sales or other taxes associated with the Business accrued or attributable to periods up to the Closing.  The Purchaser will be responsible for such taxes attributable to periods after the Closing.  The Purchaser shall not be responsible for Seller's taxes arising from the sale of the Assets.

8.5    Severability.  If any provision of this Agreement is inoperative or unenforceable for any reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatsoever.  The invalidity of any one or more phrases, sentences, clauses, sections or subsections of this Agreement shall not affect the remaining portions of this Agreement.

8.6    Notices.  All notices, requests, demands and other communications made in accordance with this Agreement shall be in writing and shall be (a) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, or (b) transmitted by hand delivery, or (c) nationally recognized overnight courier, addressed as follows:

To Seller:

Gemini Systems, LLC
61 Broadway, Suite 925
New York, NY 10006
Attention: Simon Leung, CEO

with copies to Gemini's counsel:

> Klestadt Winters Jureller Southard & Stevens
> 570 Seventh Avenue, 17th Floor
> New York, NY 10018-6314
> Attention: Brendan M. Scott, Esq.

To Owner:

> Simon Leung
> 1676 Bard Lane
> East Meadow, New York 11554

with copies to Owner's counsel:

> Gregg Shulklapper, Esq.
> Shulklapper Associates LLP
> 545 Fifth Avenue, Ste. 640
> New York, NY 10017

To Purchaser:

> ETGI, Inc.
> c/o Essex Technology Group, Inc.
> 201 West Passaic Street
> Rochelle Park, NJ 07662

with copies to Purchaser's counsel:

> Ira B Marcus, Esq.
> Saiber LLC
> 18 Columbia Turnpike
> Florham Park, NJ 07932

By the methods set forth above, notices may be given on behalf of any party by its legal counsel directly to the legal counsel of the other party.

8.7    <u>Miscellaneous</u>.

8.7.1    <u>Headings</u>.  The headings contained in this Agreement are for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

8.7.2    <u>Entire Agreement</u>.  This Agreement, together with the Schedules and Exhibits hereto, constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

8.7.3   <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.  Electronic copies of the signature pages shall be enforceable as originals.

8.7.4   <u>Governing Law; Consent to Jurisdiction</u>.  Except to the extent governed by federal bankruptcy law, this Agreement shall be governed in all respects, including as to validity, interpretation and effect, by the laws of the State of New York, excluding only New York's conflicts of laws.  To the fullest extent permitted by applicable law, the parties hereby (a) agree that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with this Agreement or any Transaction Documents or the transactions contemplated hereby and thereby shall be brought only in (i) the Bankruptcy Court, if brought prior to the entry of a final decree closing the Bankruptcy Case, and (ii) in the federal courts in the Southern District of New York, and the state courts of the State of New York, New York County (the "New York Courts") if brought after entry of such final decree closing the Bankruptcy Case, and shall not be brought, in each case, in any other State or Federal court in the United States of America or any court in any other country, (b) agree to submit to the exclusive jurisdiction of the Bankruptcy Court or the New York Courts, as applicable, pursuant to the preceding clauses for purposes of all claims, actions or proceedings arising out of, or in connection with this Agreement or any Transaction Documents or the transactions contemplated by this Agreement, (c) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (d) agrees that the mailing of process or other papers in connection with any such claim, action or proceeding in the manner described in Section 8.6 hereto shall be valid and sufficient service thereof, and € agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

8.7.5   <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN.  EACH OF THE PARTIES HERETO CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER OF THE PARITES HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (ii) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (iii) IT MAKES SUCH WAIVER VOLUNTARILY, AND (iv) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATION IN THIS SECTION.

8.7.6    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.

8.7.7    Assignment.  This Agreement shall not be assignable by any party hereto without the prior written consent of the Purchaser and the Seller; provided that Purchaser may assign this Agreement to a wholly owned subsidiary or commonly owned Affiliate.

8.7.8    No Third Party Beneficiaries.  Nothing in this Agreement shall confer any rights upon any person or entity other than the parties hereto and their respective heirs, successors and permitted assigns.

8.7.9    Amendment; Waivers.  No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification, discharge or waiver is sought.  Neither the waiver by any of the parties hereto of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.

8.7.10    Use of Name.  The Seller and the Owner agree not to use the name "Gemini Systems" or any derivation thereof after the Closing Date in the connection with any business related to, competitive with, or an outgrowth of, the business conducted by the Seller on the Effective Date.  Notwithstanding the foregoing, (i) Seller may use the name solely in connection with collecting on any Accounts Receivable and to pay and satisfy any liabilities not assumed by Purchaser hereunder, and (ii) the foregoing shall not prevent Gemini Worldwide from continuing to conduct its business subject to the terms of the Services Agreement.  Within ten (10) days after the Closing, (a) Gemini Systems shall amend its certificate of incorporation to change its name to a name which is not similar to "Gemini Systems", and (b) Gemini shall amend its certificate of formation to change its name to a name which is not similar to "Gemini Systems".

8.7.11    Non-Recourse.  No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other representative of any party hereto or of any Affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any party hereto under this Agreement solely by reason of he or she serving or having served and a director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other representative of such party.

[signatures on following page]
IN WITNESS WHEREOF the parties have executed this Agreement as of the Effective Date.


SELLER:
GEMINI SYSTEMS LLC,

By:_____

    Name: Simon Leung

    Title:

**OWNER:**


_____

SIMON LEUNG

**ESSEXTEC:**

ESSEX TECHNOLOGY GROUP, INC.


By:_____

    Name:

    Title:


**PURCHASER:**

**ETGI, INC.**

By: _____

    Name:

    Title:

**EXECUTION VERSION**

## EXHIBIT A

BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

[attached hereto]

**EXECUTION VERSION**

# EXHIBIT B

EMPLOYMENT AGREEMENT

[attached hereto]

**EXHIBIT C**

KEY EMPLOYEES

[to be provided]

**DISCLOSURE SCHEDULES**

**TO**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF MARCH 11, 2015**

Introductory Note:  Any information included in these Disclosure Schedules under any section or subsection thereof shall be deemed to be disclosed and incorporated by reference into any other section or subsection of the Disclosure Schedules to the extent that such disclosure would be responsive, whether or not a specific cross-reference to any other section or subsection is included.

**Disclosure Schedule**

**Section 1.3.3 – Federal Tax Lien**

The Internal Revenue Service holds an outstanding Federal tax lien for unpaid
employment taxes in the aggregate amount of $1,085,876.34.

**Disclosure Schedule**

**Section 1.3.3 – State Tax Lien**

The New York State Department of Taxation and Finance holds an outstanding tax lien
for unpaid employment taxes in the aggregate amount of at least $57,908.33.
In addition, the City of New York Department of Finance has filed a tax warrant in the
amount of $868.21

**Disclosure Schedule**

## Schedule 1.5 – Accounts Payable

TO BE UPDATED PRIOR TO CLOSING

**Disclosure Schedule**

**Section 1.6 – Client Contracts**

List all client contracts other than the "Excluded Contracts" relating to the Business entered into by the Sellers prior to the Closing in the Ordinary Course of Business and consistent with the representations and warranties contained in this Agreement and past practice:

- *Master Services Agreement*, by and between Actavis, LLC and Gemini Systems, LLC, dated January 27, 2014

- *Supplier Master Services Agreement*, by and between AllsourcePPS, Inc., and Gemini Systems, dated September 17, 2014

- *Subcontractor Standard Business Terms,* by and between Gemini Systems, LLC and  Alvarez & Marsal Holdings, LLC, dated October 16, 2014

- Consulting Agreement, by and between Arrow Enterprise Computing Solutions, Inc., and Gemini Systems, LLC, dated March 28, 2013

- *Consulting Services Agreement,* by and between Gemini Systems, LLC and BASF Corporation, dated March 5, 2007

- Third Party Agreement, by and between Gemini Systems, LLC and Lynx Technology Partners, Inc., dated August 5, 2013

- *Services Agreement between ICE Benchmark Administration Limited and Gemini Systems Worldwide, Inc.*, dated November 22, 2013, including Statement of Work

- *Services Agreement between ICAP Information Services, Inc. and Gemini Systems Worldwide, Inc.*, dated April 25, 2014, including Statement of Work

- Agreement for Professional Services, by and between National Association of Securities Dealers, Inc. and Gemini Systems, dated April 24, 2006

- Technical Services Agreement, by and between IBM – International Business Machines Corporation and Gemini Systems, LLC, dated December 11, 2006 (Agreement #: 4906B10630)

- Technical Services Agreement, by and between IBM – International Business Machines Corporation and Gemini Systems, LLC, dated October 17, 2007 (Agreement #: 4907016195)

- Consulting Agreement, by and between Jefferies & Company, Inc. and Gemini Systems, LLC, dated September 29, 2006

- *Services Agreement*, by and between Gemini Systems, LLC and NBA Properties, Inc., dated June 28, 2011

45

- *Consulting Services Agreement*, by and between New York Stock Exchange, Inc., and Gemini Systems, LLC, dated November 7, 2002

- *Consulting Services Agreement,* by and between The Prudential Insurance Company of America and Gemini Systems, LLC, dated November 21, 2013

- Consulting Agreement, by and between Gemini Systems, LLC and  Teach For America, Inc., dated May 1, 2007

- Master Professional Services Agreement, by and between Titlevest Technology Holdings, LLC, and Gemini Systems, LLC, dated October 14, 2013

- Consulting Agreement, by and between Gemini Systems, LLC, and Wakefern Food Corp, dated May 20, 2011

- Vendor Direct Access Agreement dated November 15, 2011 between Gemini Systems, LLC, and Wakefern Food Corp

- Professional Services Agreement, by and between Seller and Financial Industry Regulatory Authority, dated as of February 20, 2015 (Countersigned Version not yet received by Seller, but FINRA has acknowledged existence of contractual relationship)


Open Statements of Work without master agreements:
- Essex Technology Group, Inc,  Statement of Work dated February 6, 2015 for Teknor Apex, Cognos Environmental Review and Assessment

- Glyphic Technologies, Inc., Statement of Work, dated February 27, 2015

- Cravath, Swaine, & Moire LLP, Statement of Work dated March 2, 2015

- Intermarket Surveillance Group, ISG Portal and UAF Application, Hosting & Support Proposal Statement of Work, dated July 25, 2013

- Media Development Loan Fund, System Administration Retainer Statement of Work, dated February 2, 2010

- Cravath, Swaine, & Moire LLP, Statement of Work dated March 10, 2015 – Lotus Notes/Domino Application Development Support

**Disclosure Schedule**

**Section 1.7 – IP Agreements**

List all agreements and contracts relating to any intellectual property of the Sellers:
- See Section 2.1.16 of the Disclosure Schedules.

**Disclosure Schedule**

**Section 2.1.2 – Required Consents**

List all consents, licenses, approvals, orders or authorizations of, or registrations, declarations or filings with, any Governmental Authority that is required on the part of the Sellers or the Owner in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby:

- None

List all consents of any third party required to be obtained by the Sellers in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby (including, without limitation, in connection with the assignment to Purchaser of the Client Contracts):

- See Disclosure Schedule Section 1.6.

- See Disclosure Schedule Section 2.1.10 (consent of landlord to assignment required)

**Disclosure Schedule**

**Section 2.1.3 – Jurisdictions where Sellers are Qualified to do Business**

- New York

**Disclosure Schedule**

**Section 2.1.4 – Capitalization**

The Debtor is owned 100% by Simon Leung.

**Disclosure Schedule**

**Section 2.1.6 – Taxes**

**Section 2.1.8 – Tax Returns subject to Audit**

List all tax returns that have not been filed:
- Sellers have not filed corporate tax returns for the tax years 2012 or 2013.  Drafts of said returns have been provided to Purchaser.


List all taxes due on such returns:
- Substantial taxes, interest and penalties are due the IRS and New York State as disclosed elsewhere in these Disclosure Schedules in respect of withholding taxes that Sellers failed to remit to the tax authorities.


List all transfer, property or other taxes that are payable by the Purchaser in respect of the sale by Sellers:
- Unless waived by order of the Bankruptcy Court, all sales or use taxes payable with respect to and/or on account of the transfer of the Seller's furniture and fixtures to Purchaser shall be paid by Purchaser to Seller at the Closing in the form of a certified check in the amount of the sales tax indicated on the notice provided by the Tax Department (or, if no such notice is received as of the Closing, the amount agreed upon by Seller and Purchaser based on the allocation of the Purchase Price and the applicable sales tax rate) made payable to the Tax Department.


List all tax liens:
- See Disclosure Schedule 1.3.3 and 1.3.3

- As previously disclosed to Purchaser, Sellers owe substantial sums to the IRS and New York State tax authorities in respect of unremitted withholding taxes.


List all tax returns of Sellers that are under Audit:
- NYS is conducting a sales and use tax audit covering 12/1/2011 through 2/28/2015.  .

**Disclosure Schedule**

**Section 2.1.7 – Material Contracts**

List all of the following Contracts:
- mortgages, indentures, security agreements, letters of credit, loan agreements and other agreements, guarantees and instruments relating to the borrowing of money or extension of credit;

  o Relationship Ready Line of Credit with Citibank, N.A.

  o Transition Agreement dated as of April 15, 2014, between Seller, Owner and Essextec

  o Security Agreement dated as of August 20, 2014 between Seller and Essextec

  o Seller has revolving credit card lines with Amex and [Visa/MasterCard]

- employment, consulting, sales representative, severance and agency agreements;

  o See consulting agreements on Disclosure Schedule Section 1.6 and Disclosure Schedule Section 2.1.11

- collective bargaining agreements;

  o none

- bonus, profit-sharing, compensation, stock option, pension, retirement, deferred compensation or other plans, trusts or funds for the benefit of employees, officers, agents and directors (whether or not legally binding);

  o See Disclosure Schedule Section 2.1.18

- licenses of patent, copyright, trade names, trademark, transfer of technology or know how and other intellectual property rights:

  o Many of the Client Contracts listed on Disclosure Schedule Section 1.6 contain work for hire or similar provisions regarding the assignment of intellectual property rights to the client/customer.

- agreements or commitments for capital expenditures in excess of $20,000 for any single project (it being warranted that all undisclosed agreements or commitments for capital projects do not exceed $50,000 in the aggregate for all projects)

  o none;

52

- brokerage or finder's agreements

    o none;

- joint venture and partnership agreements

    o none

- other agreements, contracts and commitments which in any case involve payments or receipts of more than $20,000

    o Mutual Non-Disclosure Agreement, by and between Amazon.com, Inc. and Gemini Systems, LLC, dated May 14, 2013

    o AWS Partner Network Terms & Conditions Last Updated: June 5, 2014

    o Confidentiality Agreement, by and between Gemini Systems, LLC and Glyphic Technologies, Inc., dated December 13, 2011

    o Memorandum of Understanding, by and between Gemini Systems LLC and Glyphic Technologies, Inc, dated December 8, 2009 AND Amended Memorandum of Understanding, by and between Gemini Systems LLC and Glyphic Technologies, Inc, dated August 27, 2014

    o IBM Partnerworld Agreement, International, by and between IBM and Gemini Systems, LLC,  including attachments.

    o Confidentiality Agreement, by and between Maxell Corporation of America and Gemini Systems, LLC, dated June 22, 2006

    o Mutual Non-Disclosure Agreement, by and between Qumu, Inc., and Gemini Systems, LLC dated August 7, 2012

    o Mutual Subcontractor Agreement, by and between Revelwood Incorporated and Gemini Systems, LLC, dated February 19, 2014

    o Consulting Confidentiality, Non-Solicitation, And Business Protection Agreement, by and between Gemini Systems, LLC and Softential, Inc., dated June 9, 2011

    o Mutual Non-Disclosure Agreement, by and between Gemini Systems and SureStep IT, Inc., dated April 8, 2014

    o *Teaming Letter*, by and between Tangible Security, Inc. and Gemini Systems, LLC, dated December 8, 2014

    o Sales & Agency Program Agreement, dated September 30, 2014, between Arrow Enterprise Computing Solutions, Inc. and Gemini Systems, LLC

o Installment Agreement with IRS with respect to 2007 and 2010 tax deficiencies, which call for monthly installments of $25,000.  Due to financial constraints Seller suspended payments in 2014.

o Consulting Confidentiality, Non-Solicitation and Business Protection Agreement, y and between Seller and Satish Anthony/Inov Soft Inc., dated as of September 27, 2011

List any defaults under these Contracts:
- Amex default

- Seller is delinquent with many of its vendors, including its landlord, Amex and Arrow.

**Disclosure Schedule**

**Section 2.1.8 – Leases**

Agreement of Lease, between Metropolitan Life Insurance Company, Landlord, And
Gemini Systems, Inc., Tenant, dated November 30, 1995, as amended.  Seller is in
default with respect to payment of rent.

**Disclosure Schedule**

**Section 2.1.9 – List of Directors, Officers and Employees**

| Last Name | First Name | Annual | Q1 2014 Bonus | Apprx 2014 Sales Commission | Monthly Car | Tuition Reimbursement |
|---|---|---|---|---|---|---|
| Afandi | Shoaib | 137,000.00 | 1,008.32 | | | |
| Ali | Muhammed | 60,000.00 | | | | |
| Balasubramanian | Ramkumar | 95,000.00 | 676.4 | | | |
| Bisignani | Michael | 202,500.00 | 388.8 | | 491.33 | 20k annual |
| Chan | Yat | 40,000.08 | | | | |
| Chou | Clifford | 55,000.08 | | | | |
| Destefano | Jonathan | 75,000.00 | 702 | | | |
| Esposito | William | 146,520.00 | 1,193.92 | | | |
| Everett | Michael | 55,000.08 | | | | |
| Frid | Slava | 201,500.00 | 2,240.68 | | | |
| Frolov | Paul | 187,000.00 | 1,146.60 | | 569 | |
| Herbst | Evan | 225,000.00 | | 186228 | | |
| Hester | Quincy | 138,499.92 | | | | |
| Homewood | Arthur | 130,000.08 | | | | |
| Hoppas | Constantinos | 150,000.00 | 528 | | | |
| Kapoor | Maneesh | 105,000.00 | 1,537.20 | | | |
| Kaul | Parul | 75,000.00 | 684 | | | |
| Lam | Yat-Sum | 120,000.00 | 1,785.60 | | | |
| Leny | Ginzel | 72,000.00 | | | | |
| Leung | Nicholas | 75,000.00 | 822 | | | |
| Leung | Simon | 150,000.00 | | | | |
| Li | Xiao | 125,000.00 | 1,650.00 | | | |
| Lucas | Charles | 100,000.00 | | 182958 | | |
| Luftig | David | 200,000.00 | | 122724 | | |
| Marcellus | Marc | 100,000.00 | 20.4 | | | |
| Merone | Tanya | 105,000.00 | | | | |
| Mousmoules | Harry | 147,000.00 | 470.4 | | | 10k annual |
| Nakhwa | Abhijeet | 155,000.00 | 5,505.60 | | | |
| Nemerovsky | Arkady | 118,900.00 | 1,797.39 | | | |
| Noble | Maureen | 82,800.00 | | 25337 | | |
| Nunziante | Richard | 145,000.00 | 310.8 | 260 | | |
| Occhipinti | Michael | 165,000.00 | | | | |
| Osorio | Manuel | 118,800.00 | 313.5 | | | |
| Rajasekaran | Viswasarathy | 110,000.00 | 1,452.00 | | | |
| Ramos | Jasmin | 87,000.00 | | | | |
| Rathinam | Victor | 90,000.00 | 1,094.40 | | | |
| Reese | Kaitlyn | 90,562.00 | 912 | | | |
| Reisert | Gregory | 120,000.00 | | 192680 | | |

| Rolnik | Jamie | 65,000.00 | | | | |
| Sadakov | Dmitry | 90,000.00 | 1,339.20 | | | |
| Sakthivel | Murali | 90,000.00 | 957.6 | | | |
| Sam | Chon | 55,000.08 | | | | |
| Shmulenson | Michael | 172,960.00 | 2,532.72 | 4270 | | |
| Sirabella | Patricia | 169,999.92 | | | 600 | |
| Sorensen | Erik | 155,000.00 | 2,331.20 | | | |
| Thiyadath | Krishnanand | 100,000.00 | 1,664.00 | | | |
| Troitskiy | Sergey | 90,000.00 | 1,130.40 | | | |
| Vimont | William | 125,000.00 | 1,760.00 | | | |
| Wang | Pei | 150,000.00 | 1,560.00 | | | |
| Widrick | Alex | 90,000.00 | | 59683 | | |
| Yacubovich | Claire | 202,500.00 | 1,944.00 | | 650 | |

Contractors:

| **Contractor** | **Company** | **Contractor Hrly Cost to GS** | **Daily Rate** |
|---|---|---|---|
| Dhananjay Sawant | Astro Technology | 75 | |
| Jolly Patel | Jolly Patel | 75 | |
| Juan Adames | Xennetta Systems | | 735 |
| Mohit Garg | Elephant Bytes | 75 | |
| Satish Anthony | Inov-Soft | 100 | |
| Varies | Essex Technology Group, Inc. | Varies | |
| Varies | Gemini Systems (India) Limited | Varies | |
| Varies | Gemini Systems SPB | Varies | |

List of any employees currently not actively at work:
- None.

**Disclosure Schedule**

**Section 2.1.10 – Litigation**

List all judicial or administrative actions, suits, proceedings or investigations pending or, to the Knowledge of the Sellers or the Owner, threatened which has or could have a Material Adverse Effect or result in any liability on the part of the Sellers, or which involves or could involve the validity of this Agreement or of any action taken or to be taken in connection herewith:

- American Express Travel Related Services Company, Inc., Plaintiff, v. Gemini Systems LLC D/B/A Gemini Systems, Defendant

- Sellers, generally, are delinquent in payment of many vendors, including its landlord.

**Disclosure Schedule**

**Section 2.1.13 – Transactions with Affiliates**

List, for the past 3 years, whether Sellers have directly or indirectly, purchased, leased from others or otherwise acquired any property relating to the Business or obtained any services from, or sold, leased to others or otherwise disposed of any property relating to the Business or furnished any services relating to the Business to, or otherwise dealt with respect to the Business with any Affiliate:

- Over the past 3 years Sellers obtained services from their operating affiliates in Russia, India and China in the ordinary course of business.

**Disclosure Schedule**

**Section 2.1.14 – Intellectual Property**

List all "intellectual property" relating to the business now held by or owned by Sellers:

| Domain Name | Registrar | Expiration Date |
|---|---|---|
| GEMINI-SYSTEMS.COM | NETWORK SOLUTIONS, LLC. | 2016-11-10 |
| EXCEPTIONALANALYTICS.COM | GoDaddy.com, LLC | 2016-01-01 |
| EXCEPTIONALUX.COM | GoDaddy.com, LLC | 2015-04-26 |
| EXCEPTIONALITOPS.COM | GoDaddy.com, LLC | 2015-07-15 |
| EXCEPTIONALBPM.COM | GoDaddy.com, LLC | 2015-10-08 |
| CHAMPIONSHIPWORLD.COM | NETWORK SOLUTIONS, LLC. | 2015-03-13 |
| CHAMPIONSHIPWORLD.NET | NETWORK SOLUTIONS, LLC. | 2015-03-13 |
| CHAMPIONSHIPWORLD.ORG | NETWORK SOLUTIONS, LLC. | 2015-03-13 |
| RESILIENCEWORKPLACE.COM | NETWORK SOLUTIONS, LLC. | 2015-03-17 |
| GEMINITES.COM | NETWORK SOLUTIONS, LLC. | 2015-04-15 |
| SEEKINGSERENITY.COM | GoDaddy.com, LLC | 2015-06-16 |

List all contracts and agreements (whether oral or written) between the Sellers and a third party which imparts or which imparted an obligation of noncompetition, secrecy, confidentiality or non-disclosure upon the Sellers or any employee, which obligation is currently in effect:

- Most agreements to which Sellers are a party with its customers and vendors and which are disclosed in Schedule 1.6 and 2.1.7 and impart or imparted an obligation of noncompetition, secrecy, confidentiality or non-disclosure upon the Sellers and their employees.

In addition:

- Confidentiality Agreement, by and between Seller and Moody's, dated as of March 4, 2015

- Mutual Non-Disclosure Agreement, by and between Seller and Thrivent Financial for Lutherans, dated as of February 23, 2015

- Non-Disclosure Agreement, by and between Seller and Modern Language Association (MLA), dated as of March 9, 2015

- Non-Disclosure Agreement, by and between Seller and Financial Industry Regulatory Authority, Inc., dated as of February 20, 2015 (Countersigned Version not yet received by Seller)

**Disclosure Schedule**

**Section 2.1.15 – Insurance**

**Disclosure Schedule**