**EXECUTION VERSION**

## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of March __, 2015 (the "Effective Date"), among ETGI, Inc., a New Jersey corporation (the "Purchaser"), ESSEX TECHNOLOGY GROUP, INC., a New Jersey corporation ("Essextec"), GEMINI SYSTEMS LLC, a New York limited liability company ("Gemini" or "Seller"), and SIMON LEUNG, an individual (the "Owner").

## W I T N E S S E T H:

**WHEREAS**, Gemini filed a voluntary petition for reorganization under Chapter 11, Title 11, United States Code, as amended (the "Bankruptcy Code") on March [11], 2015 in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Case Number 15-10574 (___) (the "Bankruptcy Case");

**WHEREAS**, at the time of the filing of the Bankruptcy Case, Seller was engaged in the business of software consulting services and software sales operations in the United States (the "Business");

**WHEREAS,** the Seller wishes to sell and transfer to the Purchaser and the Purchaser wishes to purchase from the Seller all of the Assets (as hereinafter defined) relating to the Seller' Business in accordance with Sections 105(a), 363 and other applicable provisions of the Bankruptcy Code, upon the terms and conditions and for the consideration described below in this Agreement; and

**WHEREAS**, the transactions hereunder are subject to Bankruptcy Court approval and the Assets will be sold pursuant to a Sale Order (as hereinafter defined) in form and substance satisfactory to Seller, Owner and Purchaser.

**NOW, THEREFORE,** in consideration of the mutual promises, covenants, representations and warranties made herein and of the mutual benefits to be derived therefrom, the parties hereto agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ASSETS

1.1     Sale of Assets.  Subject to the terms and conditions hereof, at the Closing (as hereinafter defined) the Seller shall sell, transfer, convey and deliver all of the Assets (as hereinafter defined) of the Seller to the Purchaser and the Purchaser shall purchase all of the Assets from the Seller free and clear of all Liens existing as of the Closing, regardless of whether any of such Assets existed before, on, or after the commencement of the Bankruptcy Case.

1.2     Purchase Price.  The purchase price of the Assets (the "Purchase Price") is $4,430,000.00.  The Purchase Price shall be payable at the Closing by wire transfer or other

immediately available funds, provided, however, that the Purchaser shall receive a credit against the Purchase Price on account of its assumption of the following obligations and liabilities: (a) any and all cure amounts to be paid to counterparties to Assigned Contracts, as agreed, other than amounts paid to cure pre-petition defaults under Gemini's lease for Suite 925 at 61 Broadway, New York, New York, if any, (b) certain pre-petition debt owed by Gemini to Arrow Electronics, Inc. and its Affiliates, in the amount of $1,190,000.00; (c)  any and all obligations of Gemini in respect of the $500,000 DIP Financing Facility loaned by Essextec to Gemini pursuant to Section 364(c) of the Bankruptcy Code and as "So Ordered" by the Bankruptcy Court, (d) any and all obligations of Gemini  in respect of future amounts loaned, if any, by Essextec to Gemini pursuant to Section 364(c) of the Bankruptcy Code on an as "So Ordered" basis by the Bankruptcy Court after the date hereof; (e) money owed on account of advances made or obligations incurred under that certain Transition Agreement dated as of April 16, 2014 as amended by that certain Amendment to Transition Agreement dated March 5, 2015 (collectively, the "Transition Agreement"), and (f) any and all obligations of Gemini in respect of (i) a Demand Note dated March 6, 2015 in the original principal amount of Fifty Thousand and 00/100 Dollars ($50,000.00), (ii) a Demand Note dated March 6, 2015 in the original principal amount of Ten Thousand and 00/100 Dollars ($10,000.00), (iii) a Demand Note dated March 6, 2015 in the original principal amount of Thirty-Five Thousand and 00/100 Dollars ($35,000.00), and (iv) a Demand Note dated March 10, 2015 in the original principal amount of Thirty Thousand and 00/100 Dollars ($30,000.00) (collectively, the "Demand Notes").  The amount set forth in clause (a) and (b) shall be paid directly to Gemini or any other applicable counterparties.  The obligations in clauses (c) – (f) shall be applied to reduce the amount of the Purchase Price and shall be deemed satisfied in full upon consummation of the Closing.

1.3  Closing.  The closing of the sale and purchase of the Assets (the "Closing") shall take place at the offices of the Gemini's counsel in New York, New York on or before _____, 2015 (as such date may be extended by the mutual written agreement of the parties, the "Closing Date").   The Parties shall use their commercially reasonable efforts to consummate the transactions contemplated herein within two (2) calendar days after the Sale Order becomes a Final Order.  At the Closing:

1.3.1  The Seller shall deliver to the Purchaser, free and clear of any Lien other than Permitted Liens, all of the Assets by delivery of instruments of conveyance and such other documents and certificates as are specified herein.

1.3.2  The Purchaser and Seller's Key Employees who are hired by Purchaser shall enter into Confidentiality, Assignment of Invention, and Noncompetition Agreements in a form and substance reasonably acceptable to Purchaser.

1.3.3  A portion of the Purchase Price shall be applied to satisfy and discharge in full: (a), (c) that certain tax lien filed against Gemini by the Internal Revenue Service, as more particularly described in Section 1.3.3 of the Disclosure Schedule (the "Federal Tax Lien"), (d) that certain tax lien filed against Gemini by the New York Division of Taxation and Finance, as more particularly described in Section 1.3.3 of the Disclosure Schedule (the "State Tax Lien"), and (e) the secured debt owed by Seller to Citibank, N.A. (the "Citibank  Loan").

1.3.4    Each of the parties shall deliver a certificate certifying that all representations and warranties made by such party hereunder remain true, correct and complete in all respects as of the Closing Date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date).

1.3.5    The Purchaser shall pay the balance of the Purchase Price, if any, to the Seller.

1.4    <u>Allocation of Purchase Price</u>.  The parties agree to allocate: (a) $20,000.00 of the Purchase Price to furniture, fixtures and equipment; (b) a portion of the Purchase Price equal to at least $800,000.00 and no more than $1,000,000.00 to Accounts Receivable; and (c) the balance of the Purchase Price to goodwill.  The parties shall each report the federal, state, local and other tax consequences of the purchase and sale of the Assets contemplated hereby in a manner consistent with such allocation.  In that regard, Purchaser and Seller each hereby covenant and agree to deliver at Closing copies of Form 8594, Asset Acquisition Statement Under Section 1060 (which shall be filed by both Purchaser and Seller, in accordance with the Instructions therefor), and that neither Purchaser nor Seller will take a position on any income tax return or in any judicial proceeding that is in any way inconsistent with the Purchase Price allocation as determined in this Agreement.

1.5    <u>Assumption of Liabilities; Purchaser Not Successor to Seller</u>.  Purchaser shall assume as of the Closing Date and shall subsequently observe and honor, only the going-forward obligations (i.e., obligations arising and accruing on or after the Closing Date) of Seller under the Client Contracts (as hereinafter defined), the IP Agreements (as hereinafter defined) and those contracts and Accounts Payable set forth in Section 1.5 of the Disclosure Schedule which are duly assigned to Purchaser in accordance with this Agreement (collectively, the "Assumed Liabilities").  For the sake of clarity, the parties acknowledge that the Purchaser will assume the Client Contracts and IP Agreements in accordance with the requirements of the applicable provisions of the Bankruptcy Code and subject to the procedures set forth in the Sale Order.  Purchaser shall not be the successor to either of the Seller and Seller hereby acknowledges and agrees that, except for the Assumed Liabilities, Purchaser is not assuming any liabilities or obligations of Seller, whether known, unknown, contingent or otherwise.

1.6    <u>Open Client Contracts</u>.  Subject to Bankruptcy Court approval, the Seller shall assign to the Purchaser, and the Purchaser shall assume, all Client Contracts other than the Excluded Contracts (as hereinafter defined) relating to the Business entered into by the Seller prior to the Closing in the Ordinary Course of Business and consistent with the representations and warranties contained in this Agreement and past practice (the "Client Contracts"). As of the Effective Date, all Client Contracts are listed on Section 1.6 of the Disclosure Schedule.

1.7    <u>Intellectual Property Rights</u>.  All of the Seller's agreements and contracts with respect to Intellectual Property (as hereinafter defined) are set forth in Section 1.7 of the Disclosure Schedule (the "IP Agreements").

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

2.1     <u>Representations and Warranties of the Seller and the Owner</u>.    The Seller and Owner severally, and not jointly, represent and warrant to Purchaser as follows:

2.1.1     <u>Ownership and Condition of Assets</u>.    The Seller has good and marketable title to all the Assets, free and clear of any Liens, whether arising by operation of any law, judgment, decree or agreement, except for (a) the Federal Tax Lien, (b) the State Tax Lien, (c) liens securing the Citibank Loan, and (c) Permitted Liens.    Subject to the entry of and in accordance with the Sale Order, all Liens other than Permitted Liens will be discharged in full on or prior to the Closing Date.    The Assets being transferred to the Purchaser are sufficient for the operation of the Seller's Businesses as currently conducted.    Gemini Systems, Inc. ("Gemini Systems"), Gemini Systems Worldwide, Inc. ("Gemini Worldwide") and Gemini Systems Services, Inc. ("Gemini Services") do not own any Assets, except as set forth in Disclosure Schedule 2.1.1, and their consent is not required to consummate the sale or transfer of the Assets pursuant to the terms of this Agreement, except as set forth on Disclosure Schedule 2.1.1.

2.1.2     <u>Authority for Agreements</u>.    Subject to Bankruptcy Court approval and entry of the Sale Order, the Seller and the Owner have the legal capacity to execute and deliver this Agreement as well as other agreements and instruments referenced in this Agreement (collectively, the "Transaction Agreements"), and to perform their obligations under the Transaction Agreements and to consummate the transactions contemplated by each such Agreement.    Subject to Bankruptcy Court approval, the Transaction Agreements constitute the valid and legally binding obligations of the Seller and the Owner.    The execution and delivery of the Transaction Agreements and the consummation of the transactions contemplated by the Transaction Agreements will not conflict with or result in any violation of or default under any provision of (a) the operating agreement or certificate of formation of Gemini, or (b) any mortgage, indenture, lease, agreement or other instrument, permit, concession, grant, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to the Seller or the Owner, or any of the properties of the Seller or the Owner.    Upon entry of the Sale Order, except as set specified in Section 2.1.2 of the Disclosure Schedule, no consent, license, approval, order or authorization of, or registration, declaration or filing with, any Governmental Authority is required on the part of the Seller or the Owner in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.    Upon entry of the Sale Order, except as set specified in Section 2.1.2 of the Disclosure Schedule, no consent of any third party is required to be obtained by the Seller in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby (including, without limitation, in connection with the assignment to Purchaser of the Client Contracts).

2.1.3     <u>Company Status</u>.    Gemini is a limited liability company duly formed, validly existing and in good standing under the laws of the State of New York, and subject to Bankruptcy Court approval, has full power and authority to carry on its business as now conducted and to own or lease and to operate its properties as and in the places where such

business is now conducted and such properties are now owned, leased or operated.  The Seller is duly qualified or licensed to do business and is in good standing in each of the jurisdictions specified in Section 2.1.3 of the Disclosure Schedule, which includes each jurisdiction in which the nature of such Seller's business or the properties owned or leased by it makes such qualification necessary and where the failure to so qualify may give rise (individually or in the aggregate) to a Material Adverse Effect.  Gemini has delivered to the Purchaser complete and correct copies of its operating agreement and certificate of formation, as in effect on the Effective Date, together with a Certificate of Good Standing (or the applicable equivalent) in the State of New York and each of the jurisdictions set forth in Section 2.1.3 of the Disclosure Schedule.

      2.1.4    <u>Capitalization</u>.  All of the membership interests in Gemini are owned by the Owner, either directly or indirectly through those intermediate entities set forth in Section 2.1.4 of the Disclosure Schedule.

      2.1.5    <u>Undisclosed Liabilities</u>.  Except as disclosed in the Bankruptcy Case, Seller does not have any liabilities or obligations of any nature, whether absolute, accrued, contingent or otherwise.

      2.1.6    <u>Taxes</u>.  Except as provided in Section 2.1.6 of the Disclosure Schedule, the Seller and Owner have duly filed all federal, state and local Returns which are required to be filed by them prior to the Effective Date and have paid all Taxes which are shown thereon to be due and all other Taxes imposed by law upon them or any of their properties, assets, income, receipts, payrolls, transactions, capital, net worth or franchises which have become due and payable.  Except as provided in Section 2.1.6 of the Disclosure Schedule, no transfer, property or other Taxes are or will be payable (including, without limitation, as a result of an audit or other official inquiry before or after the Closing) by the Purchaser or the Seller in respect of the sale by the Seller.  Except for the Federal Tax Lien and State Tax Lien described in Section 2.1.6 of the Disclosure Schedule, no tax liens have been filed and neither the Internal Revenue Service, the New York State Department of Taxation and Finance, nor any other taxing authority is now asserting or, to the Knowledge of the Seller and Owner, threatening to assert against the Seller or Owner any deficiency or claim for additional Taxes.  Except as provided in Section 2.1.6 of the Disclosure Schedule, no Return of the Seller or Owner is currently under audit by the Internal Revenue Service, the New York State Department of Taxation and Finance, or by the taxing authorities of any other jurisdiction.

      2.1.7    <u>Material Contracts</u>.  Section 2.1.7 of the Disclosure Schedule contains a complete and correct list as of the Effective Date of all agreements, contracts and commitments of the following types, written or oral, to which the Seller is currently a party or by which the Seller or its properties are bound as of the Effective Date:    (a) mortgages, indentures, security agreements, letters of credit, loan agreements and other agreements, guarantees and instruments relating to the borrowing of money or extension of credit; (b) employment, consulting, sales representative, severance and agency agreements; (c) collective bargaining agreements; (d) bonus, profit-sharing, compensation, stock option, pension, retirement, deferred compensation or other plans, trusts or funds for the benefit of employees, officers, agents and directors (whether or not legally binding); (e) licenses of patent, copyright, trade names, trademark, transfer of technology or know how and other intellectual property rights; (f) agreements or commitments for capital

expenditures in excess of $20,000 for any single project (it being warranted that all undisclosed agreements or commitments for capital projects do not exceed $50,000 in the aggregate for all projects); (g) brokerage or finder's agreements; (h) joint venture and partnership agreements; and (i) other agreements, contracts and commitments which in any case involve payments or receipts of more than $20,000.  The Seller has delivered to the Purchaser complete and correct copies of all such written agreements, contracts and commitments, together with all amendments thereto, and accurate descriptions of all oral agreements.  Such agreements, contracts and commitments are in full force and effect and there does not exist thereunder any default or event or condition or course of dealing which, after notice or lapse of time or both, would constitute a default thereunder on the part of the Seller or, to the Knowledge of the Seller and Owner, any other party thereto.  The Seller has all required certifications, authorizations and approvals from its vendors and others (including, without limitation, International Business Machines Corp.) to operate the Business, and upon consummation of the transactions contemplated by the Transaction Agreements the Purchaser shall possess all such certifications, authorizations and approvals.

2.1.8   Property.

(a)      The Seller owns no real property.  The only real property leased by the Seller in the United States is the real property (such property, collectively the "Real Property") leased pursuant to the leases set forth on Section 2.1.8 of the Disclosure Schedule (the "Leases").  The Seller has a valid leasehold interest in each Real Property, free and clear of all Liens.  The Leases are in full force and effect, and true, correct and complete copies thereof have been delivered to the Purchaser.  Except as set forth in Section 2.1.8 of the Disclosure Schedule, no default exists under the Leases, and no event has occurred under Leases which, but for the giving of notice or the passage of time, or both, would constitute a breach or default thereunder.

(b)      All improvements located on the Real Property and all tangible personal property currently in use by the Seller are in operating condition and repair, subject to ordinary wear and tear, and are performing the functions for which they were intended.  The Real Property possesses all Certificates of Occupancy and permits required to allow the Business to be conducted.

2.1.9   Employees, Labor Matters, etc.

(a)      Section 2.1.9 of the Disclosure Schedule contains a complete and correct list of the names of all directors, officers and salaried employees of the Seller engaged in the Business (the "Applicable Employees").  Immediately prior to the Closing, all of the Applicable Employees of the Seller shall be terminated and Seller shall, in accordance with the priorities set forth in section 507 of the Bankruptcy Code and any other applicable sections thereof, to the extent funds are available, (i) pay all wages and other remuneration due to such Applicable Employees with respect to their services as employees of Seller through the date of such termination, including pro rata bonus payments and all vacation pay earned prior to the Closing Date (if any); (ii) pay termination or severance payments and provided health plan continuation coverage in accordance with the requirements of Section 4980B of the Code (as well as its predecessor provision, Section 162(k) of the Code) and Sections 601 through 608, inclusive, of ERISA and Sections 601 through 608 of ERISA ("COBRA"); and (iii) make any and all

6

payments to Applicable Employees required under Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar foreign, state, or local law, regulation, or ordinance.  Notwithstanding the foregoing, Seller and Owner agree to assist and cooperate with the Purchaser in hiring and employing all or any of such Applicable Employees that Purchaser desires to employ after the Closing Date.

(b)     Section 2.1.9 of the Disclosure Schedule sets forth the location of each Applicable Employee of the Seller, and, with respect to each such Applicable Employee, his or her salary or hourly rate currently in effect, annual bonuses (last paid or payable), if any, any other fringe benefits or incentive paid or payable to him or her and the total value of such other fringe benefits and incentives.  Except as set forth on Section 2.1.9 of the Disclosure Schedule, all such Applicable Employees are actively at work, and no such Applicable Employee is currently on leave of absence, layoff, military leave, suspension, sick leave, workers' compensation, salary continuance or short or long term disability or otherwise not actively performing his or her work during all normally scheduled business hours.

(c)     No Applicable Employee of the Seller is a party to any confidentiality, non-competition, proprietary rights or other such agreement between such Applicable Employee and any Person besides such entity that would be material to the performance of such Applicable Employee's employment duties, or the ability of such entity or Purchaser to conduct the business of such entity;

(d)     No labor organization or group of employees has filed any representation petition or made any written or oral demand for recognition;

(e)     To the Knowledge of the Seller and Owner, no union organizing or decertification efforts are underway or threatened and no other question concerning representation exists;

(f)     No labor strike, work stoppage, slowdown, or other material labor dispute has occurred, and none is underway or, to the Knowledge of Seller and Owner, threatened;

(g)     There is no workman's compensation liability, experience, or matter that could have a Material Adverse Effect;

(h)     There is no employment-related charge, complaint, grievance, investigation, inquiry, or obligation of any kind, pending or threatened in any forum, relating to an alleged violation or breach by Seller (or their officers or directors) of any law, regulation, or contract;

(i)     No employee or agent of Seller has committed any act or omission giving rise to liability for any violation or breach identified in subsection (h) above;

(j)     Each Applicable Employee of the Seller is employed on an "at-will" basis;

(k)    There are no employment contracts or severance agreements with any Applicable Employees of Seller, and there are no written personnel policies, rules, or procedures applicable to Applicable Employees of Seller; and

(l)    There are no collective bargaining agreements.

2.1.10  <u>Litigation</u>.  Except for the Bankruptcy Case and as set forth in Section 2.1.10 of the Disclosure Schedule there is no judicial or administrative action, suit, proceeding or investigation pending or, to the Knowledge of the Seller or the Owner, threatened which has or could have a Material Adverse Effect or result in any liability on the part of the Seller, or which involves or could involve the validity of this Agreement or of any action taken or to be taken in connection herewith; nor has any such action, suit, proceeding or  investigation been pending within the three (3) years preceding the Effective Date.

2.1.11  <u>Brokers, Finders, etc</u>.  All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the participation of any Person acting on behalf of the Seller in such manner as to give rise to any valid claim against the Seller or the Purchaser for any brokerage or finder's commission, fee or similar compensation.

2.1.12  <u>Compliance with Applicable Laws</u>.  The Seller is in compliance in all material respects with all Applicable Laws relating to the operation or conduct of the Business.

2.1.13  <u>Transactions with Affiliates</u>.  Except as set forth on Section 2.1.13 of the Disclosure Schedule, during the past three years neither the Seller nor the Owner has directly or indirectly, purchased, leased from others or otherwise acquired any property relating to the Business or obtained any services from, or sold, leased to others or otherwise disposed of any property relating to the Business or furnished any services relating to the Business to, or otherwise dealt with respect to the Business with any Affiliate (except with respect to remuneration for services as officers, directors or employees of the Seller).  No Affiliate is involved in a business that is in competition with the business of the Seller or Purchaser.

2.1.14  <u>Intellectual Property</u>.

(a)    Section 2.1.14 of the Disclosure Schedule contains a complete and correct list and accurate summary description of all intellectual property relating to the Business now held by or owned by the Seller (the "Intellectual Property").  The Intellectual Property includes all intellectual property that is used in the Business.  Except as set forth in Section 2.1.14 of the Disclosure Schedule, all Intellectual Property is registered to or owned by or licensed to the Seller, and is valid and enforceable.

(b)    Except as set forth in Section 2.1.14 of the Disclosure Schedule, the Seller has not infringed nor is infringing, nor has the Seller contributed to or is contributing to the infringement of, any copyrights, trademarks, trade-names, logos, inventions, discoveries, trade secrets, processes, know-how, or any applications or registrations relating thereto, owned by another Person and not licensed to the Seller.  Except as set forth in Section 2.1.14 of the

Disclosure Schedule, there are no pending or, to the Knowledge of the Owner or Seller, threatened actions against the Seller for infringement of any such Intellectual Property.

(c)      all licenses for the use of any Intellectual Property and computer software owned by or licensed by third parties to the Seller are described in Section 2.1.14 of the Disclosure Schedule, are in full force and effect and, following the consummation of the transactions contemplated by this Agreement, shall remain in full force and effect.

(d)      The IP Agreements constitute all of the contracts and agreements relating to the Intellectual Property included in the Assets.  The IP Agreements are in full force and effect, and true, correct and complete copies thereof have been delivered to the Purchaser.  No default exists under the IP Agreements, and no event has occurred under IP Agreements which, but for the giving of notice or the passage of time, or both, would constitute a breach or default thereunder.

(e)      Set forth in Section 2.1.14 of the Disclosure Schedule is a list of all contracts and agreements (whether oral or written) between the Seller and a third party which imparts or which imparted an obligation of noncompetition, secrecy, confidentiality or non-disclosure upon the Seller or any employee, which obligation is currently in effect.

(f)      The Seller and the Owner have received no notices from any party indicating to them that Sections 2.1.14(a), (b) and (c) are untrue.

2.1.15  <u>Insurance</u>.  Section 2.1.15 of the Disclosure Schedule contains a complete and correct list and accurate summary description of all insurance policies maintained by the Seller.  The Seller has delivered to the Purchaser complete and correct copies of all such policies together with all riders and amendments thereto.  Such policies are in full force and effect, and all premiums due thereon have been paid.  The Seller has complied in all respects with the terms and provisions of such policies.

2.1.16  <u>ERISA</u>.

(a)      Each Seller Plan is identified in Section 2.1.16 of the Disclosure Schedule.  Each Seller Plan that is intended to qualify under Section 401(a) of the Code or similar provision of foreign law is identified as such in Section 2.1.16 of the Disclosure Schedule, and is so qualified.  The Seller has performed all obligations required to be performed by it by the terms of the Seller Plans and applicable laws, rules and regulations.  The Seller has complied in all material respects with all applicable laws, rules and regulations relating to each Seller Plan.

(b)      The Seller has not, and the Seller and Owner have no Knowledge that any other party in interest (as defined in Section 3(14) of ERISA) to any Seller Plan has, engaged in any transaction with respect to any Seller Plan in connection with which the Seller or any other party in interest could be subjected to either a civil penalty assessed pursuant to Section 502(i) of ERISA or a tax imposed by Section 4975 of the Code.

(c)    No Seller Plan which is a "defined benefit plan" (as defined in Section 3(35) of ERISA) or any trust created under any such Seller Plan has been terminated since September 2, 1974.  No material liability to the Pension Benefit Guaranty Corporation (the "PBGC"), other than annual premium payments, has been or is expected by the Seller to be incurred by the Seller with respect to any Seller Plan.  There has been no reportable event (within the meaning of Section 4043(b) of ERISA), which at the time of such event required notification within 30 days to the PBGC.  There has been no other reportable event with respect to any Seller Plan which could result in a liability to the business of the Seller as a result thereof.  There has been no event or condition which presents a risk of termination of any such Seller Plan by the PBGC.

(d)    Full payment has been made of all amounts which the Seller is required under the terms of each Seller Plan to have paid as contributions to such Seller Plan as of the last day of the most recent fiscal year of such Seller Plan ended prior to the Effective Date or, if later, the most recent date as of which such amount is required to be paid under such Seller Plan (and, with respect to any Seller Plan that is subject to Section 412(m) of the Code, all payments required to be made have been paid on or before each required installment due date (as defined in Section 412(m) of the Code) preceding the Effective Date), and, with respect to any Seller Plan, no accumulated funding deficiency (as defined in Section 302 of ERISA and Section 412 of the Code), whether or not waived, exists.  There has been no failure to make any payment due prior to the Effective Date that is or could become a liability of the Seller under Section 412(c) of the Code.

(e)    The present value as of the date of the most recent Financial Statements of all accrued benefits under all Seller Plans subject to Section 412 of the Code did not, as of such date, exceed the current value of the assets of such Seller Plans allocable to such accrued benefits.  The terms "present value," "current value" and "accrued benefit" have the meanings specified in section 3 of ERISA.

(f)    No Seller Plan is a Multiemployer Plan and the Seller has not withdrawn or partially withdrawn from any Multiemployer Plan under circumstances giving rise to a withdrawal liability under ERISA.

(g)    Neither the Seller nor any corporation, trade or business under common control with the Seller (within the meaning of Sections 414(b), (c), (m) or (o) of the Code) has engaged in any transaction since January 1, 1986 described in Section 4069(a) of ERISA.

(h)    No Seller Plan provides for the payment of any welfare benefit (as defined in Section 3(1) of ERISA) to any former or retired employee of the Seller or any of the Affiliates, except as may be required by Section 4980B of the Code or Section 601 of ERISA.

(i)    No Seller Plan provides for the payment of severance benefits upon termination of employment.

2.1.18 <u>Client Contracts</u>.    Subject to Bankruptcy Court approval, the Client Contracts are in full force and effect, and true, correct and complete copies thereof have been delivered to the Purchaser.  No default exists under the Client Contracts, and no event has occurred under the Client Contracts which, but for the giving of notice or the passage of time, or both, would constitute a material breach or default thereunder.

2.1.19 <u>Customers</u>.    Listed in Section 2.1.19 of the Disclosure Schedule are the names of all of the top twenty-five (25) customers of the Seller that ordered goods or services from the Seller for the past twelve (12) months, and the amount during such period for which each such customer was invoiced.  Except as disclosed in Section 2.1.19 of the Disclosure Schedule, the Seller and the Owner have no Knowledge as of the Effective Date that any customer of the Seller listed in Section 2.1.19 of the Disclosure Schedule has ceased, or will cease whether by reason of the consummation of the transactions contemplated by this Agreement or otherwise, to use the goods or services of the Seller which are being transferred to and assumed by the Purchaser, or has substantially reduced, or will substantially reduce, the use of such goods or services at any time.

2.1.20 <u>Disclosure</u>.  The representations and warranties contained in this Section 2.1 do not contain any untrue statement of a fact or omit to state any fact which is either (a) necessary in order to make the statements and information contained in this Section 2.1 not misleading, or (b) which a prudent purchaser of the Assets would want to know.

2.1.21 <u>Bankruptcy</u>.  Gemini is in full compliance with the Bankruptcy Code, the rules promulgated thereunder and all orders of the Bankruptcy Court in connection with the Sale Order.  Neither Gemini nor Gemini Systems or any affiliate or representative of Seller has taken any action, or failed to take any action, which might, to any extent, prevent, impede or result in the revocation of the vesting in Purchaser upon entry of the Sale Order of good, valid and marketable title to the Assets (or any portion thereof) free and clear of all Liens and interests of creditors and equity security holders.

2.1.22 <u>No Other Representations and Warranties</u>.  Except for the representations and warranties contained in this Section 2.1 (including the related portions of the Disclosure Schedule), neither Seller nor Owner has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller or Owner, including any representation or warranty as to the future revenue, profitability or success of the Business.

2.2    <u>Representations and Warranties of the Purchaser and Essextec</u>.  The Purchaser and Essextec, jointly and severally, represent and warrant to the Seller and Owner as follows:

2.2.1    <u>Corporate Status</u>.  The Purchaser and Essextec are each a corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey.

2.2.2    <u>Authority for Agreements</u>.  Purchaser and Essextec have the full corporate power and authority to execute and deliver the Transaction Agreements to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated by such Transaction Agreements.  The execution and delivery of the Transaction

Agreements, and the consummation of the transactions contemplated hereunder have been duly authorized by the Purchaser and Essextec, as applicable. This Agreement constitutes the valid and legally binding obligation of the Purchaser and Essextec. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereunder will not conflict with or result in any violation of or default under any provision of the Purchaser's or Essextec's respective certificate of formation or any mortgage, indenture, lease, agreement or other instrument, permit, concession, grant, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to the Purchaser or Essextec or any of their respective properties. No consent, approval, order or authorization of, or registration, declaration or filing with any Governmental Authority is required on the part of the Purchaser or Essextec in connection with the execution and delivery of this Agreement, or the consummation of the transactions contemplated hereby or by any Transaction Agreement.

2.2.3   <u>Brokers, Finders, etc</u>. All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the participation of any Person acting on behalf of the Purchaser in such manner as to give rise to any valid claim against the Seller for any brokerage or finder's commission, fee or similar compensation.

2.2.4   <u>Sufficiency of Funds</u>. Purchaser has sufficient cash on hand, when combined with the proceeds of the funds committed by Essextec and/or others, to make payment of the Purchase Price and consummate the transactions contemplated hereby.

## ARTICLE III

## CLOSING OBLIGATIONS

3.1   <u>Closing Deliveries</u>. At the Closing the following agreements, instruments and documents shall be executed and delivered:

3.1.1.   <u>Sale of Assets and Assumption of Client Contracts</u>. The Seller and the Purchaser shall execute and deliver a Bill of Sale, Assignment and Assumption Agreement in the form attached hereto as Exhibit A.

3.1.2   <u>Employment of Owner by Purchaser</u>. Essextec and the Owner shall execute and deliver an Employment Agreement in substantially the form attached hereto as Exhibit B (the "Employment Agreement").

3.1.3   <u>Lease Assignment</u>. If Purchaser assumes the Lease, Seller shall execute and deliver a Lease Assignment in a form mutually agreeable to Purchaser and Seller, whereby it assigns to Purchaser all of its right, title and interest in and to that certain Agreement of Lease, dated November 30, 1995, for space located at 61 Broadway, New York, NY.

3.1.4   <u>Resolutions</u>. The Purchaser and Seller shall each deliver written resolutions of their respective members, managers, shareholders and/or board of directors (as applicable) authorizing the transactions contemplated herein.

3.1.5   <u>Incumbency Certificate</u>.  The Seller shall deliver a Incumbency Certificate naming all of its directors, officers, shareholders and/or members (as applicable), and containing certified copies of such Seller's (a) certificate of incorporation or certificate of formation (as applicable), (b) bylaws or operating agreement (as applicable), and (c) resolutions authorizing the transactions contemplated herein.

3.2   <u>Satisfaction of Indebtedness and other Liabilities</u>.  The Seller shall permit the Purchaser to use a portion of the Purchase Price to make the payments described in Section 1.3 hereof.

3.3   <u>Accounts Receivable; Accounts Payable; Representation of</u> .  On the Closing Date, Seller shall provide Purchaser with a list of all its Accounts Receivable and the invoice dates thereof and the name of the payee.  On the Closing Date, Seller shall provide Purchaser with a list of all of its Accounts Payable and other obligations, whether or not disclosed or reserved against in the Financial Statements, excluding only those that are being paid at the Closing.  On the Closing Date, the Seller shall deliver to Purchaser written acknowledgments signed by those individuals who made loans to the Seller setting forth (a) the amount of such loan, (b) the amount of interest accrued to the Closing Date, (c) a waiver of any right to receive interest on such loan from and after the Closing Date, and (d) an agreement not to look solely to the Seller's Accounts Receivable for payment of such loan.  Such undertakings shall be acceptable in form and substance to the Purchaser.

## <u>ARTICLE IV</u>

### COVENANTS

4.1   <u>Due Diligence</u>.  During the term of this Agreement, Seller will afford Purchaser's authorized representatives all reasonable opportunity and access during normal business hours to its personnel, contracts, books and records and all other documents and data related to the Seller, the Assets and the Business.  Where practicable, Seller will mail such information and materials related to the Seller, the Business and the Assets to Purchaser or Purchaser's accountants and counsel.

4.2   <u>Conduct of Business until the Closing Date</u>.  From the Effective Date to the Closing Date, except as contemplated by this Agreement or otherwise consented to by Purchaser in writing (which consent shall not be unreasonably withheld or delayed), subject to orders of the Bankruptcy Court and otherwise to the requirements of the Bankruptcy Code, the Seller shall use commercially reasonable efforts to:

4.2.1   carry on its business in, and only in, the Ordinary Course of Business, in substantially the same manner as has been conducted since the Petition Date, subject to orders of the Bankruptcy Court and otherwise to the requirements of the Bankruptcy Code, and use all reasonable efforts to preserve intact its present business organization, keep available the services of its present officers and Key Employees, and preserve its relationship with customers and others

13

having business dealings with it to the end that its goodwill and going business shall be in all material respects unimpaired following the Closing Date;

4.2.2   maintain all its material structures, equipment and other tangible personal property currently in use in good operating condition and repair, except for ordinary wear and tear;

4.2.3   keep in full force and effect insurance comparable in amount and scope of coverage to insurance now carried by it;

4.2.4   pay accounts payable and other obligations when they become due and payable in the Ordinary Course of Business;

4.2.5   perform in all material respects all of its obligations under agreements, contracts and instruments relating to or affecting its properties, assets and business;

4.2.6   maintain its books of account and records in the usual, regular and ordinary manner;

4.2.7   not amend its certificate of incorporation or bylaws;

4.2.8   not enter into or assume any agreement, contract or commitment of the character required to be disclosed in Section 2.1.9;

4.2.9   not merge or consolidate with, or agree to merge or consolidate with, or purchase substantially all of the assets of, or otherwise acquire any business or any corporation, partnership, association or other business organization or division thereof;

4.2.10  not take any action the taking of which would result in a violation of any of the representations and warranties set forth in Section 2.1.7; and

4.2.11  promptly advise Purchaser in writing of any change which, individually or in the aggregate, has or could have a Material Adverse Effect on the Business or breach this Section 4.2.

4.3    Financials, etc.  Seller shall provide Purchaser, as soon as the same become available, copies of all financial statements in the form of management reports of Seller for periods subsequent to the most recent Financial Statement which become available prior to the Closing Date.

4.4    Public Announcements.  Except as required by law, none of the parties hereto shall make any public announcement in respect of the transactions contemplated hereby without the prior written consent of the other parties hereto (which consent will not be unreasonably withheld or delayed).

4.5    <u>Filings and Authorizations</u>.  The Seller shall, as promptly as practicable, file or supply, or cause to be filed or supplied, all applications, notifications and information required to be filed or supplied by them pursuant to Applicable Law in connection with the sale and transfer of the Assets pursuant to this Agreement and the consummation of the transactions contemplated hereby.  Seller, as promptly as practicable, (i) shall make, or cause to be made, all such other filings and submissions under laws, rules and regulations applicable to them and give such reasonable undertakings, as may be required for them to consummate the transfer of the Assets and the other transactions contemplated hereby, (ii) shall use its commercially reasonable efforts to obtain, or cause to be obtained, all authorizations, approvals, consents and waivers from all Persons and Governmental Authorities necessary to be obtained by it in order for it to consummate such transfer and such transactions, including without limitation all third party consents required for the assignment of contracts, and (iii) shall use its reasonable efforts to take, or cause to be taken, all other actions necessary, proper or advisable in order for it to fulfill its obligations hereunder; and Seller shall coordinate and cooperate with the Purchaser in exchanging such information and supplying such reasonable assistance as may be reasonably requested by the Purchaser in connection herewith.

4.6    <u>Access to Records</u>.  After the Closing Date, the Purchaser shall provide the Seller, the Owner and their representatives reasonable access to the books and records of Seller included in the Assets during normal business hours and on reasonable prior notice, to enable the Seller to prepare tax returns, deal with tax audits or collect Accounts Receivable.

4.7    <u>Further Assurances</u>.  By way of example and not limitation, following the Closing the Seller and the Owner shall use their commercially reasonable best efforts to cause International Business Machines Corporation to enter into Agreements or Relationships with the Purchaser similar to those that now exist with Seller.  By way of further example and not limitation, following the Closing the Seller shall change its company name to one that does not include 'Gemini' or any variation thereof.
.

4.8    <u>Restrictive Covenants</u>.

4.8.1    <u>Covenant Not to Compete</u>.  The Seller and the Owner recognize and agree that in order to adequately protect the Business to be conducted by the Purchaser, a covenant not to compete of limited duration and scope is necessary and desirable.  The Seller and the Owner therefore each agree that for a period of sixty (60) months after the Closing Date or twenty-four (24) months after the termination of the Employment Agreement referenced in Section 3.1.2, whichever is later (the "Restricted Period"), for any reason whatsoever, none of them (nor any of their Affiliates) will directly or indirectly, either as an individual for his own account or enterprise, or as a partner, owner, joint-venturer, officer, director, employee, agent, salesman, independent contractor, supplier, principal consultant, or 5% or more equity holder of any entity or third party:

(a)    engage directly or indirectly in the United States in any business that sells or licenses software or provides consulting services relating to software;

(b)      hire or solicit for employment, directly or indirectly, any of the Purchaser's personnel or any of the Applicable Employees (which shall be deemed to include, without limitation, any existing employee, consultant or independent contractor of the Purchaser or any person who is such an employee, consultant or independent contractor of the Purchaser as of the Closing Date) in any capacity whatsoever; provided that this Section 4. 8.1(b) shall not restrict the right of Seller or Owner to (i) solicit or recruit generally in the media, or (ii) solicit or hire employees that have been separated from the service of the Purchaser or any of its Affiliates for a period of at least one hundred eighty (180) days, provided that neither Seller nor Owner solicited such separation;

(c)      attempt directly or indirectly to induce (a) any Applicable Employees not to become employed by the Purchaser, or (b) any of the Purchaser's personnel to leave the employ of, or discontinue such person's consultant, contractor, or other business association with the Purchaser; or

(d)      interfere with, disrupt or attempt to disrupt the business relationships, contractual or otherwise between the Purchaser and any of its (or those that Purchaser will have as a result of the transactions contemplated hereby) agents, customers, suppliers or employees.

4.8.2    Confidentiality.  The Seller and the Owner will treat and hold as such all of the Confidential Information, refrain from using any of the Confidential Information except in connection with this Agreement, and deliver promptly to the Purchaser or destroy, at the request and option of the Purchaser, all tangible embodiments (and all copies) of the Confidential Information that are in its possession. In the event that Seller or the Owner are requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, the Seller or the Owner (as applicable) will notify the Purchaser promptly of the request or requirement so that the Purchaser may seek an appropriate protective order or waive compliance with the provisions of this Section 4.8. If, in the absence of a protective order or the receipt of a waiver hereunder, any of the Seller or the Owner is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, such Seller or the Owner (as applicable) may disclose the Confidential Information to the tribunal; *provided, however*, that such Seller or the Owner (as applicable) shall use its best efforts to obtain, at the request of the Purchaser, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as the Purchaser shall designate.

4.8.3    Non-Disparagement.    The Seller and the Owner shall not make any statements, whether oral or in writing, that would tend to disparage or defame the Purchaser, Essextec or their respective products, services, employees, officers, directors or shareholders.

4.8.4    Remedies.    The Seller and the Owner acknowledge and agree that if they were to breach the covenants contained in Sections 4. 8.1, 4. 8.2 or 4. 8.3 hereof, monetary damages alone would not adequately compensate the Purchaser.    In addition to all remedies available at law or in equity, in the event that any of the Seller and/or the Owner breaches the

covenants contained in Sections 4. 8.1, 4. 8.2 or 4. 8.3 hereof, the Purchaser shall be entitled to interim restraints and permanent injunctive relief for the enforcement thereof.  The duration of the Seller's and the Owner's covenants set forth in Sections 4. 8.1, 4. 8.2 or 4. 8.3 also shall be extended by a period of time equal to the number of days, if any, during which any of the Seller and/or the Owner is in violation of the provisions contained in Sections 4. 8.1, 4. 8.2 or 4. 8.3  (as applicable).  All of the rights and remedies of the parties hereto shall be cumulative with, and in addition to, any other rights, remedies or causes of action allowed by law or equity and shall not exclude any other rights or remedies available to either of the parties hereto.

       4.8.5   <u>Acknowledgements</u>.  The Seller and the Owner acknowledge that (i) the type of restrictions, periods of restriction, and geographical scope of the restrictions imposed in the provisions of Sections 4. 8.1, 4. 8.2 or 4. 8.3 are fair and reasonable and are reasonably required in order to protect and maintain the proprietary interests of the Purchaser, other legitimate business interests and the goodwill associated with the business of the Purchaser; and (ii) the time, scope, geographic area and other provisions of this Section 4. 8 have been specifically negotiated by sophisticated commercial parties, represented by legal counsel, and are given as an integral part of this Agreement. If any of the covenants contained in Sections 4. 8.1, 4. 8.2 or 4. 8.3, or any part thereof, is held to be unenforceable by reason of it extending for too great a period of time or over too great a geographic area or by reason of it being too extensive in any other respect, the parties agree (a) such covenant shall be interpreted to extend only over the maximum period of time for which it may be enforceable and/or over the maximum geographic areas as to which it may be enforceable and/or over the maximum extent in all other respects as to which it may be enforceable, all as determined by the court or arbitration panel making such determination and (b) in its reduced form, such covenant shall then be enforceable, but such reduced form of covenant shall only apply with respect to the operation of such covenant in the particular jurisdiction in or for which such adjudication is made. Each of the covenants and agreements contained in this Section 4. 8 (collectively, the "Protective Covenants") is separate, distinct and severable. All rights, remedies and benefits expressly provided for in this Agreement are cumulative and are not exclusive of any rights, remedies or benefits provided for by law or in this Agreement, and the exercise of any remedy by a party hereto shall not be deemed an election to the exclusion of any other remedy (any such claim by the other party being hereby waived). The existence of any claim, demand, action or cause of action of the Seller or the Owner against the Purchaser, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Purchaser of each Protective Covenant. The unenforceability of any Protective Covenant shall not affect the validity or enforceability of any other Protective Covenant or any other provision or provisions of this Agreement.

       4. 8.6   <u>Notification of Restrictive Covenants</u>.  Prior to accepting employment with any person, firm or entity during the Restricted Period, the Owner shall notify the prospective employer in writing of his obligations pursuant to this Section 4. 8 and shall simultaneously provide a copy to the Purchaser.  In addition, the Owner hereby grants consent to notification by the Purchaser to his new employer about Owner's obligations under this Agreement, including providing a copy of this Agreement (or the relevant provisions hereof).

       4. 8.7   <u>Fees and Costs</u>.  If the Seller and/or the Owner should breach any of the terms, provisions, and conditions of this Section 4. 8, the Purchaser shall be entitled to recover all

costs of suit plus reasonable attorney's fees incurred in enforcing such terms, provisions, and restrictions.

      4. 8.8    <u>Survival of Restraints</u>.  The provisions of this Section 4. 8 shall survive the closing of the transactions contemplated hereby.

    4.10    <u>Breakup Fee and Expense Reimbursement</u>.

      4.10.1    <u>Breakup Fee</u>.  In the event that the Bankruptcy Court enters a Final Order approving an Alternate Transaction, then Purchaser shall be entitled to and Gemini shall pay to Purchaser at the consummation of an Alternate Transaction (or in the case of a plan of reorganization or liquidation that is an Alternate Transaction upon confirmation of such plan of reorganization or liquidation), 3.0% of the Purchase Price (the "Breakup Fee").  The Breakup Fee provided for by this Section is intended to cover opportunity costs incurred by Purchaser in pursuing and negotiating this Agreement and the transactions contemplated hereby, and is considered by the Parties to be reasonable for such purposes.  The Breakup Fee shall be paid from the first sale proceeds of an Alternate Transaction.  The claims of Purchaser to the Breakup Fee shall constitute an administrative expense against Gemini's bankruptcy estate under the applicable provisions of the Bankruptcy Code.

      4.10.2    <u>Expense Reimbursement</u>.  In addition to any Breakup Fee that may be payable pursuant to this Section, upon (i) any event in which the Breakup Fee is payable pursuant to this Section or (ii) termination of this Agreement by Purchaser pursuant to Section 7.1.1(b) or Section 7.1.1(i), Seller shall reimburse up to $200,000 of the actual and documented out-of-pocket fees and expenses incurred by Purchaser and its Affiliates in the course of negotiating, drafting and approving this Agreement, Disclosure Schedules and the Transaction Documents prior to the date this Agreement is terminated, whether incurred before, on or after the Petition Date (the "Expense Reimbursement").  The claims of Purchaser to the Expense Reimbursement shall constitute an administrative expense against Gemini's bankruptcy estate under the applicable provisions of the Bankruptcy Code.  "Alternative Transaction" means (a) a merger, consolidation, restructuring, reorganization, plan of reorganization in the Bankruptcy Case, joint venture, refinancing, funding of a plan of reorganization in the Bankruptcy Case, business combination, transaction or series of transactions involving the sale or other disposition (including, without limitation, by lease, foreclosure, transfer in lieu of foreclosure, or management agreement) of all or any part of a Seller, the Business, the Assets or any other assets of a Seller pursuant to one or more transactions to a Person other than Purchaser; (b) the sale of outstanding or newly issued (or some combination of sold and newly issued) capital stock of a Seller (including by way of a debt for equity swap, tender offer, foreclosure or plan of reorganization or liquidation) resulting in a transfer of voting control of a Seller to a Person or group of Persons who, before the transaction or series of transactions, did not hold voting control of such Seller; or (c) any other business combination with a Person other than Buyer affecting the Assets or voting control of a Seller.

      4.10.3    <u>Survival</u>.  The provisions of this Section 4.10 shall survive the closing or earlier termination of the transactions contemplated hereby.

    4.11    <u>Employees and Employee Benefits</u>.

4.11.1 Purchaser shall, or shall cause an Affiliate of Purchaser to, offer employment effective on the Closing Date, to all Applicable Employees that it affirmatively elects, in its sole discretion, to offer employment (the Applicable Employees who are offered and accept such employment and commence employment on the Closing Date, the "Transferred Employees").

4.11.2 With respect to any employee benefit plan maintained by Purchaser or an Affiliate of Purchaser for the benefit of any Transferred Employee, effective as of the Closing, Purchaser shall use good faith efforts to recognize all service of the Transferred Employees with Seller, as if such service were with Purchaser, for vesting, eligibility and accrual purposes; provided, however, such service shall not be recognized to the extent that (x) such recognition would result in a duplication of benefits or (y) such service was not recognized under the corresponding benefit plan provided for the Transferred Employee by the Seller.

4.11.3 Effective as of the Closing, the Transferred Employees shall cease active participation in the Seller Plans. Seller shall remain liable for all eligible claims for benefits under the Seller Plans that are incurred by the Applicable Employees prior to the Closing Date.

4.11.4 This Section 4.11 shall be binding upon and inure solely to the benefit of each of the parties to this Agreement, and nothing in this Section 4.11, express or implied, shall confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Section 4.11. Nothing contained herein, express or implied, shall be construed to establish, amend or modify any benefit plan, program, agreement or arrangement. The parties hereto acknowledge and agree that the terms set forth in this Section 4.11 shall not create any right in any Transferred Employee or any other Person to any continued employment with Purchaser or any of its Affiliates or compensation or benefits of any nature or kind whatsoever.

4.11.5 Purchaser has no obligation to hire any employees of the Seller pursuant to this Agreement.  Seller acknowledges, however, that the Purchaser is entitled to hire any of the Applicable Employees; provided that Purchaser shall give Seller a written list of those Applicable Employees that it desires to hire at least five (5) days prior to the Closing Date.

4.12   <u>Supplement to Disclosure Schedules</u>.   From time to time prior to the Closing, Seller shall supplement or amend the Disclosure Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof that causes a representation or warranty set forth in Section 2.1 to be untrue (each a "Schedule Supplement").   Each such Schedule Supplement shall be deemed to be incorporated into and to supplement and amend the Disclosure Schedules as of the Closing Date; <u>provided</u>, however, that if such event, development or occurrence which is the subject of the Schedule Supplement constitutes or relates to something that has had or is reasonably likely to cause a Material Adverse Effect, then Purchaser shall have the right to terminate this Agreement pursuant to Section 7.1.1(c); provided, further, that Seller's provision of a Schedule Supplement and Purchaser's non-termination of this Agreement shall not constitute a waiver of any of Purchaser's rights hereunder.   After receiving a Schedule Supplement Purchaser may elect to close the transaction of purchase and sale contemplated by this Agreement and seek indemnification from Seller and Owner pursuant to Section 5.1.

4.13   <u>Confidentiality</u>.   Seller, Owner, Purchaser and Essextec acknowledge and agree that the Confidentiality Agreement dated April 15, 2013 remains in full force and effect and, in addition, covenant and agree to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to the parties hereto and their advisors pursuant to this Agreement. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this Section 4.13 shall nonetheless continue in full force and effect.

4.14   <u>Sales Tax on Transfer</u>.   Unless waived by order of the Bankruptcy Court, all sales or use taxes payable with respect to and/or on account of the transfer of the Seller's furniture and fixtures to Purchaser shall be paid by Purchaser to Seller at the Closing in the form of a certified check in the amount of the sales tax indicated on the notice provided by the Tax Department (or, if no such notice is received as of the Closing, the amount agreed upon by Seller and Purchaser based on the allocation of the Purchase Price and the applicable sales tax rate) made payable to the Tax Department.   Seller shall promptly remit the same to the Tax Department following Closing. Seller and Owner shall jointly and severally defend, indemnify and hold the Purchaser harmless against all claims for any additional New York State sales tax owed in connection with this Agreement and the transactions contemplated hereby.

4.15   <u>Bankruptcy Covenants</u>.

4.15.1   The Sale Motion seeking the entry of the Bidding Procedures Order shall be filed within three (3) business days after execution of this Agreement.   The purchase and sale of the Assets shall be subject to the terms and conditions of the Bidding Procedures Order.

4.15.2   If this Agreement and the sale of the Assets to Purchaser on the terms and conditions hereof are determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order, Purchaser and Seller agree to use commercially reasonable best efforts to cause the Bankruptcy Court to enter the Sale Order, which shall include provisions authorizing and approving the transactions contemplated hereby, including, without limitation (i) the sale of the Assets to Purchaser free and clear of all encumbrances pursuant to the terms of this Agreement and Section 363(b) and (f) of the Bankruptcy Code; (ii) finding Purchaser to be in good faith and providing for the protection afforded under Section 363(m) of the Bankruptcy

Code; (iii) waiving the stays set forth in Bankruptcy Rules 6004(h) and 6006(d); (iv) providing that Purchaser shall not be subject to any successor liability and shall have no liability or suffer any damages for any encumbrances existing prior to the Closing Date which may be asserted against Seller, the Assets, the Business or Gemini's bankruptcy estate, or any claims against Purchaser as successor to the Assets; (v) approving the assumption and assignment to the Purchaser pursuant to Section 365 of the Bankruptcy Code of all assigned contracts; (vi) providing for the retention of jurisdiction by the Bankruptcy Court to resolve any and all disputes that may arise under or relate to this Agreement or the Sale Order, whether between Seller and Purchaser or involving a Person in interest in the Bankruptcy Case; (vii) containing findings of fact and conclusions of law that include the following: (A) the transactions under this Agreement were negotiated and entered into in good faith and at arm's-length; (B) the marketing and sale process conducted by Seller pursuant to the Bidding Procedures are bona fide and adequate; (C) Seller gave due and proper notice and an opportunity to be heard to all interested parties of this Agreement and the transactions contemplated herein; (D) Purchaser is not holding itself out to the public as a continuation of Seller; (D) the consideration to be paid by Purchaser under this Agreement constitutes reasonably equivalent value (as that term is used in each of the Uniform Fraudulent Transfer Act and Section 548 of the Bankruptcy Code) and fair consideration for the Assets; and (F) neither Purchaser nor Seller are entering into the transactions contemplated by this Agreement fraudulently.  Gemini shall promptly provide Purchaser with copies of any objections to the Sale Order.

4.15.3  In the event an appeal is taken or a stay pending appeal is requested (or a petition for certiorari or motion for rehearing or reargument is filed), with respect to the Bidding Procedures Order, the Sale Order, or any other order of the Bankruptcy Court related to this Agreement, Seller shall take all steps as may be reasonable and appropriate to defend against such appeal, petition, or motion and Purchaser agrees to cooperate in such efforts.  Each Party shall use its commercially reasonable best efforts to obtain an expedited resolution for such appeal.

4.15.4  From and after the date of this Agreement, except as may be provided in the Bidding Procedures Order, Seller shall not take any action or fail to take any action, which action or failure to act would reasonably be expected to prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement. Seller covenants and agrees that the terms of any plan of reorganization or liquidation or proposed order of the Bankruptcy Court that may be filed, proposed or submitted or supported by Gemini after entry of the Sale Order or consummation of the transactions contemplated hereby shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement, the Bidding Procedures Order or the Sale Order, or the rights of Purchaser hereunder or thereunder.

4.15.5  The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, as applicable, the Bidding Procedures Order and the Sale Order.  Each Party shall promptly provide the other Party and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Party has in its possession (or receives) pertaining to the Sale Motion, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on

the docket of the Bankruptcy Court or otherwise made available to the other Parties and their counsel.

4.16   <u>Acquisition Proposal or Alternate Transaction</u>.   Seller represents that, other than this Agreement, Seller is not party to or bound by any contract with respect to an Acquisition Proposal or an Alternate Transaction.   Other than as provided in, and contemplated by, the Bidding Procedures Order, Seller shall not (and Seller shall cause each Representative or Affiliate of Seller to not), directly or indirectly, solicit or participate in negotiations or discussions regarding any Acquisition Proposal from any Person other than Purchaser or execute or enter into a contract with respect to an Acquisition Proposal or Alternate Transaction.   If, after the date hereof, Seller receives any written proposal or offer with respect to a potential or actual Acquisition Proposal or Alternate Transaction, Seller shall promptly (but no later than two (2) days after receipt thereof) communicate to Purchaser the material terms of any such proposal or offer and, if not prohibited by confidentiality obligations, the identity of the party making such proposal or offer.   Subject to Bankruptcy Court approval, Seller agrees that in order for any Acquisition Proposal to be accepted by Seller and submitted for approval by the Bankruptcy Court, such proposal must be a "Qualified Bid" as defined in the Bidding Procedures Order.

## ARTICLE V

## INDEMNIFICATION

5.1   <u>By Seller and Owner</u>.   The Seller and the Owner covenant and agree to defend, indemnify and hold harmless the Purchaser and its Affiliates, and each of its respective officers, directors, employees and agents from and against any and all liability, obligation, loss, cost, diminution of value, deficiency or damage (whether absolute, accrued, conditional or otherwise) and including reasonable attorneys' fees incurred in the defense of any of the same ("Losses"), resulting from or arising out of (a) in the case of the Seller, (i) the incorrectness of any representation or warranty made by the Seller and/or the Owner herein, (ii) any breach of any covenant, agreement or obligation to be performed by Seller and/or Owner herein; (iii) any liabilities or obligations of Seller other than the Assumed Liabilities, (iii) any claims relating to the Seller's operations other than the Business; or (iv) any claim or loss engendered by Purchaser's exercise of the powers granted it pursuant to Section 4.6 of this Agreement and (b) in the case of the Owner, (i) the incorrectness of any representation or warranty made by Owner under Section 2.1.1, 2.1.2, 2.1.3, 2.1.4, 2.1.6 or 2.1.13 of this Agreement, (ii) the incorrectness of any representation or warranty made by Owner under this Agreement, either by misstatement or a failure to disclose, to the extent that (x) such representation or warranty is incorrect in a material manner, or (y) the Owner had Knowledge of such incorrectness at the time such representation or warranty was made, or (iii) a breach of this Agreement or any other Transaction Agreements by the Owner.   In all cases the Seller's or Owner's obligation to provide indemnification for Losses shall end from and after the date, if any, that a court of competent jurisdiction shall have determined in a final and non-appealable judgment that such claim or loss resulted primarily from the gross negligence or willful misconduct of the Purchaser.

5.2   <u>By Purchaser and Essextec</u>.   The Purchaser and Essextec, jointly and severally, covenant and agree to defend, indemnify and hold harmless the Seller and the Owner from and

against any and all Losses, resulting from or arising out of (i) the incorrectness of any representation or warranty made by the Purchaser or Essextec herein, (ii) any breach of any covenant, agreement or obligation to be performed by Purchaser or Essextec herein; or (iii) the Assumed Liabilities.

5.3    Procedure.

5.3.1    The party making a claim under this Article V is referred to as the "Indemnified Party", and the party against whom such claims are asserted under this Article V is referred to as the "Indemnifying Party". In the case of any claim asserted by a third party against an Indemnified Party, notice shall be given by the Indemnified Party to the "Indemnifying Party" promptly after such Indemnified Party has actual Knowledge of any claim as to which indemnity may be sought, and the Indemnified Party shall permit the Indemnifying Party (at the expense of such Indemnifying Party) to assume the defense of any claim or any litigation resulting therefrom, provided that (i) counsel for the Indemnifying Party, who shall conduct the defense of such claim or litigation, shall be reasonably satisfactory to the Indemnified Party,  and the Indemnified Party may participate in such defense, but only at such Indemnified Party's expense pursuant to this Section 5.3, and (ii) the omission by any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its indemnification obligation under this Agreement except to the extent that such omission results in the a failure of actual notice to the Indemnifying Party and such Indemnifying Party is damaged as a result of such failure to give notice.   No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of the Indemnified Party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability with respect to such claim or litigation.  The Indemnifying Party shall have the full right to defend against any such claim or demand, and shall be entitled to settle or agree to pay in full such claim or demand; provided, however, that the Indemnifying Party shall not accept settlement of any such claim or demand without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld.  In any event, the Seller and the Purchaser shall cooperate in the defense of any action or claim subject to this Section 5.3 and the records of each shall be available to the other with respect to such defense.

5.3.2    Except in the case of fraud or breaches of this Agreement that merit the issuance of interim restraints and/or permanent injunctive relief, the indemnification provided for in this Section shall provide the sole recourse for the parties to this Agreement in the event of a breach of or inaccuracy in a representation or warranty, or any other breach of this Agreement. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under Applicable Law, except in the case of fraud, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates arising under or based upon any Applicable Law, except pursuant to the indemnification provisions set forth in this Article V.

5.3.3    No indemnification may be sought for breach of or inaccuracy in a representation or warranty unless written notice with respect thereto is given to the Indemnifying Party prior to the expiration of the subject representation or warranty under Section 5.4 hereof.

5.3.4    In the event that the Purchaser has any claims against the Seller or the Owner pursuant to Section 5.3.1 hereof, the Purchaser shall be entitled to set off against any payments due to the Seller pursuant hereto or the Owner pursuant to the Bonus Compensation Plan (as defined in the Employment Agreement) that is part of the Employment Agreement, by placing the amount in dispute in a separately segregated bank account located in the State of New Jersey.  The segregated funds shall be released upon final adjudication or settlement of the disputed issue in accordance with the terms of the judgment or settlement. The parties shall attempt in good faith to resolve any such dispute.

5.3.5    The Purchaser's right to indemnification hereunder shall not in any way be affected or limited by (a) the fact that the Purchaser performed due diligence on the Seller, the Assets and the Business, and (b) any Knowledge of the Purchaser, whether actual, constructive or otherwise, as to the inaccuracy of any of the representations or warranties made by the Seller or the Owner hereunder.

5.4    <u>Survival of Representations and Warranties, etc.</u>    The representations and warranties contained in this Agreement shall survive the execution and delivery of this Agreement, any examination by or on behalf of the parties hereto and the completion of the transactions contemplated herein, but only to the extent specified below:

5.4.1    except as set forth in Sections (b) and (c) below, the representations and warranties contained in Sections 2.1 and 2.2 shall survive for a period of two (2) years following the Closing;

5.4.2    the representations and warranties contained in Sections 2.1.1, 2.1.2, 2.1.3, 2.1.4, 2.1.13, 2.2.1, 2.2.2 and 2.2.3 shall survive without limitation; and

5.4.3    the representations and warranties contained in Sections 2.1.8 and 2.1.19 shall survive until the expiration of the applicable statute of limitations.

5.5    <u>Certain Limitations</u>.  The indemnification provided for in Section 5.1 and Section 5.2 shall be subject to the following limitations:

5.5.1    The Indemnifying Party shall not be liable to the Indemnified Party for indemnification under Section 5.1(i) or Section 5.2(i), as the case may be, until the aggregate amount of all Losses in respect of indemnification under Section 5.1(i) or Section 5.2(i) exceeds $100,000 (the "Deductible"), in which event the Indemnifying Party shall be required to pay or be liable for all Losses, including those within the Deductible.  Notwithstanding the foregoing, this Section 5.5.1 shall not apply to (a) any breach of any representation or warranty of which the Person making the same had Knowledge at the time it was made, (b) an intentional breach of any covenant or obligation contained herein, or (c) a breach of the representations and warranties contained in Sections 2.1.1, 2.1.2, 2.1.3, 2.1.4, 2.1.13, 2.2.1, 2.2.2 and 2.2.3.

5.5.2    The aggregate amount of all Losses for which a party shall be liable as an Indemnifying Party pursuant to Section 5.1(i) or Section 5.2(i) shall not exceed [$3,000,000.]

5.5.3    Each Indemnified Party shall take, and cause its Affiliates to take, all commercially reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise thereto, including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to a claim for indemnification.

## ARTICLE VI

## CONDITIONS PRECEDENT

6.1    <u>Conditions to Closing of the Parties</u>.  The respective obligations of the Parties to consummate the transactions contemplated by this Agreement to consummated at the Closing are subject to the satisfaction of the condition that the sale of the Assets by Seller to Purchaser and the assumption and assignment of the Assigned Contracts as contemplated by this Agreement shall have been approved by the Bankruptcy Court pursuant to the Sale Order in form and substance satisfactory to all Parties, which as of the Closing Date shall be in full force and effect and shall not have been violated, vacated, withdrawn, overruled, resolved or stayed, modified, reversed, amended or revoked.

6.2    <u>Bidding Procedures Order and Sale Order</u>.    Purchaser's obligations to consummate the Closing hereunder are contingent upon the Bankruptcy Court having entered the Bidding Procedures Order and the Sale Order, which Sale Order shall have become a Final Order.

6.3    <u>Filed Motions</u>.  Purchaser's obligations to consummate the Closing hereunder are contingent upon all motions and other documents having been filed with and submitted to the Bankruptcy Court in connection with the Acquisition (including, without limitation, the Sale Order), in the form and substance satisfactory to Purchaser in its sole discretion.

6.4    <u>No Default</u>.  In the event that a DIP Financing Facility is entered into after the date of this Agreement, there shall exist no default or event of default under the DIP Financing Facility Documents.

6.5    <u>Sale Order</u>.  Purchaser's obligations to consummate the Closing hereunder are contingent upon the Bankruptcy Court having entered the Bidding Procedures Order which*, inter alia*, approves the amount and conditions for payment of the Breakup Fee and Expense Reimbursement and which is in form and substance satisfactory to Purchaser, and the Bankruptcy Court having entered a Sale Order, in form and substance satisfactory to Purchaser in its sole discretion, which order shall be in full force and effect; shall not have been reversed, vacated or stayed; shall not have been amended, supplemented, or otherwise modified without the prior written consent of Purchaser (which consent shall not be unreasonably withheld), and the Sale Order shall have become a Final Order.

6.6    <u>Receipt of Governmental Approvals</u>.  Purchaser's and Seller's obligations to consummate the Closing hereunder are contingent upon Seller and Purchaser receiving all Governmental Approvals required for lawful consummation of the transactions contemplated

herein, if any.  The parties shall use their commercially reasonable best efforts to obtain all such Governmental Approvals.

6.7    <u>Agreements with Key Employees</u>.    Purchaser's obligation to consummate the Closing hereunder is contingent upon the Seller's Key Employees that Purchaser desires to employ agreeing to work for Purchaser and entering into Confidentiality, Assignment of Invention, and Noncompetition Agreements with Purchaser in a form and substance reasonably acceptable to Purchaser.

6.8    <u>Bankruptcy Case</u>.  Since the date of this Agreement, there shall not have been any dismissal of the Bankruptcy Case or conversion of the Bankruptcy Case to a case under Chapter 7 of Title 11 of the United States Code.

**<u>ARTICLE VII</u>**

**TERMINATION**

7.1    <u>Termination</u>.

7.1.1    <u>Termination of Agreement</u>.  The parties may terminate this Agreement as provided below (whether before or after the entry of the Bidding Procedures Order and/or the Sale Order):

(a)    the Purchaser and the Seller may terminate this Agreement by mutual written consent at any time prior to the Closing;

(b)    the Purchaser may terminate this Agreement by giving written notice to the Seller at any time prior to the Closing (i) in the event the Owner or the Seller has breached any representation, warranty, or covenant contained in this Agreement and such breach has caused or is reasonably likely to cause a Material Adverse Effect, or (ii) if the Closing shall not have occurred on or before the Closing Date because any of the conditions precedent set forth in Sections 6.2 through 6.5 hereof have not been satisfied in full;

(c)    the Seller may terminate this Agreement by giving written notice to the Purchaser at any time prior to the Closing (i) in the event the Purchaser has breached any representation, warranty, or covenant contained in this Agreement and such breach has caused or is reasonably likely to cause a Material Adverse Effect, or (ii) if the Closing shall not have occurred on or before the Closing Date because any of the conditions precedent set forth in Sections 6.2 and 6.3 hereof have not been satisfied in full;

(d)    the Purchaser may terminate this Agreement by giving written notice to Seller if the Closing shall not have occurred on or before 5:00 p.m. on the fifteenth day after the Sale Order has been entered;

26

(e)    the Purchaser may terminate this Agreement by giving written notice to Seller if (i) the Bankruptcy Court has not entered the Bidding Procedures Order on or before April 30, 2015 or (ii) the Bidding Procedures Order has been entered but is stayed, withdrawn, or rescinded as of such date;

(f)    the Purchaser may terminate this Agreement by giving written notice to Seller if (i) the Bankruptcy Court has not entered the Sale Order on or before June 1, 2015 or (ii) on or after June 30, 2015 if a legal proceeding shall be pending pursuant to which a Person has appealed the Sale Order, or if the Sale Order shall have been withdrawn or rescinded;

(g)    the Purchaser may terminate this Agreement by giving written notice to Seller if an order has been entered dismissing the Bankruptcy Case, converting the Bankruptcy Case to a Chapter 7 case or if Gemini files a motion or other pleading seeking the dismissal or conversion of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise;

(h)    the Purchaser or the Seller may terminate this Agreement in the event that any Law or order becomes effective restraining, enjoining, or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement;

(i)    the Seller may terminate this Agreement at any time after the Bankruptcy Court approves an Alternate Transaction, or Purchaser may terminate this Agreement upon the closing of an Alternate Transaction;

(j)    the Purchaser may terminate this Agreement at any time after the appointment of a Chapter 7 trustee or an examiner with expanded powers in the Bankruptcy Case;

(k)    the Purchaser may terminate this Agreement at any time in the event the Bankruptcy Court does not approve the Breakup Fee and Expense Reimbursement;

(l)    the Purchaser may terminate this Agreement in the event the Bankruptcy Court grants relief from the automatic stay to any party to permit foreclosure or the exercise of other remedies on any material assets of Seller, other than any such relief from automatic stay granted to Essextec under a DIP Financing Facility;

(m)    the Purchaser may terminate this Agreement in the event that the Seller modifies, alters or amends this Agreement without the consent of Purchaser, or in the event that the Seller consents to any such modification, alteration or amendment; or

(n)    In the event that a DIP Financing Facility is entered into, Purchaser may terminate this Agreement if an event of default under the DIP Financing Facility has occurred and has not been cured or waived by Essextec in accordance with the terms of such DIP Financing Facility documents.

7.2    Effect of Termination.  In the event of the termination of this Agreement pursuant to the provisions of Section 7.1, this Agreement shall become void and have no effect, without

any liability on the part of any party hereto, or any of its directors, officers, employees, agents, consultants, representatives or stockholders, to any other party to this Agreement in respect of this Agreement, except for (i) any liability resulting from such party's breach of this Agreement, and (ii) Seller's obligation, if any, to Purchaser to pay the Breakup Fee and Expense Reimbursement.

## ARTICLE VIII

## DEFINITIONS; MISCELLANEOUS

8.1    <u>Definition of Certain Terms</u>.    The following terms shall have the following meanings:

<u>Accounts Payable:</u>  obligations to trade creditors on account of services rendered or goods provided in connection with the operation of the Business prior to the Closing Date.

<u>Accounts Receivable</u>:  (i) all trade accounts receivable and other rights to payment from customers of the Seller with respect to the Business, and the full benefit of all security for such accounts or rights to payment, (b) all other accounts or notes receivable of Seller and the full benefit of all security for such accounts or notes, and (iii) any claim, remedy or other right related to any of the foregoing.

<u>Affiliate</u>:  as to any Person, means any other Person who or which, directly or indirectly, alone or together with others, controls, is controlled by, or is under common control with such Person, or any officer or director of such Person or any member of the immediate family of any such natural Person.

<u>Applicable Employee</u>:  as defined in Section 2.1.9.

<u>Applicable Law</u>:  means all applicable provisions of all (i) constitutions, treaties, statutes, laws, rules, regulations, ordinances, orders or directives of any Governmental Authority, (ii) Governmental Approvals and (iii) orders, decisions, judgments, awards and decrees of any Governmental Authority.

<u>Acquisition Proposal</u>:  means a proposal (other than from Purchaser) relating to (i) any merger, consolidating, restructuring, reorganization, plan of reorganization in the Bankruptcy Case, joint venture, refinancing, funding of a plan of reorganization in the Bankruptcy Case, business combination, sale or other disposition of all or any part of a Seller, the Business, the Assets or any other assets of a Seller pursuant to one or more transactions, (ii) the sale of any of the outstanding shares of capital stock or equity interests of a Seller (including by way of a debt for equity swap, tender offer, foreclosure or plan of reorganization or liquidation) or (iii) any similar transaction or business combination involving one or more Persons (other than Purchaser) and a Seller with respect to a Seller, the Business, the Assets, or any other assets of Seller.

<u>Assets</u>:  means the following assets used in the Business:

(i)      All intangible assets, goodwill, customer lists, manuals, sales and marketing materials, phone numbers, internet websites and domain names, including the right to use the name "Gemini Systems" and all derivations thereof;

(ii)      The Assigned Contracts, Client Contracts and IP Agreements other than the Excluded Contracts;

(iii)      All furniture, fixtures, equipment, inventory and other personalty;

(iv)      All books and records relating to the foregoing in both hard copy and electronic form;

(v)      All security deposits provided under real estate or equipment leases that are being assigned to and assumed by Purchaser;

(vi)      All Accounts Receivable;

(vii)      all claims, Causes of Action, Acquired Avoidance Actions, and refunds including with respect to taxes for all periods ended after the Closing Date; and

(viii)      whatever right, title and interest Gemini may have in connection with its certain agreements, among Gemini, Gemini Worldwide, ICE, ICAP, and other parties with services provided by DataBP.

Notwithstanding the above, the assets to be transferred to the Purchaser under this Agreement shall not include the following (the "Excluded Assets"):  cash, bank accounts, insurance policies or proceeds, credit card balances, the right to tax refunds, corporate records, any contracts or agreements other than the Client Contracts and IP Agreements, automobiles or the Owner's personal effects, and rights under the Transaction Agreements.

Assigned Contracts: means all of Seller's contracts that are (i) listed on Schedule 1.5 of Seller's Disclosure Schedules as the date hereof and (ii) listed on Schedule 1.5 of the Seller's Disclosure Schedules after the date hereof with Purchaser's prior written consent.

Assumed Liabilities:  as defined in Section 1.5.

Acquired Avoidance Action:  means any Avoidance Actions on account of or with respect to payments or transfers of property made by Seller to any former or current managers, employees and independent contractors of Seller and any subsidiaries prior to the filing of the Bankruptcy Case who are employed or engaged by Purchaser or any of its Affiliates or assignees.

Avoidance Actions:  means all causes of action of Gemini under Sections 544 through 553 of the Bankruptcy Code with respect to payments or transfers of property made prior to the filing of the Bankruptcy Case.

Bankruptcy Case:  as defined in the first "Whereas" clause.

Bankruptcy Code:  as defined in the first "Whereas" clause.

Bankruptcy Court:  as defined in the first "Whereas" clause.

Bankruptcy Rules:    means the Federal Rules of Bankruptcy Procedure, as amended, or any successor rules.

Bidding Procedures:  means the procedures for the submission of competing bids for the acquisition of the Assets as approved by the Bidding Procedures Order.

Bidding Procedures Order:  means the order to be entered by the Bankruptcy Court approving those portions of the Sale Motion that concern the notice of auction and sale hearing, Bidding Procedures, and bidding protections, including the Breakup Fee and Expense Reimbursement.

Breakup Fee:  as defined in Section 4.10.1.

Business:  as defined in the second "Whereas" clause.

Causes of Action:  means all claims, causes of action, choses in action, rights of recovery, repayment obligations, rights of setoff and rights of recoupment that Seller has or may have against any Person.

Client Contracts:  as defined in Section 1.6.

Closing:  as defined in Section 1.3.

Code:  the Internal Revenue Code of 1986, as amended.

Confidential Information:  confidential or proprietary information about the Purchaser, the Seller and/or its respective clients or customers, including but not limited to, trade secrets, methods, models, passwords, access to computer files, financial information and records, computer software programs, agreements and/or contracts between the Seller and its respective clients and customers, Client Contracts, creative policies and ideas, educational and strategic marketing support products, methods of operation, financial or business projections of the Seller or the Purchaser and information about or received from the Seller's or the Purchaser's clients or customers and other companies with which the Seller or the Purchaser do business.

DIP Financing Facility:  means any debtor-in-possession financing facility, if any, entered into after the date hereof by and between Gemini and Essextec.

Disclosure Schedule:  the disclosure schedule, dated the date hereof, which has been delivered to the Purchaser by the Seller and initialed by the Seller for identification.

ERISA:  the Employee Retirement Income Security Act of 1974, as amended.

Excluded Contracts: all contracts other than the Assigned Contracts.

Final Order:  means an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for re-argument has been taken or been made and is pending for argument.

Governmental Approval:  means an authorization, consent, approval, permit, license or exemption of, registration or filing with, or report or notice to, any Governmental Authority.

Governmental Authority:  means any nation or government, any regional, state, local or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including, without limitation, any government authority, agency, department, board, commission or instrumentality of the United States, any State of the United States or any political subdivision thereof, and any tribunal or arbitrator(s) of competent jurisdiction.

IP Agreements:  as defined in Section 1.7.

Intellectual Property:  as defined in Section 2.1.14.

Knowledge:  the actual or constructive knowledge of the Owner or any Key Employee, after diligent inquiry.

Key Employees:  those employees of the Seller set forth on Exhibit C hereto.

Lien:  any mortgage, pledge, adverse claim, security interest, encumbrance, title defect, title retention agreement, voting trust agreement, interest, equity, option, lien or charge of any kind.

Material Adverse Effect:  any material adverse change in the condition (financial or other) of the Seller's properties, assets, liabilities, business, operations or prospects, other than changes of a general economic or political nature, which do not affect the Seller or the Business uniquely.

Multiemployer Plan:  a "multiemployer plan" within the meaning of Section 3(37) of ERISA.

Ordinary Course of Business.  an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person.

Permitted Lien.  (a) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures; (b) mechanics', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business; (c) liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business; and (d) other immaterial imperfections of title or Liens, if any, that have not, and would not, interfere with Purchaser's continued use of the Assets and conduct of the Business as presently conducted.

Person:  any natural person, firm, partnership, association, corporation, limited liability company, trust or Governmental Authority.

Petition Date:  means March [11], 2015.

Purchaser:  as defined in the first paragraph of this Agreement.

Purchaser Plan:  any pension, retirement, profit sharing, stock bonus or other plan of deferred compensation, any medical, dental or other health benefit plan, any life insurance, disability insurance or accident insurance plan, any severance plan, policy or arrangement, or any other employee benefit plan within the meaning of Section 3(3) of ERISA an any bonus, incentive, stock option, restricted stock or other equity based compensation program to which the Essextec, Purchaser or any of their Affiliates are party, to which Essextec, Purchaser or any of their Affiliates contribute or in connection with which Essextec, Purchaser or any of their Affiliates are or could become liable for contributions, or under which employees of Essextec, Purchaser or any of their Affiliates participate or have a right to receive benefits.

Returns:  all reports, estimates, declarations, information statements and returns due under all foreign, federal, state or local laws or regulations, as appropriate, relating to Taxes.

Sale Motion:  means the motion filed in the Bankruptcy Court on behalf of Gemini, for among other things, approval of the notice of auction and sale hearing, Bidding Procedures and bidding protections, including the Breakup Fee and Expense Reimbursement, the sale of the Assets to Purchaser and the assignment by Gemini, and assumption by Purchaser, of the Assigned Contracts.

Sale Order:  means one or more orders of the Bankruptcy Court authorizing among other things, the sale of the Assets to Purchaser and the assignment by Seller and assumption by Purchaser of the Assigned Contract.

Seller Plan:  any pension, retirement, profit sharing, stock bonus or other plan of deferred compensation, any medical, dental or other health benefit plan, any life insurance, disability insurance or accident insurance plan, any severance plan, policy or arrangement, or any other employee benefit plan within the meaning of Section 3(3) of ERISA an any bonus, incentive, stock option, restricted stock or other equity based compensation program to which the Seller is party, to which the Seller contributes or in connection with which the Seller is or could become liable for contributions, or under which employees of the Seller participate or have a right to receive benefits.

Taxes:    means all federal, state, local and foreign taxes, assessments and governmental charges, of any nature, kind or description (including, without limitation, all income taxes, franchise taxes, withholding taxes, estimated taxes, unemployment insurance, social security taxes, payroll taxes, sales and use taxes, excise taxes, occupancy taxes, real and personal property taxes, stamp taxes, transfer taxes, workers' compensation and withholding taxes) and all interest, additions to tax and penalties with respect thereto, whether such interest, additions or penalties arise before or after the Closing Date.

Transaction Agreements:  as defined in Section 2.1.2.

8.2    Representation by Counsel.  Each party hereto has been represented by separate and independent counsel in connection with the negotiation, preparation and execution of this Agreement.

8.3    Expenses.  The Seller and the Owner, on the one hand, and the Purchaser, on the other hand, shall bear their respective expenses, costs and fees (including attorneys' and accountants' fees) in connection with the transactions contemplated hereby, including the preparation and execution of this Agreement and compliance herewith, whether or not the transactions contemplated hereby shall be consummated, provided that the Seller, on the one hand, and the Purchaser, on the other hand, shall pay to the other all such expenses, costs or fees incurred by the other if such party shall materially breach its obligations hereunder.

8.4    Payment of Taxes.  The Seller will be responsible for all income, sales or other taxes associated with the Business accrued or attributable to periods up to the Closing.  The Purchaser will be responsible for such taxes attributable to periods after the Closing.  The Purchaser shall not be responsible for Seller's taxes arising from the sale of the Assets.

8.5    Severability.  If any provision of this Agreement is inoperative or unenforceable for any reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatsoever.  The invalidity of any one or more phrases, sentences, clauses, sections or subsections of this Agreement shall not affect the remaining portions of this Agreement.

8.6    Notices.  All notices, requests, demands and other communications made in accordance with this Agreement shall be in writing and shall be (a) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, or (b) transmitted by hand delivery, or (c) nationally recognized overnight courier, addressed as follows:

To Seller:

Gemini Systems, LLC
61 Broadway, Suite 925
New York, NY 10006
Attention: Simon Leung, CEO

with copies to Gemini's counsel:

>Klestadt Winters Jureller Southard & Stevens
>570 Seventh Avenue, 17th Floor
>New York, NY 10018-6314
>Attention: Brendan M. Scott, Esq.

To Owner:

>Simon Leung
>1676 Bard Lane
>East Meadow, New York 11554

with copies to Owner's counsel:

>Gregg Shulklapper, Esq.
>Shulklapper Associates LLP
>545 Fifth Avenue, Ste. 640
>New York, NY 10017

To Purchaser:

>ETGI, Inc.
>c/o Essex Technology Group, Inc.
>201 West Passaic Street
>Rochelle Park, NJ 07662

with copies to Purchaser's counsel:

>Ira B Marcus, Esq.
>Saiber LLC
>18 Columbia Turnpike
>Florham Park, NJ 07932

By the methods set forth above, notices may be given on behalf of any party by its legal counsel directly to the legal counsel of the other party.

8.7    <u>Miscellaneous</u>.

8.7.1    <u>Headings</u>.  The headings contained in this Agreement are for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

8.7.2    <u>Entire Agreement</u>.  This Agreement, together with the Schedules and Exhibits hereto, constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

8.7.3   <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.  Electronic copies of the signature pages shall be enforceable as originals.

8.7.4   <u>Governing Law; Consent to Jurisdiction</u>.  Except to the extent governed by federal bankruptcy law, this Agreement shall be governed in all respects, including as to validity, interpretation and effect, by the laws of the State of New York, excluding only New York's conflicts of laws.  To the fullest extent permitted by applicable law, the parties hereby (a) agree that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with this Agreement or any Transaction Documents or the transactions contemplated hereby and thereby shall be brought only in (i) the Bankruptcy Court, if brought prior to the entry of a final decree closing the Bankruptcy Case, and (ii) in the federal courts in the Southern District of New York, and the state courts of the State of New York, New York County (the "New York Courts") if brought after entry of such final decree closing the Bankruptcy Case, and shall not be brought, in each case, in any other State or Federal court in the United States of America or any court in any other country, (b) agree to submit to the exclusive jurisdiction of the Bankruptcy Court or the New York Courts, as applicable, pursuant to the preceding clauses for purposes of all claims, actions or proceedings arising out of, or in connection with this Agreement or any Transaction Documents or the transactions contemplated by this Agreement, (c) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (d) agrees that the mailing of process or other papers in connection with any such claim, action or proceeding in the manner described in Section 8.6 hereto shall be valid and sufficient service thereof, and € agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

8.7.5   <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN.  EACH OF THE PARTIES HERETO CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER OF THE PARITES HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (ii) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (iii) IT MAKES SUCH WAIVER VOLUNTARILY, AND (iv) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATION IN THIS SECTION.

8.7.6    Binding Effect.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.

8.7.7    Assignment.   This Agreement shall not be assignable by any party hereto without the prior written consent of the Purchaser and the Seller; provided that Purchaser may assign this Agreement to a wholly owned subsidiary or commonly owned Affiliate.

8.7.8    No Third Party Beneficiaries.   Nothing in this Agreement shall confer any rights upon any person or entity other than the parties hereto and their respective heirs, successors and permitted assigns.

8.7.9    Amendment; Waivers.   No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification, discharge or waiver is sought.  Neither the waiver by any of the parties hereto of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.

8.7.10    Use of Name.   The Seller and the Owner agree not to use the name "Gemini Systems" or any derivation thereof after the Closing Date in the connection with any business related to, competitive with, or an outgrowth of, the business conducted by the Seller on the Effective Date.   Notwithstanding the foregoing, (i) Seller may use the name solely in connection with collecting on any Accounts Receivable and to pay and satisfy any liabilities not assumed by Purchaser hereunder, and (ii) the foregoing shall not prevent Gemini Worldwide from continuing to conduct its business subject to the terms of the Services Agreement.  Within ten (10) days after the Closing, (a) Gemini Systems shall amend its certificate of incorporation to change its name to a name which is not similar to "Gemini Systems", and (b) Gemini shall amend its certificate of formation to change its name to a name which is not similar to "Gemini Systems".

8.7.11    Non-Recourse.   No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other representative of any party hereto or of any Affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any party hereto under this Agreement solely by reason of he or she serving or having served and a director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other representative of such party.

[signatures on following page]

IN WITNESS WHEREOF the parties have executed this Agreement as of the Effective Date.

**SELLER:**
GEMINI SYSTEMS LLC,

By:_____
    Name: Simon Leung
    Title:

**OWNER:**


_____
SIMON LEUNG

**ESSEXTEC:**
ESSEX TECHNOLOGY GROUP, INC.


By:_____
    Name:
    Title:


**PURCHASER:**
**ETGI, INC.**

By: _____
    Name:
    Title:

**EXECUTION VERSION**

# EXHIBIT A

BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

[attached hereto]

**EXECUTION VERSION**

**EXHIBIT B**

EMPLOYMENT AGREEMENT

[attached hereto]

**EXHIBIT C**

KEY EMPLOYEES

[to be provided]

**DISCLOSURE SCHEDULES**

**TO**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF MARCH 11, 2015**

Introductory Note:  Any information included in these Disclosure Schedules under any section or subsection thereof shall be deemed to be disclosed and incorporated by reference into any other section or subsection of the Disclosure Schedules to the extent that such disclosure would be responsive, whether or not a specific cross-reference to any other section or subsection is included.

**Disclosure Schedule**

**Section 1.3.3 – Federal Tax Lien**

The Internal Revenue Service holds an outstanding Federal tax lien for unpaid
employment taxes in the aggregate amount of $1,085,876.34.

**Disclosure Schedule**

**Section 1.3.3 – State Tax Lien**

The New York State Department of Taxation and Finance holds an outstanding tax lien
for unpaid employment taxes in the aggregate amount of at least $57,908.33.
In addition, the City of New York Department of Finance has filed a tax warrant in the
amount of $868.21

**Disclosure Schedule**

## Schedule 1.5 – Accounts Payable

TO BE UPDATED PRIOR TO CLOSING

**Disclosure Schedule**

**Section 1.6 – Client Contracts**

List all client contracts other than the "Excluded Contracts" relating to the Business
entered into by the Sellers prior to the Closing in the Ordinary Course of Business and
consistent with the representations and warranties contained in this Agreement and past
practice:

- *Master Services Agreement*, by and between Actavis, LLC and Gemini Systems,
  LLC, dated January 27, 2014

- *Supplier Master Services Agreement*, by and between AllsourcePPS, Inc., and
  Gemini Systems, dated September 17, 2014

- *Subcontractor Standard Business Terms,* by and between Gemini Systems, LLC
  and  Alvarez & Marsal Holdings, LLC, dated October 16, 2014

- Consulting Agreement, by and between Arrow Enterprise Computing Solutions,
  Inc., and Gemini Systems, LLC, dated March 28, 2013

- *Consulting Services Agreement,* by and between Gemini Systems, LLC and
  BASF Corporation, dated March 5, 2007

- Third Party Agreement, by and between Gemini Systems, LLC and Lynx
  Technology Partners, Inc., dated August 5, 2013

- *Services Agreement between ICE Benchmark Administration Limited and Gemini
  Systems Worldwide, Inc.*, dated November 22, 2013, including Statement of Work

- *Services Agreement between ICAP Information Services, Inc. and Gemini
  Systems Worldwide, Inc.*, dated April 25, 2014, including Statement of Work

- Agreement for Professional Services, by and between National Association of
  Securities Dealers, Inc. and Gemini Systems, dated April 24, 2006

- Technical Services Agreement, by and between IBM – International Business
  Machines Corporation and Gemini Systems, LLC, dated December 11, 2006
  (Agreement #: 4906B10630)

- Technical Services Agreement, by and between IBM – International Business
  Machines Corporation and Gemini Systems, LLC, dated October 17, 2007
  (Agreement #: 4907016195)

- Consulting Agreement, by and between Jefferies & Company, Inc. and Gemini
  Systems, LLC, dated September 29, 2006

- *Services Agreement*, by and between Gemini Systems, LLC and NBA Properties,
  Inc., dated June 28, 2011

45

- *Consulting Services Agreement*, by and between New York Stock Exchange, Inc., and Gemini Systems, LLC, dated November 7, 2002

- *Consulting Services Agreement,* by and between The Prudential Insurance Company of America and Gemini Systems, LLC, dated November 21, 2013

- Consulting Agreement, by and between Gemini Systems, LLC and  Teach For America, Inc., dated May 1, 2007

- Master Professional Services Agreement, by and between Titlevest Technology Holdings, LLC, and Gemini Systems, LLC, dated October 14, 2013

- Consulting Agreement, by and between Gemini Systems, LLC, and Wakefern Food Corp, dated May 20, 2011

- Vendor Direct Access Agreement dated November 15, 2011 between Gemini Systems, LLC, and Wakefern Food Corp

- Professional Services Agreement, by and between Seller and Financial Industry Regulatory Authority, dated as of February 20, 2015 (Countersigned Version not yet received by Seller, but FINRA has acknowledged existence of contractual relationship)


Open Statements of Work without master agreements:
- Essex Technology Group, Inc,  Statement of Work dated February 6, 2015 for Teknor Apex, Cognos Environmental Review and Assessment

- Glyphic Technologies, Inc., Statement of Work, dated February 27, 2015

- Cravath, Swaine, & Moire LLP, Statement of Work dated March 2, 2015

- Intermarket Surveillance Group, ISG Portal and UAF Application, Hosting & Support Proposal Statement of Work, dated July 25, 2013

- Media Development Loan Fund, System Administration Retainer Statement of Work, dated February 2, 2010

- Cravath, Swaine, & Moire LLP, Statement of Work dated March 10, 2015 – Lotus Notes/Domino Application Development Support

**Disclosure Schedule**

**Section 1.7 – IP Agreements**

List all agreements and contracts relating to any intellectual property of the Sellers:
- See Section 2.1.16 of the Disclosure Schedules.

**Disclosure Schedule**

**Section 2.1.2 – Required Consents**

List all consents, licenses, approvals, orders or authorizations of, or registrations, declarations or filings with, any Governmental Authority that is required on the part of the Sellers or the Owner in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby:

- None

List all consents of any third party required to be obtained by the Sellers in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby (including, without limitation, in connection with the assignment to Purchaser of the Client Contracts):

- See Disclosure Schedule Section 1.6.

- See Disclosure Schedule Section 2.1.10 (consent of landlord to assignment required)

**Disclosure Schedule**

**Section 2.1.3 – Jurisdictions where Sellers are Qualified to do Business**

- New York

**Disclosure Schedule**

**Section 2.1.4 – Capitalization**

The Debtor is owned 100% by Simon Leung.

**Disclosure Schedule**

**Section 2.1.6 – Taxes**

**Section 2.1.8 – Tax Returns subject to Audit**

List all tax returns that have not been filed:
- Sellers have not filed corporate tax returns for the tax years 2012 or 2013.  Drafts of said returns have been provided to Purchaser.

List all taxes due on such returns:
- Substantial taxes, interest and penalties are due the IRS and New York State as disclosed elsewhere in these Disclosure Schedules in respect of withholding taxes that Sellers failed to remit to the tax authorities.

List all transfer, property or other taxes that are payable by the Purchaser in respect of the sale by Sellers:
- Unless waived by order of the Bankruptcy Court, all sales or use taxes payable with respect to and/or on account of the transfer of the Seller's furniture and fixtures to Purchaser shall be paid by Purchaser to Seller at the Closing in the form of a certified check in the amount of the sales tax indicated on the notice provided by the Tax Department (or, if no such notice is received as of the Closing, the amount agreed upon by Seller and Purchaser based on the allocation of the Purchase Price and the applicable sales tax rate) made payable to the Tax Department.

List all tax liens:
- See Disclosure Schedule 1.3.3 and 1.3.3

- As previously disclosed to Purchaser, Sellers owe substantial sums to the IRS and New York State tax authorities in respect of unremitted withholding taxes.

List all tax returns of Sellers that are under Audit:
- NYS is conducting a sales and use tax audit covering 12/1/2011 through 2/28/2015.  .

**Disclosure Schedule**

**Section 2.1.7 – Material Contracts**

List all of the following Contracts:
- mortgages, indentures, security agreements, letters of credit, loan agreements and other agreements, guarantees and instruments relating to the borrowing of money or extension of credit;

  - Relationship Ready Line of Credit with Citibank, N.A.

  - Transition Agreement dated as of April 15, 2014, between Seller, Owner and Essextec

  - Security Agreement dated as of August 20, 2014 between Seller and Essextec

  - Seller has revolving credit card lines with Amex and [Visa/MasterCard]

- employment, consulting, sales representative, severance and agency agreements;

  - See consulting agreements on Disclosure Schedule Section 1.6 and Disclosure Schedule Section 2.1.11

- collective bargaining agreements;

  - none

- bonus, profit-sharing, compensation, stock option, pension, retirement, deferred compensation or other plans, trusts or funds for the benefit of employees, officers, agents and directors (whether or not legally binding);

  - See Disclosure Schedule Section 2.1.18

- licenses of patent, copyright, trade names, trademark, transfer of technology or know how and other intellectual property rights:

  - Many of the Client Contracts listed on Disclosure Schedule Section 1.6 contain work for hire or similar provisions regarding the assignment of intellectual property rights to the client/customer.

- agreements or commitments for capital expenditures in excess of $20,000 for any single project (it being warranted that all undisclosed agreements or commitments for capital projects do not exceed $50,000 in the aggregate for all projects)

  - none;

- brokerage or finder's agreements

    o none;

- joint venture and partnership agreements

    o none

- other agreements, contracts and commitments which in any case involve payments or receipts of more than $20,000

    o Mutual Non-Disclosure Agreement, by and between Amazon.com, Inc. and Gemini Systems, LLC, dated May 14, 2013

    o AWS Partner Network Terms & Conditions Last Updated: June 5, 2014

    o Confidentiality Agreement, by and between Gemini Systems, LLC and Glyphic Technologies, Inc., dated December 13, 2011

    o Memorandum of Understanding, by and between Gemini Systems LLC and Glyphic Technologies, Inc, dated December 8, 2009 AND Amended Memorandum of Understanding, by and between Gemini Systems LLC and Glyphic Technologies, Inc, dated August 27, 2014

    o IBM Partnerworld Agreement, International, by and between IBM and Gemini Systems, LLC,  including attachments.

    o Confidentiality Agreement, by and between Maxell Corporation of America and Gemini Systems, LLC, dated June 22, 2006

    o Mutual Non-Disclosure Agreement, by and between Qumu, Inc., and Gemini Systems, LLC dated August 7, 2012

    o Mutual Subcontractor Agreement, by and between Revelwood Incorporated and Gemini Systems, LLC, dated February 19, 2014

    o Consulting Confidentiality, Non-Solicitation, And Business Protection Agreement, by and between Gemini Systems, LLC and Softential, Inc., dated June 9, 2011

    o Mutual Non-Disclosure Agreement, by and between Gemini Systems and SureStep IT, Inc., dated April 8, 2014

    o *Teaming Letter*, by and between Tangible Security, Inc. and Gemini Systems, LLC, dated December 8, 2014

    o Sales & Agency Program Agreement, dated September 30, 2014, between Arrow Enterprise Computing Solutions, Inc. and Gemini Systems, LLC

- o   Installment Agreement with IRS with respect to 2007 and 2010 tax deficiencies, which call for monthly installments of $25,000.  Due to financial constraints Seller suspended payments in 2014.

- o   Consulting Confidentiality, Non-Solicitation and Business Protection Agreement, y and between Seller and Satish Anthony/Inov Soft Inc., dated as of September 27, 2011

List any defaults under these Contracts:
- Amex default

- Seller is delinquent with many of its vendors, including its landlord, Amex and Arrow.

**Disclosure Schedule**

**Section 2.1.8 – Leases**

Agreement of Lease, between Metropolitan Life Insurance Company, Landlord, And
Gemini Systems, Inc., Tenant, dated November 30, 1995, as amended.  Seller is in
default with respect to payment of rent.

**Disclosure Schedule**

**Section 2.1.9 – List of Directors, Officers and Employees**

| Last Name | First Name | Annual | Q1 2014 Bonus | Apprx 2014 Sales Commission | Monthly Car | Tuition Reimbursement |
|---|---|---|---|---|---|---|
| Afandi | Shoaib | 137,000.00 | 1,008.32 | | | |
| Ali | Muhammed | 60,000.00 | | | | |
| Balasubramanian | Ramkumar | 95,000.00 | 676.4 | | | |
| Bisignani | Michael | 202,500.00 | 388.8 | | 491.33 | 20k annual |
| Chan | Yat | 40,000.08 | | | | |
| Chou | Clifford | 55,000.08 | | | | |
| Destefano | Jonathan | 75,000.00 | 702 | | | |
| Esposito | William | 146,520.00 | 1,193.92 | | | |
| Everett | Michael | 55,000.08 | | | | |
| Frid | Slava | 201,500.00 | 2,240.68 | | | |
| Frolov | Paul | 187,000.00 | 1,146.60 | | 569 | |
| Herbst | Evan | 225,000.00 | | 186228 | | |
| Hester | Quincy | 138,499.92 | | | | |
| Homewood | Arthur | 130,000.08 | | | | |
| Hoppas | Constantinos | 150,000.00 | 528 | | | |
| Kapoor | Maneesh | 105,000.00 | 1,537.20 | | | |
| Kaul | Parul | 75,000.00 | 684 | | | |
| Lam | Yat-Sum | 120,000.00 | 1,785.60 | | | |
| Leny | Ginzel | 72,000.00 | | | | |
| Leung | Nicholas | 75,000.00 | 822 | | | |
| Leung | Simon | 150,000.00 | | | | |
| Li | Xiao | 125,000.00 | 1,650.00 | | | |
| Lucas | Charles | 100,000.00 | | 182958 | | |
| Luftig | David | 200,000.00 | | 122724 | | |
| Marcellus | Marc | 100,000.00 | 20.4 | | | |
| Merone | Tanya | 105,000.00 | | | | |
| Mousmoules | Harry | 147,000.00 | 470.4 | | | 10k annual |
| Nakhwa | Abhijeet | 155,000.00 | 5,505.60 | | | |
| Nemerovsky | Arkady | 118,900.00 | 1,797.39 | | | |
| Noble | Maureen | 82,800.00 | | 25337 | | |
| Nunziante | Richard | 145,000.00 | 310.8 | 260 | | |
| Occhipinti | Michael | 165,000.00 | | | | |
| Osorio | Manuel | 118,800.00 | 313.5 | | | |
| Rajasekaran | Viswasarathy | 110,000.00 | 1,452.00 | | | |
| Ramos | Jasmin | 87,000.00 | | | | |
| Rathinam | Victor | 90,000.00 | 1,094.40 | | | |
| Reese | Kaitlyn | 90,562.00 | 912 | | | |
| Reisert | Gregory | 120,000.00 | | 192680 | | |

| Rolnik | Jamie | 65,000.00 | | | | |
| Sadakov | Dmitry | 90,000.00 | 1,339.20 | | | |
| Sakthivel | Murali | 90,000.00 | 957.6 | | | |
| Sam | Chon | 55,000.08 | | | | |
| Shmulenson | Michael | 172,960.00 | 2,532.72 | 4270 | | |
| Sirabella | Patricia | 169,999.92 | | | 600 | |
| Sorensen | Erik | 155,000.00 | 2,331.20 | | | |
| Thiyadath | Krishnanand | 100,000.00 | 1,664.00 | | | |
| Troitskiy | Sergey | 90,000.00 | 1,130.40 | | | |
| Vimont | William | 125,000.00 | 1,760.00 | | | |
| Wang | Pei | 150,000.00 | 1,560.00 | | | |
| Widrick | Alex | 90,000.00 | | 59683 | | |
| Yacubovich | Claire | 202,500.00 | 1,944.00 | | 650 | |

Contractors:

| Contractor | Company | Contractor Hrly Cost to GS | Daily Rate |
|---|---|---|---|
| Dhananjay Sawant | Astro Technology | 75 | |
| Jolly Patel | Jolly Patel | 75 | |
| Juan Adames | Xennetta Systems | | 735 |
| Mohit Garg | Elephant Bytes | 75 | |
| Satish Anthony | Inov-Soft | 100 | |
| Varies | Essex Technology Group, Inc. | Varies | |
| Varies | Gemini Systems (India) Limited | Varies | |
| Varies | Gemini Systems SPB | Varies | |

List of any employees currently not actively at work:
- None.

**Disclosure Schedule**

**Section 2.1.10 – Litigation**

List all judicial or administrative actions, suits, proceedings or investigations pending or, to the Knowledge of the Sellers or the Owner, threatened which has or could have a Material Adverse Effect or result in any liability on the part of the Sellers, or which involves or could involve the validity of this Agreement or of any action taken or to be taken in connection herewith:

- American Express Travel Related Services Company, Inc., Plaintiff, v. Gemini Systems LLC D/B/A Gemini Systems, Defendant

- Sellers, generally, are delinquent in payment of many vendors, including its landlord.

**Disclosure Schedule**

**Section 2.1.13 – Transactions with Affiliates**

List, for the past 3 years, whether Sellers have directly or indirectly, purchased, leased from others or otherwise acquired any property relating to the Business or obtained any services from, or sold, leased to others or otherwise disposed of any property relating to the Business or furnished any services relating to the Business to, or otherwise dealt with respect to the Business with any Affiliate:

- Over the past 3 years Sellers obtained services from their operating affiliates in Russia, India and China in the ordinary course of business.

**Disclosure Schedule**

**Section 2.1.14 – Intellectual Property**

List all "intellectual property" relating to the business now held by or owned by Sellers:

| Domain Name | Registrar | Expiration Date |
|---|---|---|
| GEMINI-SYSTEMS.COM | NETWORK SOLUTIONS, LLC. | 2016-11-10 |
| EXCEPTIONALANALYTICS.COM | GoDaddy.com, LLC | 2016-01-01 |
| EXCEPTIONALUX.COM | GoDaddy.com, LLC | 2015-04-26 |
| EXCEPTIONALITOPS.COM | GoDaddy.com, LLC | 2015-07-15 |
| EXCEPTIONALBPM.COM | GoDaddy.com, LLC | 2015-10-08 |
| CHAMPIONSHIPWORLD.COM | NETWORK SOLUTIONS, LLC. | 2015-03-13 |
| CHAMPIONSHIPWORLD.NET | NETWORK SOLUTIONS, LLC. | 2015-03-13 |
| CHAMPIONSHIPWORLD.ORG | NETWORK SOLUTIONS, LLC. | 2015-03-13 |
| RESILIENCEWORKPLACE.COM | NETWORK SOLUTIONS, LLC. | 2015-03-17 |
| GEMINITES.COM | NETWORK SOLUTIONS, LLC. | 2015-04-15 |
| SEEKINGSERENITY.COM | GoDaddy.com, LLC | 2015-06-16 |

List all contracts and agreements (whether oral or written) between the Sellers and a third party which imparts or which imparted an obligation of noncompetition, secrecy, confidentiality or non-disclosure upon the Sellers or any employee, which obligation is currently in effect:

- Most agreements to which Sellers are a party with its customers and vendors and which are disclosed in Schedule 1.6 and 2.1.7 and impart or imparted an obligation of noncompetition, secrecy, confidentiality or non-disclosure upon the Sellers and their employees.

In addition:

- Confidentiality Agreement, by and between Seller and Moody's, dated as of March 4, 2015

- Mutual Non-Disclosure Agreement, by and between Seller and Thrivent Financial for Lutherans, dated as of February 23, 2015

- Non-Disclosure Agreement, by and between Seller and Modern Language Association (MLA), dated as of March 9, 2015

- Non-Disclosure Agreement, by and between Seller and Financial Industry Regulatory Authority, Inc., dated as of February 20, 2015 (Countersigned Version not yet received by Seller)

**Disclosure Schedule**

**Section 2.1.15 — Insurance**

**Disclosure Schedule**
**Section 2.16 - BENEFIT PLANS**